UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARTER TOWNSHIP OF SHELBY POLICE & FIRE PENSION & RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | Case No.: |
| Plaintiff, | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| ARCONIC CORPORATION, TIMOTHY MYERS, ERICK ASMUSSEN, and FREDERICK HENDERSON, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## TABLE OF CONTENTS

NATURE AND BACKGROUND OF THE ACTION ................................................................ 1

JURISDICTION AND VENUE .............................................................................................. 5

PARTIES ................................................................................................................................. 6

RELEVANT NON-PARTIES ................................................................................................. 7

SUBSTANTIVE ALLEGATIONS ......................................................................................... 7

    A.    Arconic's 2021 Share Repurchase Program ........................................................ 7

    B.    Defendants Conceal and Impede Apollo's High-Premium Offer While Repurchasing Millions of Shares, Which Constituted a Device, Scheme, or Artifice to Defraud, or Operated as a Deceit Upon Plaintiff and the Class, in Violation of Rule 10b-5(a) and (c) ........................................................................ 9

        1.    Arconic Conceals and Rebuffs Apollo's April 2022 Offer While Repurchasing Shares ................................................................ 9

        2.    Arconic Conceals Apollo's Continued Interest in Acquiring the Company and its December 2022 Offer While Repurchasing Shares ...................... 14

        3.    Arconic's Stock Soars When Apollo's Offer is Finally Revealed ............ 19

    C.    Defendants' Material Omissions and False and Misleading Statements ............. 22

        1.    Defendants Had an Obligation to Abstain From Trading in Arconic Securities or to Disclose Apollo's Offers ................................................ 22

        2.    Defendants' Statements Concerning the 2021 and 2022 Programs' Compliance with Rules 10b5-1 and 10b-18 Were Materially False and Misleading .................................................................................................. 23

        3.    Defendants' Statements Concerning Stock Repurchases Under the 2021 and 2022 Program Were Materially False and Misleading ...................... 28

        4.    Defendants' Certifications Were Materially False and Misleading .......... 34

    D.    Defendants Acted With Scienter .......................................................................... 35

    E.    Loss Causation and Economic Loss ................................................................... 36

    F.    Presumption of Reliance ..................................................................................... 37

    G.    No Safe Harbor ................................................................................................... 39

CLASS ACTION ALLEGATIONS ........................................................................... 39

CAUSES OF ACTION ......................................................................................... 42

PRAYER FOR RELIEF ....................................................................................... 44

JURY DEMAND ................................................................................................ 45

Plaintiff Charter Township of Shelby Police & Fire Pension & Retirement System ("Plaintiff") by and through the undersigned counsel, alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters, based on the investigation conducted by and under the supervision of Plaintiff's counsel, which included, among other things, a review of public documents, conference call transcripts, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases of Arconic Corporation ("Arconic" or the "Company"), and industry and analysts' reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND BACKGROUND OF THE ACTION

1.      This is a securities class action on behalf of a Class of all persons who sold publicly traded shares of Arconic common stock between April 19, 2022 and May 3, 2023, both dates inclusive (the "Class Period"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§ 78j(b), 78t(a) and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

2.      This action arises from Arconic's and certain of its senior officers' and directors' ("Defendants," defined fully below) failure to disclose offers to purchase all of the outstanding shares of Arconic common stock at a material premium far above the Company's then-current stock price, while at the same time repurchasing millions of shares of Arconic common stock through stock buyback programs at prices below the offer price.

3.      On April 19, 2022, Apollo Global Management, Inc. (together with its subsidiaries, "Apollo") approached Arconic with an offer to acquire all the Company's outstanding stock at a price between $34 and $36 per share. Apollo offered a significant cash premium to the then-current market price for Arconic common stock of $27.23 per share, and the proposal included "highly

confident" letters from potential financing sources. Arconic rebuffed Apollo's offer because the Board concluded it undervalued Arconic, i.e. the Board wanted a higher offer. Arconic Corporation Definitive Proxy Statement on Form Schedule 14A, filed with the SEC during pre-market hours on June 16, 2023 ("Proxy Statement"), p. 30.

4.     Apollo continued to demonstrate interest in an acquisition of Arconic. Apollo partnered with Irenic Capital Management LP ("Irenic") concerning the potential acquisition of Arconic starting in May 2022. From May 5, 2022 through June 23, 2022, Apollo, Irenic, and Arconic had discussions concerning a potential acquisition of Arconic. Apollo and Irenic informed Arconic of their interest in exploring a negotiated transaction for Arconic and intent to submit a revised offer to acquire Arconic. Between June 23, 2022 and November 28, 2022, Arconic, Apollo and Irenic kept in contact, but these contacts did not result in the submission of any new proposals for an acquisition of Arconic. *Id.*, pp. 30-31.

5.     Even through the Defendants were in possession of this material nonpublic information concerning Apollo's and Irenic's interest in acquiring Arconic at a price materially above the then-current prices of Arconic common stock, during the period June 1, 2022 through August 31, 2022, Arconic repurchased 4,357,690 shares of its common stock on public markets for a total cost of $122,943,904 and at an average price of $28.21 per share, significantly below Apollo's offer of $34 to $36 per share. *See* ¶¶ 52-61, 64, below; 2022 2Q 10-Q (as defined herein), pp. 43, 48; 2022 3Q 10-Q (as defined herein), pp. 19, 52.

6.     By August 31, 2022, these purchases exhausted the maximum dollar amount that Arconic could repurchase under its then-existing share repurchase program. On November 16, 2022, Arconic announced that its Board of Directors had approved a new two-year share

repurchase program authorizing the repurchase of up to $200 million worth of additional shares of Arconic common stock on the public markets.

7.    On November 28, 2022, Apollo informed Arconic that it was considering submitting a new proposal for an acquisition of Arconic at a meaningful premium to Arconic's stock price, which closed at $21.65 per share on November 28, 2022. Proxy Statement, pp. 31-32.

8.    On December 12, 2022, Apollo submitted a revised proposal to acquire Arconic in an all-cash transaction at a price of $30.00 per share, a meaningful premium to the price of Arconic's common stock, which closed on December 12, 2022 at $22.57 per share. Arconic thereafter negotiated and engaged with Apollo. *Id.*, p. 32.

9.    However, Arconic continued to engage in share repurchases at prices materially below Apollo's $30 per share offer. From November 2022 to January 2023, Arconic repurchased an additional 2,107,450 shares of Arconic common stock on the public markets for a total cost of $47,032,891, and at an average price of $22.32 per share. *See* ¶¶ 84-88, 97-100, below; 2022 10-K (as defined herein), pp. 35, 42; 2023 1Q 10-Q (as defined herein), pp. 37, 43.

10.    On February 28, 2023, at approximately 2:00 p.m. Eastern Time, while the securities markets were open, *The Wall Street Journal* ("*WSJ*") reported that Apollo had submitted a bid at an unspecific price to acquire Arconic and that Arconic's advisors had reached out to other potential acquirors. In response, the price of Arconic common stock increased $4.68 per share, or 21.5%, from its price immediately before the *WSJ* report of $21.76 per share to a closing price on February 28, 2023 of $26.44 per share.

11.    On May 4, 2023, during pre-market hours, Arconic announced that it had entered into an agreement to be acquired by Apollo in an all-cash transaction at $30.00 per share. In

response, the price of Arconic common stock increased $6.38 per share, or 28.3%, from a closing price on May 3, 2023 of $22.55 per share to a closing price on May 4, 2023 of $28.93 per share.

12.    Arconic made no disclosure concerning Apollo's offers to purchase Arconic at a material premium to then-current Arconic common stock prices for approximately ten months, during which time Arconic negotiated and communicated with Apollo and Irenic and also repurchased 6,465,140 shares of its common stock on the open market for a total cost of $169,976,795, and at an average price of $26.29 per share, far below Apollo's offers.

13.    Arconic, as a person in possession of material nonpublic information concerning Arconic, had a duty to abstain from trading in Arconic common stock or to disclose the material nonpublic information. Arconic did neither, and therefore violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

14.    Arconic's failure to disclose that a takeover offer at a substantial premium had been proposed by a serious bidder, artificially deflated the price of Arconic common stock, all the while Arconic was able to take advantage of those artificially lower prices by repurchasing shares.

15.    Arconic actions constituted a device, scheme, or artifice to defraud, or operated as a deceit upon Plaintiff and the Class, in violation of Rule 10b-5(a) and 10b-5(c), which prohibit such actions. Further, the Defendants' failure to disclose the information about Apollo's offers while engaging in share repurchases was an omission of material fact that rendered other statements made materially misleading, in violation of Rule 10b-5(b). For example, the Defendants stated in Arconic's quarterly and annual reports issued during the Class Period that Arconic's share repurchase programs were "intended to comply with Rule 10b5-1," which prohibits securities trading on the basis of material nonpublic information, and that all of Arconic's share purchases "were made in compliance with Rule 10b-18," which provides a safe harbor for share repurchases

that meet certain criteria, but does not provide a safe harbor for insider trading or other violations of the federal securities laws. However, at the time those statements were made, Arconic had made share repurchases while in possession of material nonpublic information, and therefore Arconic's share repurchase programs were not in compliance with Rule 10b5-1, and the share repurchases were not made in compliance with Rule 10b-18. Further, Defendants stated that they were continuing with share repurchases. Inasmuch as the Company was restrained by law from buying back stock during active negotiations with Apollo, the Defendants' statements with respect to ongoing stock repurchases signaled to the market that there were no, and had been no, ongoing negotiations. Accordingly, when speaking about the stock repurchases, the Defendants were obligated to disclose the whole truth – that they were in, or had been in, negotiations with Apollo.

16.    Plaintiff and the Class, investors who sold their Arconic common stock at materially deflated prices, were damaged by Defendants' violations of the federal securities laws.

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under Sections 10(b) and 20(a) of the 1934 Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, and pursuant to Section 27 of the 1934 Act, 15 U.S.C. § 78aa, which vests District Courts with exclusive jurisdiction over cases alleging violations of the 1934 Act.

18.    Venue is proper in this District pursuant to Section 27 of the 1934 Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Certain of the acts, practices, transactions, and courses of business constituting the violations alleged herein occurred within this District, including trades based on material, nonpublic information. Those trades were made either by traders working in this District or through broker-dealers and/or securities exchanges based in this District including

the New York Stock Exchange ("NYSE"). Arconic common stock was also listed and traded on the NYSE, which is located in this District.

## PARTIES

19.     Plaintiff, as set forth in the accompanying certification, which is incorporated herein by reference, sold Arconic common stock during the Class Period and was damaged thereby.

20.     Defendant Arconic was a publicly-traded provider of aluminum sheets, plates, and extrusions, as well as innovative architectural products, that advance the ground transportation, aerospace, building and construction, industrial, and packaging end markets. On August 18, 2023, Apollo acquired Arconic and assumed Arconic's obligations. Prior to that acquisition, Arconic common stock was listed and traded on the NYSE under the symbol "ARNC," and Arconic was headquartered in Pittsburgh, PA and incorporated under the laws of the State of Delaware.

21.     Defendant Timothy Myers ("Myers") was, at all relevant times, the Chief Executive Officer ("CEO") and President of Arconic, and a member of the Arconic Board of Directors (the "Board").

22.     Defendant Erick Asmussen ("Asmussen") was, at all relevant times, the Executive Vice President and Chief Financial Offer ("CFO") of Arconic.

23.     Defendant Frederick Henderson ("Henderson") was, at all relevant times, Chairman of the Board of Arconic.

24.     The defendants referenced above in paragraphs 21-23 are referred to collectively herein as the "Individual Defendants."

25.     Defendant Arconic Corporation and the Individual Defendants are referred to collectively herein as "Defendants."

## RELEVANT NON-PARTIES

26.     Apollo is an asset management firm that provides asset management and retirement services. On August 18, 2023, Apollo acquired all of the common stock of Arconic and as a matter of law assumed the Company's legal obligations. Apollo's common stock is listed and trades on the NYSE under the symbol "APO." Apollo is headquartered in New York, NY.

27.     Irenic Capital Management is an investment management firm that is based in New York, NY. The firm invests across the capital structure in unique special situation opportunities. Apollo's acquisition of Arconic included a minority investment from funds managed by affiliates of Irenic.

## SUBSTANTIVE ALLEGATIONS

### A.    Arconic's 2021 Share Repurchase Program

28.     On May 4, 2021, Arconic announced that its Board approved a stock repurchase program authorizing Arconic to repurchase up to $300 million worth of common stock, effective immediately, over a two-year period expiring April 28, 2023 (the "2021 Program"). *See* Arconic Form 10-K for the fiscal year ended December 31, 2021, filed with the SEC during post-market hours on February 22, 2022 ("2021 10-K"), pp. 41, 98.

29.     According to Arconic's 2021 10-K, the 2021 Program provided that "repurchases under the program [could] be made from time to time, as the Company deem[ed] appropriate, solely through open market repurchases effected through a broker dealer, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions" and that the 2021 Program "[was] intended to comply with Rule 10b5-1 and all purchases shall be made in compliance with Rule 10b-18, including without limitation the timing, price, and volume restrictions thereof." *Id.*

30.    According to Arconic's 2021 10-K, from May 2021 to December 2021, Arconic repurchased 4,912,505 shares of its common stock under the 2021 Program for approximately $161 million. *Id.*, p. 53.

31.    Arconic disclosed the number of shares repurchased each month, and the average price paid per share (*id.*, p. 41), but did not disclose the total amount of money spent on repurchases in each month. That information is calculated in the below chart:

| Month | Total number of shares purchased | Average price paid per share | Total |
|---|---|---|---|
| May-21 | 121,541 | $34.77 | $4,225,981 |
| Jun-21 | 124,470 | $34.59 | $4,305,417 |
| Jul-21 | 563,603 | $33.41 | $18,829,976 |
| Aug-21 | 1,293,844 | $34.34 | $44,430,603 |
| Sep-21 | 1,005,247 | $34.27 | $34,449,815 |
| Oct-21 | 595,550 | $30.51 | $18,170,231 |
| Nov-21 | 426,727 | $30.83 | $13,155,993 |
| Dec-21 | 781,523 | $30.46 | $23,805,191 |
| **Total** | **4,912,505** | **$32.85** | **$161,373,206** |

32.    Accordingly, as of December 31, 2021, there was approximately $138 million worth of Arconic shares that could still be purchased under the $300 million 2021 Program. *Id.*

33.    According to Arconic's Form 10-Q for the quarterly period ending March 31, 2022, which was filed with the SEC during post-market hours on May 4, 2022 ("2022 1Q 10-Q"), from January 2022 through March 2022, Arconic repurchased 505,982 shares of its common stock under the 2021 Program for a total cost of approximately $16 million. 2022 1Q 10-Q, p. 16.

34.    Arconic disclosed the number of shares repurchased each month during the quarter (*id.*, p. 43), and the average price paid per share, but did not disclose the total amount of money spent on repurchases in each month. That information is calculated in the below chart:

| Month | Total number of shares purchased | Average price paid per share | Total |
|---|---|---|---|
| Jan-22 | 180,043 | $30.83 | $5,550,726 |

| Month | Total number of shares purchased | Average price paid per share | Total |
|---|---|---|---|
| Feb-22 | 325,939 | $31.09 | $10,133,444 |
| Mar-22 | - | - | - |
| **Total** | **505,982** | **$31.00** | **$15,684,169** |

35.     Accordingly, as of March 31, 2022, there was approximately $123 million worth of Arconic shares that could still be purchased under the 2021 Program. *Id.*

**B.      Defendants Conceal and Impede Apollo's High-Premium Offer While Repurchasing Millions of Shares, Which Constituted a Device, Scheme, or Artifice to Defraud, or Operated as a Deceit Upon Plaintiff and the Class, in Violation of Rule 10b-5(a) and (c)**

**1.      Arconic Conceals and Rebuffs Apollo's April 2022 Offer While Repurchasing Shares**

36.     On April 4, 2022, an Apollo representative contacted Defendant Timothy Myers, the CEO of Arconic, to arrange an in-person meeting. Proxy Statement, p. 30.

37.     Two days later, on April 6, 2022, Defendant Myers and Defendant Erick Asmussen, the CFO of Arconic, met with a representative of Apollo, during which meeting "the representative of Apollo expressed that Apollo was interested in exploring a negotiated transaction with Arconic." *Id.*

38.     On April 19, 2022, Apollo "submitted a preliminary, nonbinding indication of interest to acquire 100% of the outstanding equity interests of Arconic in an all-cash transaction at a price range of $34.00 to $36.00 per share" (the "April 2022 Offer"). The April 2022 Offer was at a material premium to the price of Arconic common stock, which closed on April 19, 2022 at $27.23 per share. *Id.*

39.     The April 2022 Offer contained "'highly confident' letters from potential financing sources." The April 2022 Offer also contained a proposed a "go-shop" period during which

Arconic would be permitted to solicit competing bids for a limited period of time following the execution of a merger agreement. *Id*.

40.    On April 29, 2022, Arconic's Board, which included Defendants Myers and Henderson, held a special meeting at which members of Arconic management and others participated. *Id.* Upon information and belief, those members of Arconic management included Defendant Asmussen, who was Arconic's CFO.

41.    At the April 29, 2022 Arconic Board meeting, the Board determined to rebuff Apollo's $34 to $36 per share offer because the Board "concluded that the April 2022 Offer undervalued Arconic and was not in the best interests of the Company and its stockholders." The Board also "determined that Arconic should not engage in further discussions with respect to the" April 2022 Offer. *Id*.

42.    On April 29, 2022, Arconic's common stock closed at $25.16 per share.

43.    Myers informed a representative of Apollo of the Board's decision on April 29, 2022, and also sent a written letter concerning the Board's decision on May 3, 2022. *Id*.

44.    On May 5, 2022, a representative of Apollo contacted Defendant Myers to request a meeting, and requested that a representative of Irenic join the meeting as well. The meeting was subsequently scheduled for May 31, 2022. *Id*.

45.    On May 25, 2022, a representative of Irenic met with Defendant Myers and another representative of Arconic and expressed interest in exploring a negotiated transaction with Arconic in partnership with Apollo. *Id.*, p. 31.

46.    On May 31, 2022, Defendants Myers and Henderson met with representatives of Apollo. During the meeting, representatives of Apollo indicated that Apollo planned on submitting

a revised proposal to acquire Arconic following Arconic's upcoming June 6, 2022 investor day presentation. *Id*.

47.    On June 1, 2022, a representative of Apollo requested a meeting between Apollo and Arconic and that the two companies enter into a confidentiality agreement. *Id*.

48.    On June 9, 2022, representatives of Apollo and Irenic, during an in-person meeting with Defendants Myers and Asmussen, and another representative of Arconic, indicated that Apollo and Irenic planned to submit a revised proposal within the next two weeks. *Id*.

49.    On June 23, 2022, a representative of Apollo informed Defendant Henderson that, "in light of deteriorating macroeconomic conditions, including a challenging financing market," Apollo and Irenic would not submit an acquisition proposal in the timeline previously indicated. *Id*.

50.    Between June 23, 2022 and November 28, 2022, Arconic and Apollo and Irenic spoke occasionally. *Id.*, p. 31. Although no official offer to purchase Arconic was made during this time, these continued discussions evidence that the Defendants had an understanding that Apollo would make another offer at a premium to the trading price of Arconic's common stock.

51.    On August 2, 2022, during post-market hours, Arconic filed its Form 10-Q for the quarterly period ending June 30, 2022 with the SEC ("2022 2Q 10-Q"). The 2022 2Q 10-Q was signed by Defendant Asmussen. Defendants Myers and Asmussen also signed Sarbanes-Oxley certifications dated August 2, 2022 that were attached to the 2022 2Q 10-Q.

52.    The 2022 2Q 10-Q stated that Arconic repurchased 1,324,027 shares of its common stock during the quarter under the 2021 Program for a total cost of approximately $37 million. 2022 2Q 10-Q, p. 43.

53.     Accordingly, as of June 30, 2022, there was approximately $86 million worth of Arconic shares that could still be purchased under the 2021 Program. *Id.*, p. 48.

54.     Arconic disclosed the number of shares repurchased each month during the quarter, and the average price paid per share (*id.*), but did not disclose the total amount of money spent on repurchases in each month. That information is calculated in the below chart:

| Month | Total number of shares purchased | Average price paid per share | Total |
|---|---|---|---|
| Apr-22 | - | - | - |
| May-22 | - | - | - |
| Jun-22 | 1,324,027 | $27.70 | $36,675,548 |
| **Total** | **1,324,027** | **$27.70** | **$36,675,548** |

55.     The shares repurchased in June 2022 were repurchased at an average price significantly below Apollo's April 2022 Offer.

56.     On November 1, 2022, during post-market hours, Arconic filed its Form 10-Q for the quarterly period ending September 30, 2022 with the SEC ("2022 3Q 10-Q"). The 2022 3Q 10-Q was signed by Defendant Asmussen. Defendants Myers and Asmussen also signed Sarbanes-Oxley certifications dated November 1, 2022 that were attached to the 2022 3Q 10-Q.

57.     The 2022 3Q 10-Q stated that Arconic repurchased 3,033,663 shares during the quarter under the 2021 Program for a total of approximately $86 million. 2022 3Q 10-Q, p. 19. Further, as of August 31, 2022, Arconic had repurchased the maximum $300 million in common stock permitted under the 2021 Program.

58.     Arconic disclosed the number of shares repurchased each month during the quarter, and the average price paid per share (2022 3Q 10-Q, p. 52), but did not disclose the total amount of money spent on repurchases in each month. That information is calculated in the below chart:

| Month | Total number of shares purchased | Average price paid per share | Total |
|---|---|---|---|
| Jul-22 | 1,776,471 | $28.35 | $50,362,953 |

| Month | Total number of shares purchased | Average price paid per share | Total |
|---|---|---|---|
| Aug-22 | 1,257,192 | $28.56 | $35,905,404 |
| Sept-22 | - | - | - |
| **Total** | **3,033,663** | **$28.44** | **$86,268,356** |

59.     The shares repurchased by Arconic in the third quarter of 2022 were purchased at prices significantly below Apollo's April 2022 Offer.

60.     While Arconic repurchased approximately $177 million worth of Arconic shares under the 2021 Program over the span of 11 months between May 2021 and March 2022, the Defendants decided to repurchase $123 million in shares during the Class Period over three months between June 2022 and August 2022, reaching the maximum $300 million that could be repurchased under the 2021 Program in August 2022. The 2021 Program did not expire until April 2023.

61.     Prior to June 2022, the most shares repurchased by Arconic in one month under the 2021 Program was 1,293,844 in August 2021. Arconic repurchased more shares in each of June 2022 and July 2022 than it did in August 2021.

62.     On November 16, 2022, Arconic issued a press release and announced that its Board had approved another share repurchase program authorizing the Company to repurchase up to $200 million of common stock for a two-year period expiring November 17, 2024 (the "2022 Program").

63.     According to Arconic's Form 10-K for the fiscal year ended December 31, 2022, which was filed with the SEC during pre-market hours on February 21, 2023 ("2022 10-K"), the 2022 Program provided that "repurchases under the program [could] be made from time to time, as the Company deem[ed] appropriate, solely through open market repurchases effected through a broker dealer, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions," and that the 2022 Program

"[was] intended to comply with Rule 10b5-1 and all purchases shall be made in compliance with Rule 10b-18, including without limitation the timing, price, and volume restrictions thereof." 2022 10-K, p.87.

64.    Arconic carried out its share repurchases in June 2022, July 2022, and August 2022 under the 2021 Program, and created and announced the 2022 Program, with no disclosure of any information concerning Apollo's offer to acquire Arconic's outstanding shares at a materially higher price, nor Apollo's continued interest in acquiring Arconic.

### 2.    Arconic Conceals Apollo's Continued Interest in Acquiring the Company and its December 2022 Offer While Repurchasing Shares

65.    On November 28, 2022, Defendant Henderson met with a representative of Apollo, who informed Henderson that Apollo was "considering submitting a new proposal for an acquisition of Arconic at a meaningful premium to Arconic's stock price, which had decreased to $21.65 per share as of November 28, 2022." Proxy Statement, pp. 31-32. The Apollo representative stated that in Apollo's view, the decline in Arconic's share price was the result of Arconic's "reduced earnings guidance for 2023, the sale of the Russian operations and certain operational issues" and that the transaction "would produce an attractive, value-certain outcome for Arconic's shareholders and allow Arconic to operate in a new private governance model post-closing." *Id.*, p. 32.

66.    The Board, including Defendants Myers and Henderson, discussed Henderson's November 28, 2022 conversation with Apollo at a regularly scheduled Board meeting on December 2, 2022. *Id.*

67.    On December 7, 2022, at a meeting with Defendants Myers and Asmussen, a representative of Apollo again articulated Apollo's interest in submitting a proposal to acquire

Arconic, and that subject to internal approval, Apollo expected to submit an offer for Arconic the following week. *Id*.

68.     On December 12, 2022, Apollo submitted a revised, non-binding offer to purchase all of the Company's outstanding common stock for $30 in cash per share (the "December 2022 Offer"). *Id.*

69.     The December 2022 Offer referenced a number of "meaningful negative developments" since the April 2022 Offer, including "operational challenges at certain of Arconic's facilities, lower realized proceeds from Arconic's sale of its Russian operations than expected and a challenging macroeconomic environment." *Id.*

70.     The December 2022 Offer was at a significant premium to Arconic's common stock price, which closed on December 12, 2022 at $22.57 per share. *Id*.

71.     The December 2022 Offer "requested a 30-day period to secure committed financing for the transaction" and indicated that Apollo "was prepared to use certain of [its affiliate investment funds'] financing sources to help secure the necessary debt funding to provide a fully committed binding transaction." Moreover, the proposal reiterated Apollo's willingness to accept a "go-shop" period during which Arconic would be permitted to solicit competing bids for a limited period following the signing of the transaction, as well as a "relatively low" termination fee during that period, payable by Arconic if it terminated a transaction to accept a superior bid. However, Apollo requested a prior period of exclusive negotiations between Arconic and Apollo in order for Apollo to conduct satisfactory due diligence. *Id*.

72.     On December 13, 2022, the Arconic Board, which included Defendants Myers and Henderson, held a special meeting to discuss Apollo's December 2022 Offer. Members of Arconic

management and others participated in the meeting. *Id.* Upon information and belief, those members of Arconic management included Defendant Asmussen, who was Arconic's CFO.

73.     At the December 13, 2022 Board meeting, the Board discussed the terms of the proposal and compared it to Apollo's April 2022 Offer. The Board directed financial advisors from Goldman Sachs and Evercore "to perform preliminary financial analyses" of the proposal. *Id*.

74.     On December 21, 2022, the Arconic Board held another special meeting, at which members of Arconic management and others participated. *Id.* Upon information and belief, those members of Arconic management included Defendant Asmussen.

75.      At the December 21, 2022 Board meeting, the Board "discussed unaudited prospective financial information for Arconic that Arconic management had presented to the Board of Directors in October 2022 as part of its annual review process," and directed "Arconic management to test the assumptions underlying the prospective financial information developed in October 2022 and refine management's view of Arconic's sustainable earnings power and the risks and opportunities related thereto[.]" *Id.* The Board determined to meet again to continue to evaluate the proposal. Following the meeting, a representative of Apollo was informed by Arconic that the Board would continue to consider the proposal in January 2023. *Id.*, p. 33.

76.     On January 19, 2023, the Arconic Board held a special meeting, at which members of Arconic management and others participated. *Id.* Upon information and belief, those members of Arconic management included Defendant Asmussen.

77.     At the January 19, 2023 Board meeting, the Board discussed prospective financial information for Arconic for fiscal years 2023 through 2027 under three different prospective financial scenarios, and other parties that might potentially be interested in acquiring Arconic. *Id.* Following the discussion, the Board directed management to rebuff Arconic's offer, but to allow

for "limited due diligence information and discussions with management to allow Apollo to consider raising its bid and to provide additional assurance regarding the certainty of a potential transaction, in particular relating to transaction financing." *Id.*

78.    On January 26, 2023, Arconic entered into confidentiality agreements with Apollo and Irenic. *Id.*

79.    On January 29, 2023, Arconic provided Apollo, Irenic and their respective representatives access to an electronic data room containing limited due diligence information regarding Arconic, including financial projections. *Id.*

80.    On February 2, 2023, the Board held a regular meeting at which members of Arconic management participated. *Id.* Upon information and belief, those members of Arconic management included Defendant Asmussen.

81.    At the February 2, 2023 Board meeting, the Board discussed other parties that might potentially be interested in and financially capable of acquiring Arconic, including both potential strategic bidders and other financial sponsors. Following discussions, the Board directed Arconic management to conduct a confidential outreach to three parties who, in the judgment of the Board and its advisors, would be most likely to be interested in, and financially capable of, consummating a potential acquisition of Arconic. *Id.*

82.    Thereafter, Arconic management reached out to two strategic companies and a private equity firm to assess whether these parties would be interested in a possible transaction with Arconic, as instructed by the Board. *Id.*, pp. 33-34.

83.    On February 21, 2023, Arconic filed its 2022 10-K. The 2022 10-K was signed by Defendants Myers and Asmussen. Defendants Myers and Asmussen also signed Sarbanes-Oxley certifications dated February 21, 2023 that were attached to the 2022 2Q 10-Q.

84.     The 2022 10-K stated that Arconic repurchased 2,071,835 shares under the 2022 Program in the fourth quarter of 2022 for a total of approximately $46 million. 2022 10-K, p. 42. Further, as of December 31, 2022, there was approximately $154 million worth of Arconic common stock that could be repurchased under the 2022 Program. *Id.*, p. 35.

85.     Arconic disclosed the number of shares repurchased each month during the quarter, and the average price paid per share (*id.*), but did not disclose the total amount of money spent on repurchases in each month. That information is calculated in the below chart:

| Month | Total number of shares purchased | Average price paid per share | Total |
|-------|-------|-------|-------|
| Oct-22 | - | - | - |
| Nov-22 | 468,979 | $21.59 | $10,125,257 |
| Dec-22 | 1,602,856 | $22.56 | $36,160,431 |
| **Total** | **2,071,835** | **$22.34** | **$46,285,688** |

86.     The shares repurchased by Arconic in the fourth quarter of 2022 were purchased at prices significantly below the December 2022 Offer and the April 2022 Offer.

87.     The 1,602,856 shares repurchased in December 2022 was the single largest number of shares purchased in any month under either the 2021 Program or the 2022 Program. The shares Arconic repurchased in December 2022 were repurchased after Arconic was informed on November 28, 2022 of Apollo was "considering submitting a new proposal for an acquisition of Arconic at a meaningful premium to Arconic's stock price," and/or after Defendants received an offer for $30 per share on December 12, 2022 and thereafter negotiated with Apollo.

88.     Arconic carried out its share repurchases in November and December 2022 under the 2022 Program with no disclosure of any information concerning Apollo's offer to acquire Arconic's outstanding shares at a materially higher price, or Apollo's continued interest in acquiring Arconic.

### 3.    Arconic's Stock Soars When Apollo's Offer is Finally Revealed

89.    On February 23, 2023, Defendants Myers and Henderson met with representatives of Apollo at Apollo's request,. At that meeting, the Apollo representatives indicated that Apollo planned to submit a new proposal for an acquisition of Arconic for $30 per share within the next day. Proxy Statement, p. 34.

90.    Later in the day on February 23, 2023, Apollo "submitted a nonbinding proposal confirming its interest to acquire Arconic in an all-cash transaction at a price of $30 per share" (the "February 2023 Apollo Offer"). *Id.* The $30 per share offer was at a significant premium to the price of Arconic common stock, which closed on February 23, 2023 at $23.15 per share. *Id.*

91.    In the February 2023 Offer, Apollo stated that its due diligence of Arconic uncovered two negative findings, which "resulted in a $4.03 per share discrepancy in Apollo's valuation of Arconic since" the December 2022 Offer. Consequently, this February 2023 Apollo Offer, according to Apollo, constituted an increased offer, despite the same $30 per share price. The February 2023 Offer "included certain financing letters of support" from banking institutions, "confirming the availability of debt financing for the transaction, and reiterated that the Apollo Funds were prepared to use certain of the Apollo Funds' financing sources to help secure the necessary debt funding to provide a fully committed binding transaction." *Id.*

92.    On February 28, 2023, during market hours at approximately 2:00 p.m. Eastern Time, the *WSJ* reported that Apollo had submitted a bid to acquire Arconic and that Arconic's advisors had reached out to other potential acquirors:

> Apollo in Talks to Acquire Aerospace-Parts-Maker Arconic, Sources Say
>
> (Dow Jones) -- Private-equity firm Apollo Global Management Inc. is in talks to acquire aerospace-parts maker Arconic Corp., according to people familiar with the matter.
>
> Apollo submitted a bid in February and has debt financing in place, the people said.

Arconic's advisers have also reached out to other potential acquirers, the people said. There is no guarantee there will be a deal with any of them. Arconic stock closed Monday at $22.13, giving the Pittsburgh company a market value of about $2.2 billion. It also has a hefty debt load of more than $1.5 billion. Should there be a deal, it would be expected to carry a significant premium, the people said.

Arconic, which makes parts for the aerospace, automotive, building and energy industries, has had a bumpy history.

After being separated in 2016 from the aluminum business that is now called Alcoa, the company faced a campaign from activist investor Elliott Investment Management LP, which resulted in the resignation of Arconic's then-chief executive, Klaus Kleinfeld, and an overhaul of its board.

Arconic is now run by Timothy Myers, who took the CEO role in 2020.

The Wall Street Journal reported in 2018 that Apollo had expressed interest in a deal for Arconic. Apollo ultimately came close to an agreement to pay upward of $10 billion for the company, but the deal never happened. Arconic instead further divided into two independent, publicly traded businesses in 2020.

Arconic's Engineered Products and Forgings businesses remained in the existing company, which was renamed Howmet Aerospace Inc. Its Global Rolled Products group became part of a new company that is now known as Arconic Corp.

Arconic recently reported that its revenue for the fourth quarter totaled $1.9 billion, down 9% from the prior year as higher interest rates fanned anxiety about the economy. Its net loss widened to $273 million, or $2.70 per share, from $38 million, or 36 cents, a year earlier.

The deal would come at a muted time for private-equity buyouts. A tough financing market -- coupled with a disconnect between buyers and sellers on price after equity values plummeted last year -- have created roadblocks to deals.

Private-equity firms have turned more to private lenders, while some have opted to put more of their cash to work in new investments. Apollo, which has a large credit arm, has the ability to be creative in the structuring of its deals.

The firm, which has over $500 billion in assets under management, recently led the purchase of $900 million in convertible preferred stock of Western Digital Corp., along with Elliott.

93.    In response to this news, the price of Arconic common stock increased $4.68 per share, or 21.5%, from its price immediately before the *WSJ* report of $21.76 per share to a closing price on February 28, 2023 of $26.44 per share.

94.     On May 4, 2023, during pre-market hours, Arconic issued a press release and announced that it had entered into an agreement to be acquired by Apollo in an all-cash transaction at $30.00 per share.

95.     In response to this news, the price of Arconic common stock increased $6.38 per share, or 28.3%, from a closing price on May 3, 2023 of $22.55 per share to a closing price on May 4, 2023 of $28.93 per share.

96.     On May 4, 2023, during post-market hours, Arconic filed its Form 10-Q for the quarter ended March 31, 2023 ("2023 1Q 10-Q"). 2023 1Q 10-Q was signed by Defendant Asmussen.

97.     The 2023 1Q 10-Q stated that Arconic repurchased 35,615 shares under the 2022 Program in the first quarter of 2023 for a total of approximately $1 million. 2023 1Q 10-Q. p. 36-37. Further, as of March 31, 2023, there was approximately $153 million in Arconic common stock left that could be repurchased under the 2022 Program. 2023 1Q 10-Q, p. 43.

98.     Arconic disclosed the number of shares repurchased each month during the quarter, and the average price paid per share (*id.*), but did not disclose the total amount of money spent on repurchases in each month. That information is calculated in the below chart:

| Month | Total number of shares purchased | Average price paid per share | Total |
|---|---|---|---|
| Jan-23 | 35,615 | $20.98 | $747,203 |
| Feb-23 | - | - | - |
| Mar-23 | - | - | - |
| **Total** | **35,615** | **$20.98** | **$747,203** |

99.     The shares repurchased by Arconic in January 2023 were repurchased at prices significantly below the December 2022 Offer, and when Arconic was actively negotiating with, and actively engaged with, Apollo concerning the December 2022 Offer.

100.    Arconic carried out its share repurchases in January 2023 under the 2022 Program with no disclosure of any information concerning Apollo's offer to acquire Arconic's outstanding shares at a materially higher price, or Apollo's continued interest in acquiring Arconic.

101.    On July 31, 2023, during post-market hours, Arconic filed its Form 10-Q for the quarter ended June 30, 2023 with the SEC ("2023 2Q 10-Q"). The 2023 2Q 10-Q was signed by Defendant Asmussen.

102.    The 2023 2Q 10-Q disclosed that Arconic did not repurchase any common stock in the second quarter of 2023.

103.    On June 16, 2023, Arconic published the Proxy Statement.

104.    On August 18, 2023, Apollo completed its acquisition of Arconic.

105.    Arconic's failure to disclose knowledge that a significant corporate transaction had been proposed by a serious bidder, artificially deflated the price of Arconic common stock, all the while Arconic was able to take advantage of those artificially lower prices by repurchasing shares.

106.    Arconic actions constituted a device, scheme, or artifice to defraud, or operated as a deceit upon Plaintiff and the Class, in violation of Rule 10b-5(a) and 10b-5(c).

**C.    Defendants' Material Omissions and False and Misleading Statements**

107.    The Defendants' failure to disclose the information about Apollo's offers while engaging in share repurchases was an omission of material fact and/or rendered other statements made materially misleading, in violation of Rule 10b-5(b).

**1.    Defendants Had an Obligation to Abstain From Trading in Arconic Securities or to Disclose Apollo's Offers**

108.    Beginning in April 2022, Defendants were aware of material nonpublic information concerning Apollo's offer to acquire Arconic, including that Apollo was offering a large premium for the Company's shares and that Apollo's all-cash offer came from a highly motivated buyer

with a willingness to use certain of its own financing sources to help secure the necessary debt funding. Defendants concealed and materially misrepresented these facts for approximately ten months. During that time, Arconic repurchased over 6 million of its shares at prices well below Apollo's offers while failing to disclose any information concerning Apollo or its offers, and otherwise materially misrepresenting the reality concerning Apollo's offers, Arconic's response to those offers, and the Company's millions of stock repurchases while in possession of material nonpublic information about those offers.

109.    Under Section 10(b) and Rule 10b-5, Arconic was required to abstain from trading in Arconic's securities or to disclose this material information concerning Apollo's offers. Arconic did not abstain from trading in its own securities while in possession of this material information, and repurchased millions of common shares during the Class Period. Arconic therefore had an unequivocal duty to disclose the material nonpublic information in its possession concerning Apollo and its offers. Arconic violated this duty to disclose because it made no such disclosure until May 4, 2023, at the end of the Class Period.

110.    Arconic's duty to disclose this information was not discharged until Arconic issued a press release and announced that it had entered into an agreement to be acquired by Apollo in an all-cash transaction at $30.00 per share during pre-market hours on May 4, 2023, at the end of the Class Period.

**2.    Defendants' Statements Concerning the 2021 and 2022 Programs' Compliance with Rules 10b5-1 and 10b-18 Were Materially False and Misleading**

111.    The 2022 2Q 10-Q, filed with the SEC on August 2, 2022, stated the following concerning the 2021 Program and Arconic's share repurchases under the 2021 Program:

On May 4, 2021, Arconic announced that its Board of Directors approved a share repurchase program authorizing the Company to repurchase shares of its outstanding common stock up to an aggregate transactional value of $300 over a

two-year period expiring April 28, 2023. ***Repurchases under the program may be made from time to time, as the Company deems appropriate, solely through open market repurchases effected through a broker dealer, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions….This program is intended to comply with Rule 10b5-1 and all purchases shall be made in compliance with Rule 10b-18***, including without limitation the timing, price, and volume restrictions thereof.

2022 2Q 10-Q, pp. 16, 43 (emphasis added).

112.    The 2022 3Q 10-Q, filed with the SEC on November 1, 2022, stated the following concerning the 2021 Program, the 2022 Program, and Arconic's share repurchases under both programs:

On May 4, 2021, Arconic announced that its Board of Directors approved a share repurchase program authorizing the Company to repurchase shares of its outstanding common stock up to an aggregate transactional value of $300 over a two-year period expiring April 28, 2023. In the 2022 third quarter and nine-month period, Arconic repurchased 3,033,663 and 4,863,672 shares, respectively, of the Company's common stock for $86 and $139, respectively, under this program. Cumulatively, Arconic has repurchased 9,776,177 shares of the Company's common stock for $300 since the program's inception, resulting in completion of the total authorization. ***Repurchases under the program were made from time to time, as the Company deemed appropriate, solely through open market repurchases effected through a broker dealer, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions. This program was intended to comply with Rule 10b5-1 and all purchases were made in compliance with Rule 10b-18***, including without limitation the timing, price, and volume restrictions thereof.

\***

On May 4, 2021, Arconic announced that its Board of Directors approved a share repurchase program authorizing the Company to repurchase shares of its outstanding common stock up to an aggregate transactional value of $300 million over a two-year period expiring April 28, 2023. ***Repurchases under the program were made from time to time, as the Company deemed appropriate, solely through open market repurchases effected through a broker dealer, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions. This program was intended to comply with Rule 10b5-1 and all purchases were made in compliance with Rule 10b-18***, including without limitation the timing, price, and volume restrictions thereof.

2022 3Q 10-Q, pp. 19, 52 (emphasis added).

113.    The 2022 10-K, filed with the SEC on February 21, 2023, stated the following

concerning Arconic's share repurchases, the 2021 Program, and the 2022 Program:

> On November 16, 2022, Arconic announced that its Board of Directors approved a share repurchase program authorizing the Company to repurchase up to $200 million of common stock for a two-year period expiring November 17, 2024. ***Repurchases under the program may be made from time to time, as the Company deems appropriate, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions.*** There can be no assurance as to the number of shares the Company will purchase, if any. The share repurchase program may be increased or otherwise modified, renewed, suspended or terminated by the Company at any time, without prior notice. In connection with the establishment of this share repurchase program, the prior $300 million repurchase program, which the Company completed in August 2022, was terminated. ***This program is intended to comply with Rule 10b5-1 and all purchases shall be made in compliance with Rule 10b-18***, including without limitation the timing, price, and volume restrictions thereof.
>
> ***
>
> On May 4, 2021, Arconic announced that its Board of Directors approved a share repurchase program authorizing the Company to repurchase shares of its outstanding common stock up to an aggregate transactional value of $300 over a two-year period expiring April 28, 2023. In 2022 and 2021, Arconic repurchased 4,863,672 and 4,912,505 shares, respectively, of the Company's common stock for $139 and $161, respectively, resulting in completion of the total authorization under this program in August 2022. In connection with the establishment of a new repurchase program (see below), this repurchase program was terminated. ***Repurchases under the program were made from time to time, as the Company deemed appropriate, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions. This program was intended to comply with Rule 10b5-1 and all purchases were made in compliance with Rule 10b-18***, including without limitation the timing, price, and volume restrictions thereof.
>
> On November 16, 2022, Arconic announced that its Board of Directors approved a share repurchase program authorizing the Company to repurchase shares of its outstanding common stock up to an aggregate transactional value of $200 over a two-year period expiring November 17, 2024. ***Repurchases under the program may be made from time to time, as the Company deems appropriate, solely through open market repurchases effected through a broker dealer, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions.*** There can be no assurance as to the number of shares the Company will purchase. The share

repurchase program may be increased or otherwise modified, renewed, suspended or terminated by the Company at any time, without prior notice. ***This program is intended to comply with Rule 10b5-1 and all purchases shall be made in compliance with Rule 10b-18***, including without limitation, the timing, price, and volume restrictions thereof. In 2022, Arconic repurchased 2,071,835 shares of the Company's common stock for $46 under this program.

2022 10-K, pp. 35, 87 (emphasis added).

114.    Rule 10b5-1, titled Trading "on the basis of" material nonpublic information in insider trading cases, provides that:

(a) Manipulative or deceptive devices. The "manipulative or deceptive device[s] or contrivance[s]" prohibited by Section 10(b) of the Act (15 U.S.C. 78j) and § 240.10b-5 (Rule 10b-5) thereunder include, among other things, the purchase or sale of a security of any issuer, on the basis of material nonpublic information about that security or issuer, in breach of a duty of trust or confidence that is owed directly, indirectly, or derivatively, to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the material nonpublic information.

(b) Awareness of material nonpublic information. Subject to the affirmative defenses in paragraph (c) of this section, a purchase or sale of a security of an issuer is on the basis of material nonpublic information for purposes of Section 10(b) and Rule 10b-5 if the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale. The law of insider trading is otherwise defined by judicial opinions construing Rule 10b-5, and Rule 10b5-1 does not modify the scope of insider trading law in any other respect.

17 CFR § 240.10b5-1.

115.    Rule 10b-18 provides an issuer a safe harbor from liability for manipulation in connection with stock repurchases in the open market; however, it does not provide protection from other federal securities laws, such as insider trading and antifraud provisions.

Section 240.10b-18 provides an issuer (and its affiliated purchasers) with a "safe harbor" from liability for manipulation under sections 9(a)(2) of the Act and § 240.10b-5 under the Act solely by reason of the manner, timing, price, and volume of their repurchases when they repurchase the issuer's common stock in the market in accordance with the section's manner, timing, price, and volume conditions. As a safe harbor, compliance with § 240.10b-18 is voluntary. To come within the safe harbor, however, an issuer's repurchases must satisfy (on a daily basis) each of the section's four conditions. Failure to meet any one of the four conditions will remove all of the issuer's repurchases from the safe harbor for that day. ***The safe harbor,***

26

> *moreover, is not available for repurchases that, although made in technical compliance with the section, are part of a plan or scheme to evade the federal securities laws.*

17 CFR § 240.10b-18, Preliminary Note 1 (emphasis added).

116.    The April 2022 Offer, Arconic's refusal to engage with Apollo because the Board believed the offer undervalued Arconic, the Board's desire for a higher offer, and the ongoing conversations between Apollo, Irenic, and Arconic through November 2022, were all material nonpublic information. Once the December 2022 Offer was made, that too was material nonpublic information.

117.    Defendants Myers, Asmussen, and Henderson, were senior executives and/or directors of Arconic, and were all aware of this material nonpublic information. Their knowledge is imputed to Arconic through their positions and through *respondeat superior*, and therefore Arconic was aware of the material nonpublic information. Because Arconic was aware of the material nonpublic information, the share repurchases were on the basis of that material nonpublic information, and were made in violation of Rule 10b5-1 and not in compliance with or subject to the safe harbor of Rule 10b-18.

118.    Myers', Asmussen's and Arconic's statements in the 2022 2Q 10-Q and 2022 3Q 10-Q in paragraphs 111-112, above, that the 2021 Program was "intended to comply with Rule 10b5-1" and that "all purchases [were/shall be] made in compliance with Rule 10b-18" were untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) and Rule 10b-5(b), because, at the time the statements were made, Arconic had and was engaging in share repurchase in violation of Rule 10b5-1 in June 2022, July 2022, and August 2022, and therefore the 2021 Program was not and/or had not been in compliance

with Rule 10b5-1 and the share repurchases made during those months were not made in compliance with Rule 10b-18.

119.    Myers', Asmussen's, and Arconic's statements in the 2022 10-K in paragraph 113, above, that the 2021 Program and the 2022 Program were "intended to comply with Rule 10b5-1" and that "all purchases [were/shall be] made in compliance with Rule 10b-18" were untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) and Rule 10b-5(b), because, at the time the statements were made, Arconic had and was engaging in share repurchase in violation of Rule 10b5-1 in June 2022, July 2022, August 2022, November 2022, December 2022, and January 2023, and therefore the 2021 Program and the 2022 Program were not and/or had not been in compliance with Rule 10b5-1 and the share repurchases made during those months were not made in compliance with Rule 10b-18.

### 3.    Defendants' Statements Concerning Stock Repurchases Under the 2021 and 2022 Program Were Materially False and Misleading

120.    Defendants also violated Section 10(b) and Rule 10b-5 by affirmatively disclosing selected information about Arconic's share repurchases and its approval of an additional share repurchase program without disclosing the whole truth about Apollo's offers or the fact that such transactions occurred while Arconic was in possession of undisclosed material nonpublic information about that offer. As such, the Defendants made untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) and Rule 10b-5(b).

121.    On May 3, 2022, Arconic held a conference call to discuss its first quarter 2022 financial results ("Q1 2022 Conference Call"). During the Q1 2022 Conference Call, Defendant Myers stated that:

> And then in regards to the share repurchase program, you see that our activities were a little lighter this quarter. That's because aluminum was consuming so much working capital cash. ***But as we see availability of cash and particularly if we see a good return for our shareholders, we've still got room on that share repurchase program***, and we announced it, and we intend to follow through with it.

5/3/2022 Tr. at 12 (emphasis added).

122.    On June 6, 2022, Arconic hosted an in-person Analyst Day at the NYSE. Myers stated during his remarks at the June 6, 2022 Analyst Day that:

> We are expected to complete our existing share repurchase program and to-date, we've purchased 177 million over 300 million authorized program.
>
> We have repurchased over 5 million shares or 5% of shares outstanding for $177 million from our $300 million authorization. We plan to execute the remaining $123 million of authorization before the end of this year and as we planned since separation, dividend initiation remains an option as cash flow grows and becomes more predictable.

6/6/2022 Tr. at 6.

123.    The 2022 2Q 10-Q, filed with the SEC on August 2, 2022, stated that Arconic repurchased 1,324,027 shares of its common stock between June 1 and 30, 2022 for a total cost of approximately $37 million, and at an average price of $27.70 per share. 2022 2Q 10-Q, pp. 43, 48.

124.    Also on August 2, 2022, Arconic conducted a conference call with investors to discuss its financial results for the second quarter (the "Q2 2022 Conference Call"). During the Q2 2022 Conference Call, Defendant Asmussen stated in relevant part: "In the quarter, we repurchased approximately 1.3 million shares. Since we announced this program in May of last year and through the end of the second quarter, we repurchased approximately 6.7 million shares or

approximately 5% of our outstanding shares for $214 million against our $300 million program."
8/2/2022 Tr. at 3.

125.    Later on the Q2 2022 Conference Call, Defendant Myers also stated in relevant part: "Since we announced the [stock repurchase] program in May of last year through July 29, we have repurchased 8.7 million shares for approximately $269 million of the $300 million authorization. We expect to complete the program before year-end." 8/2/2022 Tr. at 5.

126.    The 2022 3Q 10-Q, filed with the SEC on November 1, 2022, stated that Arconic repurchased 1,776,471 shares in July 2022 for an average price of $28.35 per share, and 1,257,192 shares in August 2022 at an average price of $28.56, and that all repurchases during the quarter totally approximately $86 million. 2022 3Q 10-Q, pp. 19, 52.

127.    Also on November 1, 2022, Arconic conducted a conference call with investors to discuss its financial results for the third quarter (the "Q3 2022 Conference Call"). During the Q3 2022 Conference Call, Defendant Asmussen stated relevant part: "In the quarter, we repurchased approximately 3 million shares and completed the initial $300 million authorization that we had announced in May of last year. Since the inception of this program, we have reduced the number of shares outstanding by approximately 9%." 11/1/2022 Tr. at 4.

128.    On November 16, 2022, Arconic issued a press release announcing that the Board had approved the 2022 Program to repurchase up to $200 million of Arconic common stock. The press release was attached as an exhibit to a Form 8-K filed with the SEC during post-market hours on November 16, 2022. The Form 8-K was signed by Defendant Asmussen.

129.    In the November 16, 2022 press release, Defendant Myers stated that:

We continue to *view share repurchases as a high-return capital allocation opportunity for the Company and its shareholders*. Following the completion of our first $300 million repurchase authorization in the third quarter of 2022, this new program demonstrates our commitment to our long-term strategy and growth

outlook. We have confidence in our ability to fund both our organic growth capital investment plans and retire shares at opportunistic levels.

130.    Myers', Asmussen's and Arconic's statements in the Q1 2022 Conference Call and the November 16, 2022 press release in paragraphs 121 and 129, above, that Arconic's stock repurchases were a "good return" for Arconic shareholders and were "high-return capital allocation opportunity for the Company and its shareholders" were untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) and Rule 10b-5(b). Once Myers, Asmussen, and Arconic spoke on the subject of the value of Arconic shares, they had a duty to disclose the whole truth, namely that a willing buyer had offered to purchase Arconic at prices materially above the prices at which Arconic was repurchasing shares.

131.    Myers', Asmussen's and Arconic's statements in the Q1 2022 Conference Call, 2022 2Q 10-Q, Q2 2022 Conference Call, 2022 3Q 10-Q, Q3 2022 Conference Call, and November 16, 2022 press release, and at the June 6, 2022 Analyst Day, in paragraphs 52-54, 57-58, and 121-129, above, concerning the 2021 Program and Arconic's stock repurchases were untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) and Rule 10b-5(b), because they contained no disclosure of any information concerning Apollo's materially higher offer, that Arconic's Board believed that offer undervalued Arconic, that Arconic's Board wanted Apollo to make a higher offer, and that Arconic was repurchasing these shares at a significant discount to what Apollo would pay for all shares of Arconic.

132.    Further, Myers', Asmussen's, and Arconic's statements in paragraphs 121-122, 125, and 129, above, that Arconic was continuing with it stock repurchases were untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) and Rule 10b-5(b). Inasmuch as the Company was restrained by law from repurchasing stock during active negotiations with Apollo, the Defendants' statements with respect to ongoing buybacks signaled to the market that there were no, and had been no, ongoing negotiations. Accordingly, when speaking about the buybacks, the Defendants were obligated to disclose the whole truth – that they were in, or had been, in negotiations with Apollo.

133.    The 2022 10-K, filed with the SEC on February 21, 2023, stated that Arconic repurchased 468,979 shares in November 2022 for an average price of $21.59 per share, and repurchased 1,602,856 shares in December 2022 at an average price of $22.56 per share, and that all repurchases during the fourth quarter of 2022 totaled approximately $46 million. 2022 10-K, pp. 35, 42.

134.    Also on February 21, 2023, Arconic conducted a conference call with investors to discuss its financial results for the fourth quarter and full year (the "Q4 2022 Conference Call"). During the Q4 2022 Conference Call, Defendant Asmussen stated in relevant part: "In the fourth quarter, we repurchased 2.1 million shares for $46 million under our new $200 million two-year authorization that we announced in mid-November." 2/21/2023 Tr. at 3.

135.    Defendant Myers also stated during the Q4 2022 Conference Call that:

> Additionally, we did not waver in our commitment to return capital to shareholders, as we completed our first share repurchase program and announced the second program of $200 million. In total, we've bought back approximately 10% of our original shares outstanding. ***We remain confident in our strategy, and going forward, we will continue to execute on high-return, low-risk under-the-rooftop organic investments.***

*Id.* at 2.

136.    Myers' and Arconic's statements in the Q4 2022 Conference in paragraph 135, above, that Arconic's stock repurchases were "high-return, low-risk under-the-rooftop organic investments" were untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) and Rule 10b-5(b). Once Myers and Arconic spoke on the subject of the value of Arconic shares, they had a duty to disclose the whole truth, namely that a willing buyer had offered to purchase Arconic at prices materially above the prices at which Arconic was repurchasing shares.

137.    Myers', Asmussen's, and Arconic's statements in the 2022 10-K and the Q4 2022 Conference Call in paragraphs 84-85, and 133-135, above, concerning the 2021 Program, the 2022 Program, and Arconic's stock repurchases, were untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) and Rule 10b-5(b), because they contained no disclosure of any information concerning Apollo's materially higher April 2022 Offer and December 2022 Offer, that Arconic's Board was actively negotiating and engaging with Apollo concerning that offer, that the Board wanted Apollo to make a higher offer, and that Arconic was repurchasing these shares at a significant discount to Apollo's December 2022 Offer.

138.    Further, Myers' and Arconic statement in paragraph 135, above, that Arconic was continuing with it stock repurchases was an untrue statement of a material fact or omitted to state material facts necessary in order to make the statement made, in the light of the circumstances under which it was made, not misleading, in violation of Section 10(b) and Rule 10b-5(b). Inasmuch as the Company was restrained by law from repurchasing stock during active

negotiations with Apollo, the Defendants' statements with respect to ongoing buybacks signaled to the market that there were no, and had been no, ongoing negotiations. Accordingly, when speaking about the buybacks, the Defendants were obligated to disclose the whole truth – that they were in, or had been, in negotiations with Apollo.

### 4.    Defendants' Certifications Were Materially False and Misleading

139.    Defendants Myers and Asmussen executed Certifications, dated August 2, 2022, that were attached to the 2022 2Q 10-Q and stated, among other things, that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;…
>
> The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):…Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

140.    Myers and Asmussen executed Certifications, dated November 1, 2022, that were attached to the 2022 3Q 10-Q and contained identical statements to the statements alleged in paragraph 139.

141.    Myers and Asmussen executed Certifications, dated February 21, 2023, that were attached to the 2022 10-K and contained identical statements to the statements alleged in paragraph 139.

142.    Myers', Asmussen's, and Arconic's statements in paragraphs 139-141 were untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) and Rule 10b-5(b), because, as alleged herein, at the time the statements were made, (a) the documents the certifications were attached to contained false and

misleading statements and (b) the insider trading in violation of Rule 10b-5(a) and (c) had not been disclosed to the Board's audit committee, because had it been disclosed to the audit committee, it would have shortly thereafter been publicly disclosed.

### D.    Defendants Acted With Scienter

143.    Arconic and the Individual Defendants acted with scienter because the Defendants had actual knowledge of the material facts that they failed to disclose and that rendered their representations materially false and misleading.

144.    Defendants were aware of the details and timing of Apollo's offers. Apollo communicated its offers to the highest executive level of Arconic – sending its offer letters directly to, and having other communications directly with, Defendants Myers, Asmussen, and Henderson – and its offers were discussed at multiple Board meetings, which were chaired by Henderson and attended by Myers and Asmussen, and in which the Company's senior management participated.

145.    Defendants were aware of Arconic's repurchases of millions of shares of its own stock. Among other things, Defendants disclosed these repurchases in the 2022 2Q 10-Q, 2022 3Q 10-Q, 2022 10-K, and 2023 1Q 10-Q filed in August 2022, November 2022, February 2023, and May 2023, respectively. Defendants Myers and Asmussen signed these filings and/or certified their completeness and accuracy.

146.    Defendants were aware of the market price of Arconic's stock, and were therefore aware that Apollo's offers were at prices materially above the market price, as well as that Arconic's repurchases were at prices well below Apollo's offers.

147.    Defendants created a second share repurchase program (the 2022 Program) in November 2022, shortly before Apollo made its December 2022 Offer. Yet the Defendants did not suspend trading under the 2022 Program after Apollo told them on November 28, 2022 that Apollo was considering submitting a new proposal for an acquisition of Arconic at a meaningful premium

to Arconic's stock price, and/or after Defendants received an offer for $30 per share on December 12, 2022 and thereafter negotiated with Apollo.

148.    In addition to Defendants' actual knowledge of the undisclosed material facts, the inference of scienter is enhanced further by the financial motive Defendants had for Arconic to repurchase millions of its shares at prices artificially deflated by Defendants' failure to disclose Apollo's offer to acquire those shares at materially higher prices.

### E.    Loss Causation and Economic Loss

149.    During the Class Period as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the prices of Arconic common stock and operated as a fraud or deceit on sellers of Arconic common stock.

150.    As detailed above, when material undisclosed information emerged and the truth was revealed concerning, *inter alia*, Apollo's offers, Arconic's response to those offers, and Arconic's repurchases while in possession of material nonpublic information concerning those offers, the price of Arconic common stock increased as the prior artificial depression or deflation was removed.

151.    The increase in the price of Arconic common stock was the direct result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the share price increase negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

152.    The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially depress or deflate the prices of Arconic common stock and/or to maintain the stock at artificially depressed or deflated levels, and

36

the subsequent significant increase in the value of Arconic common stock when Defendants' prior misrepresentations, omissions, and other fraudulent conduct were revealed.

153.    At all relevant times, Defendants' omissions or materially false and misleading statements alleged herein directly or proximately caused the damages suffered by Plaintiff and other Class members.

154.    Those omissions and statements were materially false and misleading through their failure to disclose a true and accurate picture of the material facts concerning the market for Arconic's shares, and its business, operations, and financial prospects, as alleged herein.

155.    Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, and otherwise failed to disclose information they had a duty to disclose, causing the price of Arconic's common stock to be artificially depressed or deflated.

156.    Plaintiff and other Class members sold Arconic's common stock at those artificially low prices, causing them to suffer damages as complained of herein.

**F.    Presumption of Reliance**

157.    Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

158.    Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Arconic's common stock was an efficient market at all relevant times by virtue of the following factors, among others:

   a.    Arconic's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

b. Arconic regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

c. Arconic was followed by a number of securities analysts employed by major brokerage firms, including Goldman Sachs and Deutsche Bank, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

159. As a result of the foregoing, the market for Arconic's common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the Company's stock. Under these circumstances, all sellers of Arconic's common stock during the Class Period suffered similar injury through their sales of Arconic's common stock at artificially depressed or deflated prices and a presumption of reliance applies.

160. Without knowledge of the misrepresented or omitted material facts, or the Defendants' devices, schemes, artifices to defraud, or acts, practices, or courses of business that operated as a fraud or deceit upon Plaintiff and the Class, Plaintiff and other Class members sold Arconic's common stock between the time Defendants omitted, misrepresented, and failed to disclose material facts, or committed or performed devices, schemes, artifices to defraud, or acts, practices, or courses of business that operated as a fraud or deceit upon Plaintiff and the Class, and the time the true facts were disclosed.

161.    Accordingly, Plaintiff and other Class members are entitled to a presumption of reliance upon the integrity of the market.

**G.    No Safe Harbor**

162.    The statutory safe harbor provided for forward-looking statements does not apply to the allegedly false statements and omissions pled in this Complaint.

163.    The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances. To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

164.    Alternatively, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pled herein, the Company and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false and misleading when made.

## CLASS ACTION ALLEGATIONS

165.    Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who sold Arconic common stock during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are Defendants, Apollo, Irenic, the officers and directors of the Company, Apollo, and Irenic ("Excluded D&Os"), the Defendants'

and the Excluded D&Os' immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any of the foregoing have or had a controlling interest.

166.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Arconic's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Arconic or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, during the Class Period, shares of Arconic common stock were held by hundreds or thousands of individuals located geographically throughout the United States. Joinder would be highly impracticable.

167.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sold shares of Arconic during the Class Period and sustained damages from Defendants' wrongful conduct in violation of the federal laws complained of herein.

168.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel who are competent and experienced in securities class action litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

169.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.    whether Defendants violated the 1934 Act and Rule 10b-5 as alleged herein;

      b.    whether Defendants omitted and/or misrepresented material facts;

c.  whether Defendants employed any device, scheme, or artifice to defraud or engaged in any act, practice, or course of business which operated or would operate as a fraud or deceit upon any person

d.  whether Defendants acted knowingly or recklessly in issuing false and/or misleading statements;

e.  whether the prices of Arconic's common stock during the Class Period were artificially depressed or deflated because of Defendants' conduct complained of herein; and

f.  whether the members of the Class have sustained damages and, if so, the proper measure of damages.

170.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Treatment as class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

171.   Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

172.   Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action as a class action.

## CAUSES OF ACTION

## COUNT I

**For Violations of Section 10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

173.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

174.    Section 10(b) of the 1934 Act provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement [1] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

175.    SEC Rule 10b-5 provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

176.    During the Class Period, Defendants engaged in a plan, scheme, and course of conduct that was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the Class, as alleged herein; and (ii) cause Plaintiff and the Class to sell Company common stock at artificially depressed or deflated prices. In furtherance of this

unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

177.    Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and/or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff and others similarly situated in connection with their sale of the Company's common stock.

178.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective sales of the Company's common stock during the Class Period.

179.    Defendants are therefore liable to Plaintiffs and the Class for damages in an amount to be determined at trial.

## COUNT II

### For Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants

180.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

181.    Section 20(a) of the 1934 Act provides that:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

182.    During the Class Period, the Individual Defendants acted as controlling persons of Arconic within the meaning of Section 20(a) of the 1934 Act.

183.    By virtue of their positions with the Company, the Individual Defendants had the power and ability to control the actions of Arconic and its employees. The Individual Defendants each participated in and are culpable for and by virtue of the acts alleged herein. By reason of such conduct, the Individual Defendants are jointly and severally liable with Arconic pursuant to Section 20(a) of the 1934 Act.

184.    The Individual Defendants are therefore liable to Plaintiff and the Class in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands relief as follows:

A.    Declaration this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that Defendants violated the 1934 Act and Rule 10b-5 and are liable pursuant to the 1934 Act for those violations;

C.    Awarding damages in favor of Plaintiff and other members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding Plaintiff and members of the Class their costs of suit, including reasonable attorneys' fees and expenses and expert fees; and

E.    Directing such further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 29, 2025                    WOLF POPPER LLP

/s/ *Joshua W. Ruthizer*
Robert C. Finkel
rfinkel@wolfpopper.com
Joshua W. Ruthizer
jruthizer@wolfpopper.com
Adam T. Savett
asavett@wolfpopper.com
Justyn Millamena
JMillamena@wolfpopper.com
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone: (212) 759-4600

VANOVERBEKE, MICHAUD
& TIMMONY, P.C.
Thomas C. Michaud
tmichaud@vmtlaw.com
Aaron L. Castle
acastle@vmtlaw.com
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200

*Attorneys for Plaintiff*

### CERTIFICATION OF CHARTER TOWNSHIP OF SHELBY POLICE & FIRE PENSION & RETIREMENT SYSTEM PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Jerome T. Moffitt, on behalf of the Charter Township of Shelby Police & Fire Pension & Retirement System ("Shelby P&F"), declare the following as to the claims asserted or to be asserted under the federal securities laws:

1. I am the Chairman of the Board of Shelby P&F. I am authorized to execute this certification on behalf of Shelby P&F and authorized to initiate this litigation on behalf of Shelby P&F.

2. Shelby P&F has reviewed the class action complaint against Arconic Corporation, Timothy Myers, Erick Asmussen, and Frederick Henderson, and authorized its filing.

3. Shelby P&F did not engage in transactions in the securities that are the subject of this complaint at direction of its counsel, or in order to participate in any private action arising under the federal securities laws.

4. Shelby P&F is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

5. Shelby P&F fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the class.

6. Shelby P&F made the following transaction(s) in Arconic common stock during the class period specified in the complaint:

*See* attached Schedule A.

7. During the three year period preceding the date of signing of this certification, Shelby P&F has sought to serve or has been appointed as a lead plaintiff or representative party on behalf of an asserted class in the following actions that asserted claims under the federal securities laws:

*Shelby Twp Police & Fire Ret. Sys. v. Celsius Holdings, Inc. et al*, No. 9:24-cv-81472 (S.D. Fla.)

8. Shelby P&F will not accept any payment for serving as a representative party on behalf of the class beyond Shelby P&F's pro rata share of any recovery except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

1/18/2025
Executed on this _____ day of January, 2025

CHARTER TOWNSHIP OF SHELBY POLICE & FIRE PENSION & RETIREMENT SYSTEM

By: _____    _____
9A6774CBCB51444...

Jerome T. Moffitt, Chairman

## SCHEDULE A

## SECURITIES TRANSACTIONS

| Date | Transaction | Shares | Per Share Price |
|---|---|---|---|
| 4/25/2022 | Sale | 801 | $25.02 |
| 6/29/2022 | Purchase | 5,900 | $28.18 |
| 12/16/2022 | Purchase | 600 | $21.34 |
| 2/24/2023 | Sale | 3,400 | $21.67 |
| 2/28/2023 | Sale | 1,000 | $22.62 |
| 5/4/2023 | Sale | 2,100 | $28.77 |

Prices listed are rounded up to two decimal places