UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

In re ARCONIC CORPORATION          :    Civil Action No. 1:25-cv-00863-AKH
SECURITIES LITIGATION              :
_____  x    CLASS ACTION

**AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION AND OVERVIEW ........................................................................1

JURISDICTION AND VENUE ..............................................................................................3

PARTIES ........................................................................................................................4

RELEVANT NON-PARTIES ...............................................................................................6

SUBSTANTIVE ALLEGATIONS .........................................................................................6

    A.    Arconic's Share Repurchase Activity .........................................................8

    B.    The Apollo Acquisition Offer and Arconic's Internal Discussions ..........16

    C.    Arconic Conceals Apollo's Continued Interest in Acquiring the Company and Its December 2022 Offer While Repurchasing Shares .......................................................................................................19

    D.    Arconic Continues to Conceal Apollo's Offer Until the End of the Class Period .........................................................................................23

DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS ........................27

    A.    Defendants Violated Their Duty to Disclose Apollo's Offers or Abstain from Trading in Arconic Securities .............................................27

    B.    Defendants' Statements Concerning Stock Repurchases Under the 2021 and 2022 Programs Were Materially False and Misleading ............29

    C.    Defendants' Statements Concerning the 2021 and 2022 Programs' Compliance with Rule 10b5-1 Were Materially False and Misleading .................................................................................................34

    D.    Defendants' SOX Certifications Were Materially False and Misleading .................................................................................................40

DEFENDANTS ACTED WITH SCIENTER ...........................................................................41

LOSS CAUSATION AND ECONOMIC LOSS ......................................................................44

PRESUMPTION OF RELIANCE .........................................................................................45

NO SAFE HARBOR ........................................................................................................47

CLASS ACTION ALLEGATIONS .......................................................................................47

**Page**

COUNT I ........................................................................................................................50

 For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against
  Defendants Arconic, Myers, and Asmussen ...............................................50

COUNT II ......................................................................................................................51

 For Violation of §20(a) of the 1934 Act Against Defendants Myers,
  Asmussen, and Henderson .........................................................................51

PRAYER FOR RELIEF ................................................................................................51

JURY DEMAND ...........................................................................................................52

Lead Plaintiffs City of Pontiac Reestablished General Employees' Retirement System, Indiana Electrical Workers Benefit Trust Fund IBEW, Indiana Electrical Workers Pension Trust Fund IBEW, and IBEW Local Union 481 Defined Contribution Plan and Trust ("Lead Plaintiffs"), by and through the undersigned counsel, allege the following based upon personal knowledge as to Lead Plaintiffs' own acts, and upon information and belief as to all other matters, based on the investigation conducted by and under the supervision of Lead Counsel, which included, among other things, a review of public documents, conference call transcripts, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases of Arconic Corporation ("Arconic" or the "Company"), industry and analysts' reports about the Company, and publicly available information about Apollo Global Management, Inc. ("Apollo").

## NATURE OF THE ACTION AND OVERVIEW

1.  This is a securities class action on behalf of all sellers of Arconic common stock between June 6, 2022 and May 3, 2023, both dates inclusive (the "Class Period"), asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against Arconic and certain of the Company's senior officers and directors during the Class Period ("Defendants," defined fully below).

2.  This action arises from Defendants' material omissions and misrepresentations concerning Apollo's offers to purchase all of Arconic's outstanding common stock at significant premiums to the Company's stock price and the Company's repurchases of millions of dollars' worth of its shares without disclosing material nonpublic information about Apollo's offers, which, if disclosed as required, would have indicated to investors that Arconic stock was worth significantly more.

3.    In April 2022, Apollo privately approached Arconic with an offer to acquire all of the Company's outstanding stock.  Apollo offered a significant cash premium over Arconic stock's then market price of $27.23 and substantial transaction certainty – the proposal included "highly confident" letters from potential financing sources, and Apollo itself has enormous financial resources.  After engaging in internal deliberations regarding Apollo's offer and obtaining financial advice from Goldman Sachs & Co. LLC ("Goldman Sachs") and Evercore Group LLC ("Evercore"), the Board concluded that Apollo's initial April 2022 offer, even though at a significant premium to Arconic stock's then market price, undervalued the Company.  Defendants continued to engage with Apollo, which was determined to acquire the Company and returned with repeated offers at significant premiums to Arconic stock's market price, culminating in Apollo's acquisition of Arconic at a significant premium in 2023.  Yet, despite stating internally that the stock was worth significantly more than Apollo's undisclosed offers, Defendants continued to repurchase millions of shares at prices far below Apollo's offers, while concealing from investors that a credible buyer was willing to pay a large premium over the market price for all outstanding shares of Arconic stock.

4.    Arconic made no disclosure concerning Apollo's offers for approximately ten months, while the Company repurchased millions of its own shares at prices far below Apollo's offers.  At the same time, Defendants made numerous misleading statements touting this significant repurchase activity – announcing at the outset of the Class Period their plan for Arconic to repurchase over $120 million worth of stock by the end of 2022 (with the option for even more) and then repeatedly updating investors about these buybacks during the Class Period, all with no disclosure concerning Apollo's credible offer to acquire Arconic shares at materially higher prices.  Arconic also affirmatively represented to investors that its repurchases complied with Rule 10b5-1, which expressly forbids repurchases while aware of material nonpublic information (absent

compliance with a safe harbor that Arconic did not purport to satisfy). As a result, Arconic omitted material information about Apollo's offers that the Company had a duty to disclose, and Defendants made material misrepresentations about Arconic's repurchases, in violation of the federal securities laws.

5. When investors learned the truth that Apollo was willing to buy all of the Company's stock for a significant premium above the trading price, Arconic's stock price climbed sharply.

6. This action seeks damages on behalf of sellers of Arconic stock during the Class Period who were harmed as a result of these violations of the federal securities laws by Defendants.

## JURISDICTION AND VENUE

7. The claims asserted in this Complaint arise under Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the 1934 Act, 15 U.S.C. §78aa.

8. Venue is proper in this District pursuant to Section 27 of the 1934 Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b), because many of the acts, practices, and transactions constituting the violations alleged in this Complaint occurred within this District. Venue is proper based on substantial connections with this District, which upon information and belief include: (a) Defendants' execution of stock repurchases through broker-dealers located in Manhattan; (b) Defendants' June 6, 2022 Investor Day presentation at the New York Stock Exchange in Manhattan ("Investor Day"); (c) Defendants' communications with analysts located in Manhattan – including individual analysts from Wolfe Research, J.P. Morgan, Goldman Sachs, and The Benchmark Company – during Arconic's earnings conference calls and other communications; (d) Defendants' meetings, telephone calls, and other communications concerning Apollo's offers to acquire Arconic with the Company's financial advisors, Goldman Sachs and Evercore, and its legal

advisor, Wachtell, Lipton, Rosen & Katz ("Wachtell"), all of which are located in Manhattan; (e) Defendants' and their financial and legal advisors' meetings, telephone calls, and other communications concerning Apollo's offers to acquire Arconic with Apollo, Apollo's financial advisor, Morgan Stanley & Co. LLC, Apollo's legal advisor, Paul, Weiss, Rifkind, Wharton & Garrison LLP, and Irenic Capital Management ("Irenic"), all of which are located in Manhattan; (f) trading of Arconic common stock on the New York Stock Exchange, located in Manhattan; and (g) the dissemination of materially false and misleading information in this District. Arconic itself is now owned and controlled by Apollo, which is located in this District.

## PARTIES

9. Lead Plaintiffs sold Arconic common stock during the Class Period as set forth in their previously filed certifications (ECF No. 21-2) and were damaged thereby.

10. Defendant Arconic was a publicly traded provider of aluminum sheets, plates, and extrusions, as well as architectural products, for the ground transportation, aerospace, building and construction, industrial, and packaging end markets. During the Class Period, Arconic common stock traded in an efficient market on the NYSE under the ticker symbol "ARNC." As of February 17, 2023, there were approximately 99.4 million shares of Arconic common stock issued and outstanding. On August 18, 2023, Apollo acquired Arconic and its obligations. Arconic is now a private company controlled by Apollo.

11. Defendant Timothy Myers ("Myers") was, at all relevant times, the Chief Executive Officer ("CEO") and President of Arconic, and a member of the Arconic Board of Directors (the "Board").

12. Defendant Erick Asmussen ("Asmussen") was, at all relevant times, the Executive Vice President and Chief Financial Officer ("CFO") of Arconic. On information and belief,

Asmussen attended and participated in all or substantially all of the meetings of the Arconic Board that are alleged in this Complaint.

13.    Defendant Frederick Henderson ("Henderson") was, at all relevant times, Chairman of the Board of Arconic.

14.    The Defendants referenced above in ¶¶11-13 are collectively referred to in this Complaint as the "Individual Defendants."

15.    Defendant Arconic and the Individual Defendants are referred to herein collectively as "Defendants."

16.    Defendants are liable for, *inter alia*: (i) failing to disclose material nonpublic facts known to them about Apollo's offers to purchase Arconic, Arconic's responses to Apollo's offers, Arconic's stock repurchases, and the true value of Arconic's common stock; and (ii) making materially false and misleading statements concerning Arconic's stock repurchases, as alleged in this Complaint.  In addition, Defendants' fraudulent scheme and course of business operated as a fraud or deceit on sellers of Arconic's common stock and: (i) deceived the investing public regarding Arconic's prospects and stock value; (ii) artificially deflated the market price of Arconic's common stock; and (iii) caused Lead Plaintiffs and other members of the Class to sell Arconic's common stock at artificially deflated prices.

17.    The Individual Defendants made, or caused to be made, materially false and misleading statements and omissions of material fact that caused Arconic's common stock to trade at artificially depressed or deflated levels during the Class Period.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of, and had the ability and opportunity to prevent the issuance or cause the correction of, Arconic's public statements, as alleged in this Complaint.  Because of their positions with the Company and

their access to material nonpublic information available to them but not to the public, the Individual Defendants knew that the facts specified in this Complaint had not been disclosed to and were being concealed from the market and that Arconic's representations were materially false and misleading at the time they were made. The Individual Defendants are liable for the material omissions and false and misleading statements pled in this Complaint.

## RELEVANT NON-PARTIES

18.     Apollo is an asset management firm based in New York, New York. It is one of the largest active asset managers in the United States, with approximately $515 billion of assets under management as of June 30, 2022. On August 18, 2023, funds managed by Apollo acquired all of the outstanding common stock of Arconic.

19.     Irenic is an investment management firm based in New York, New York. Irenic was established in 2021 with $335 million in assets under management and grew to $1.4 billion in assets under management by March 2025, according to *Institutional Investor*. Apollo's acquisition of Arconic included a minority investment from funds managed by affiliates of Irenic.

## SUBSTANTIVE ALLEGATIONS

20.     This case involves material misrepresentations, omissions, and a scheme by Defendants to defraud Arconic's public investors during the Class Period by repurchasing approximately $170 million worth of Arconic stock on the open market, while concealing material information that Apollo was offering to acquire all outstanding shares of Arconic stock at a substantial premium to the stock's market prices, materially misleading investors through numerous affirmative statements concerning Arconic's repurchases that made no mention of Apollo's superior offer, and misrepresenting to investors that the repurchases complied with the federal securities laws, when in fact Defendants were aware of, but failed to disclose, material nonpublic information concerning a credible buyer willing to pay a large premium over the market price. Defendants

therefore made materially false and misleading statements and omissions in violation of Rule 10b-5(b), and their repurchases, misrepresentations about the repurchases, and omissions about the Apollo offers together constituted a device, scheme, or artifice to defraud and an act, practice or course of business which operated as a fraud or deceit upon investors in violation of Rule 10b-5(a) and (c).

21.    Apollo first contacted Arconic privately with an offer to buy the Company at a substantial premium in April 2022 (the "April 2022 Offer"), two months before the start of the Class Period.[1]  Apollo continued to actively pursue its offer in communications with Arconic in May and June 2022.  *Id.* at 30-31.  Defendants' fraudulent scheme began in June, when they announced a plan for Arconic to repurchase over $120 million in stock by the end of 2022 (with the possibility of more repurchases beyond that amount) and began massive repurchases of Arconic stock, all without disclosing Apollo's premium offer.

22.    Defendants continued to engage with Apollo concerning a premium acquisition between June and November 2022 and – despite a lag in Apollo's original timetable related to the macroeconomic environment – Apollo remained determined to acquire the Company and Apollo and Defendants continued to engage privately concerning Apollo's desire to acquire Arconic.  *Id.* Meanwhile, having repurchased the entire amount of stock that had been authorized by the Arconic Board, Defendants caused the Board to authorize additional repurchases in November, and the repurchases continued.

23.    In late November 2022, Apollo informed Defendants that it would be submitting a formal new proposal for an acquisition of Arconic at a meaningful premium to Arconic's stock price,

---

[1]    Arconic Corporation, Definitive Proxy Statement (June 16, 2023), https://www.sec.gov/Archives/edgar/data/1790982/000114036123030186/ny20009102x2_defm14a.htm  (referred to herein as the "Proxy Statement"), at 30.

and in December, Apollo privately delivered its offer, again at a substantial premium to Arconic stock's then-market price (the "December 2022 Offer"). *Id.* at 31-32. Meanwhile, Defendants continued their fraudulent scheme by continuing to repurchase Arconic stock without disclosing Apollo's premium offer.

24.     In response to Apollo's December 2022 Offer, Defendants engaged in active negotiations with Apollo and several other potential acquirers during the first several months of 2023. *Id.* at 33. Those negotiations culminated in premium offers by both Apollo and a separate bidder, and Arconic ultimately accepted Apollo's final offer at a substantial premium in May 2023. *Id.* at 33-41.

25.     Section A below alleges the details of Arconic's stock repurchases. Sections B, C, and D then allege the details of Apollo's offer and Defendants' responses, including their failure to disclose Apollo's premium offer to investors while the Company continued to repurchase stock.

### A.     Arconic's Share Repurchase Activity

26.     On May 4, 2021, Arconic announced that its Board approved a stock repurchase program authorizing Arconic to repurchase up to $300 million worth of common stock, effective immediately, over a two-year period expiring April 28, 2023 (the "2021 Program"). *See* Arconic Form 10-K for the fiscal year ended December 31, 2021, filed with the SEC on February 22, 2022 ("2021 10-K"), at 41, 98.

27.     According to Arconic's 2021 10-K, the 2021 Program provided that "repurchases under the program [could] be made from time to time, as the Company deem[ed] appropriate, solely through open market repurchases effected through a broker dealer, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions." The 2021 10-K also stated that the 2021 Program "[was] intended to comply with Rule 10b5-1." *Id.*

28.     According to Arconic's 2021 10-K, from May 2021 to December 2021, Arconic repurchased 4,912,505 shares of its common stock under the 2021 Program for approximately $161 million. *Id*. at 53.

29.     In its 2021 10-K, Arconic disclosed the number of shares repurchased each month and the average price paid per share (*id*. at 41). The total amount of money spent on repurchases each month is calculated based on the total number of shares repurchased and average price per share in the chart below:

| Month | Total Number of Shares Purchased | Average Price Paid Per Share | Total |
|-------|----------------------------------|------------------------------|-------|
| May-21 | 121,541 | $34.77 | $4,225,981 |
| Jun-21 | 124,470 | $34.59 | $4,305,417 |
| Jul-21 | 563,603 | $33.41 | $18,829,976 |
| Aug-21 | 1,293,844 | $34.34 | $44,430,603 |
| Sep-21 | 1,005,247 | $34.27 | $34,449,815 |
| Oct-21 | 595,550 | $30.51 | $18,170,231 |
| Nov-21 | 426,727 | $30.83 | $13,155,993 |
| Dec-21 | 781,523 | $30.46 | $23,805,191 |
| **Total** | **4,912,505** | **$32.85** | **$161,373,206** |

30.     Accordingly, as of December 31, 2021, approximately $139 million worth of Arconic shares could still be purchased under the $300 million 2021 Program. *Id*.

31.     According to Arconic's Form 10-Q for the quarter ended March 31, 2022, which was filed with the SEC on May 4, 2022 ("2022 1Q 10-Q"), from January 2022 through March 2022, Arconic repurchased 505,982 shares of its common stock under the 2021 Program for a total cost of approximately $16 million. 2022 1Q 10-Q at 16. Defendant Asmussen signed the 2022 1Q 10-Q, and Defendants Asmussen and Myers signed Sarbanes-Oxley Act of 2002 ("SOX") certifications attesting that the 2022 1Q 10-Q did not contain any untrue statement of a material fact or omit to

state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

32.    In its 2022 1Q 10-Q, Arconic disclosed the number of shares repurchased each month during the quarter (*id*. at 43) and the average price paid per share.  The total amount of money spent on repurchases in each month is calculated based on the total number of shares repurchased and average price per share in the chart below:

| Month | Total Number of Shares Purchased | Average Price Paid Per Share | Total |
|---|---|---|---|
| Jan-22 | 180,043 | $30.83 | $5,550,726 |
| Feb-22 | 325,939 | $31.09 | $10,133,444 |
| Mar-22 | - | - | - |
| **Total** | **505,982** | **$31.00** | **$15,684,169** |

Accordingly, as of March 31, 2022, approximately $123 million worth of Arconic shares could still be purchased under the 2021 Program.  *Id*.

33.    On August 2, 2022, during post-market hours, Arconic filed its Form 10-Q for the quarter ended June 30, 2022 with the SEC ("2022 2Q 10-Q").  The 2022 2Q 10-Q was signed by Defendant Asmussen.  Defendants Myers and Asmussen also signed SOX certifications dated August 2, 2022, that were attached to the 2022 2Q 10-Q, attesting that the 2022 2Q 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

34.    The 2022 2Q 10-Q stated that Arconic repurchased 1,324,027 shares of its common stock during the quarter under the 2021 Program for a total cost of approximately $37 million.  2022 2Q 10-Q at 43.

35.     Accordingly, as of June 30, 2022, approximately $86 million worth of Arconic shares could still be purchased under the 2021 Program. *Id*. at 48.

36.     In its 2022 2Q 10-Q, Arconic disclosed the number of shares repurchased each month during the quarter and the average price paid per share (*id.*). The total amount of money spent on repurchases in each month is calculated based on the total number of shares repurchased and average price per share in the chart below:

| Month | Total Number of Shares Purchased | Average Price Paid Per Share | Total |
|---|---|---|---|
| Apr-22 | - | - | - |
| May-22 | - | - | - |
| Jun-22 | 1,324,027 | $27.70 | $36,675,548 |
| **Total** | **1,324,027** | **$27.70** | **$36,675,548** |

37.     The average repurchase price of $27.70 per share in June 2022 was significantly below Apollo's April 2022 Offer of $34.00 to $36.00 per share. The stock's highest intraday or closing market price from June 6 through June 30, 2022, was $31.24 on June 7, and below $30.00 per share on all but three days during that period. Thus, every Class member who sold Arconic stock during that period, even at the highest price during that period, suffered damages as a result of Defendants' fraud.

38.     As alleged in detail in ¶¶67-69, 113-115, 142 *infra*, Arconic's June 2022 repurchases were made while Defendants were aware of material nonpublic information about Apollo's offer to acquire all of Arconic's common stock and Arconic's response to the offer.

39.     On November 1, 2022, during post-market hours, Arconic filed its Form 10-Q for the quarter ended September 30, 2022 with the SEC ("2022 3Q 10-Q"). The 2022 3Q 10-Q was signed by Defendant Asmussen. Defendants Myers and Asmussen also signed SOX certifications dated November 1, 2022, that were attached to the 2022 3Q 10-Q, attesting that the 2022 3Q 10-Q did not

- 11 -

contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

40.    The 2022 3Q 10-Q stated that Arconic repurchased 3,033,663 shares during the quarter under the 2021 Program for a total of approximately $86 million.  2022 3Q 10-Q at 19. Thus, as of August 31, 2022, Arconic had repurchased the maximum $300 million in common stock authorized under the 2021 Program.

41.    In its 2022 3Q 10-Q, Arconic disclosed the number of shares repurchased each month during the quarter and the average price paid per share (*id*. at 52).  The total amount of money spent on repurchases in each month is calculated based on the total number of shares repurchased and the average price per share in the chart below:

| Month | Total Number of Shares Purchased | Average Price Paid Per Share | Total |
|---|---|---|---|
| Jul-22 | 1,776,471 | $28.35 | $50,362,953 |
| Aug-22 | 1,257,192 | $28.56 | $35,905,404 |
| Sept-22 | - | - | - |
| **Total** | **3,033,663** | **$28.44** | **$86,268,356** |

42.    The average repurchase prices in July and August 2022 of $28.35 and $28.56 per share, respectively, were significantly lower than Apollo's April 2022 Offer of $34.00 to $36.00 per share.  The stock's highest intraday or closing market prices in July and August 2022 were $30.45 on July 29 and $30.68 on August 1, and below $30.00 per share on all but three days in each of those months.  Thus, every Class member who sold Arconic stock during July and August 2022, even at the highest prices during those months, suffered damages as a result of Defendants' fraud.  The same is true of September and October 2022, when the stock's highest intraday or closing monthly prices

were $28.22 on September 12 and $21.79 on October 26, and below $26.00 on all but six days in September and below $21.00 on all but seven days in October.

43.     While Arconic repurchased approximately $177 million worth of its shares under the 2021 Program over the span of eleven months from May 2021 through March 2022, Arconic repurchased approximately $123 million worth of its shares during the first three months of the Class Period from June 2022 through August 2022, reaching the maximum of $300 million that could be repurchased under the 2021 Program in August 2022. The 2021 Program did not expire until April 2023. Thus, Arconic more than doubled its monthly repurchase rate after receiving Apollo's initial offer in April 2022 and repurchased the entire amount of stock authorized under the 2021 Program ten months early.

44.     Before June 2022, the largest number of shares repurchased by Arconic in a single month under the 2021 Program was 1,293,844 in August 2021. Arconic repurchased more shares in each of June 2022 and July 2022 than it did in August 2021.

45.     On November 16, 2022, Arconic issued a press release announcing that its Board had approved another share repurchase program, which authorized the Company to repurchase up to $200 million worth of common stock in the two-year period expiring November 17, 2024 (the "2022 Program").

46.     According to Arconic's Form 10-K for the fiscal year ended December 31, 2022, which was filed with the SEC on February 21, 2023 ("2022 10-K"), the 2022 Program provided that "repurchases under the program [could] be made from time to time, as the Company deem[ed] appropriate, solely through open market repurchases effected through a broker dealer, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of

capital, and overall market conditions." The 2022 10-K also stated that the 2022 Program "[was] intended to comply with Rule 10b5-1." 2022 10-K at 87.

47.    The 2022 10-K was signed by Defendants Myers and Asmussen. Defendants Myers and Asmussen also signed SOX certifications dated February 21, 2023, that were attached to the 2022 10-K, attesting that the 2022 10-K did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

48.    The 2022 10-K stated that Arconic repurchased 2,071,835 shares under the 2022 Program in the fourth quarter of 2022 for a total of approximately $46 million. Id. at 42.

49.    In its 2022 10-K, Arconic disclosed the number of shares repurchased each month during the fourth quarter, and the average price paid per share (id.). The total amount of money spent on repurchases in each month is calculated based on the total number of shares repurchased and the average price per share in the chart below:

| Month | Total Number of Shares Purchased | Average Price Paid Per Share | Total |
|---|---|---|---|
| Oct-22 | - | - | - |
| Nov-22 | 468,979 | $21.59 | $10,125,257 |
| Dec-22 | 1,602,856 | $22.56 | $36,160,431 |
| **Total** | **2,071,835** | **$22.34** | **$46,285,688** |

50.    The average repurchase prices of $21.59 per share and $22.56 per share in November and December 2022, respectively, were significantly below both Apollo's April 2022 Offer of $34.00-$36.00 per share and Apollo's December 2022 Offer of $30.00 per share. The stock's highest intraday or closing market prices in November and December 2022 were $23.88 on November 30 and $24.15 on December 1, and below $23.00 per share on all but one day in November and three days in December. Thus, every Class member who sold Arconic stock during

November and December 2022, even at the highest prices during those months, suffered damages as a result of Defendants' fraud.

51.    The 1,602,856 shares repurchased in December 2022 were the single largest number of shares purchased in any month under either the 2021 Program or the 2022 Program.  The shares Arconic repurchased in December 2022 were repurchased after Arconic was informed on November 28, 2022 that Apollo was "considering submitting a new proposal for an acquisition of Arconic at a meaningful premium to Arconic's stock price" (as alleged in detail in ¶73 *infra*).  At least some of the December 2022 repurchases occurred after Defendants received Apollo's offer to buy all of Arconic's common stock for $30.00 per share on December 12, 2022, and thereafter negotiated with Apollo (as alleged in detail in ¶¶76-82 *infra*).

52.    On May 4, 2023, during post-market hours, Arconic filed its Form 10-Q for the quarter ended March 31, 2023 ("2023 1Q 10-Q").  The 2023 1Q 10-Q was signed by Defendant Asmussen and included SOX certifications signed by Defendants Asmussen and Myers, attesting that the 2023 1Q 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

53.    The 2023 1Q 10-Q stated that Arconic repurchased 35,615 shares under the 2022 Program in the first quarter of 2023 for a total of approximately $1 million.  2023 1Q 10-Q at 36-37.

54.    In its 2023 1Q 10-Q, Arconic disclosed the number of shares repurchased each month during the quarter and the average price paid per share (*id.*).  The total amount of money spent on repurchases in each month is calculated based on the total number of shares repurchased and the average price per share in the chart below:

| Month | Total Number of Shares Purchased | Average Price Paid Per Share | Total |
|-------|----------------------------------|------------------------------|-------|
| Jan-23 | 35,615 | $20.98 | $747,203 |
| Feb-23 | - | - | - |
| Mar-23 | - | - | - |
| **Total** | **35,615** | **$20.98** | **$747,203** |

55.     The average repurchase price of $20.98 per share in January 2023 was significantly below Apollo's December 2022 offer of $30.00 per share.  The stock's highest intraday or closing price that month was $24.44 on January 18, and below $24.00 on all but two days that month.  Thus, every Class member who sold Arconic stock in January 2023, even at the monthly high, suffered damages as a result of Defendants' fraud.  The same is true of Class members who sold Arconic common stock during the remainder of the Class Period (*i.e.*, in February, March, April, or the first three days of May) when the highest intraday or closing prices were $27.28, $28.15, $26.45, and $25.09 on February 28 (after the *Wall Street Journal* reported Apollo's interest in acquiring Arconic during market hours that day), March 16, April 3, and May 1, respectively.

**B.     The Apollo Acquisition Offer and Arconic's Internal Discussions**

56.     On April 4, 2022, Apollo contacted Defendant Myers, Arconic's CEO, to arrange an in-person meeting.  Proxy Statement at 30.

57.     Two days later, on April 6, 2022, Defendant Myers and Defendant Asmussen, Arconic's CFO, met with Apollo.  During the meeting, "the representative of Apollo expressed that Apollo was interested in exploring a negotiated transaction with Arconic." *Id*.

58.     On April 19, 2022, Apollo offered "to acquire 100% of the outstanding equity interests of Arconic in an all-cash transaction at a price range of $34.00 to $36.00 per share" (the April 2022 Offer).  The April 2022 Offer was at a material premium (approximately 28.5% using the

median proposed price) to the price of Arconic common stock, which closed on April 19, 2022 at $27.23 per share.  *Id*.

59.     The April 2022 Offer contained "'highly confident' letters from potential financing sources."  The April 2022 Offer also contained a proposed "go-shop" period during which Arconic would be permitted to solicit competing bids for a limited period of time following the execution of a merger agreement.  *Id*.

60.     On April 29, 2022, the Arconic Board, which included Defendants Myers and Henderson, held a special meeting in which members of Arconic's management, Arconic's financial advisor Goldman Sachs, and Arconic's legal advisor Wachtell participated.  *Id*.

61.     At the April 29, 2022 Arconic Board meeting, the Board determined that Apollo's $34.00 to $36.00 per share offer "undervalued Arconic and was not in the best interests of the Company and its stockholders."  *Id*.

62.     On April 29, 2022, Arconic's common stock closed at $25.16 per share, far below Apollo's offer.

63.     Also on April 29, 2022, Defendant Myers informed Apollo of the Board's decision concerning the April 2022 Offer.  *Id*.

64.     On May 5, 2022, Apollo contacted Defendant Myers to request a meeting, and requested that Irenic join the meeting as well.  The meeting was subsequently scheduled for May 31, 2022.  *Id*.

65.     On May 25, 2022, Irenic met with Defendant Myers and expressed interest in exploring a negotiated transaction with Arconic in partnership with Apollo.  *Id*. at 31.

66.     On May 31, 2022, Defendants Myers and Henderson met with Apollo.  During the meeting, Apollo indicated that it planned to submit a revised proposal to acquire Arconic following Arconic's upcoming June 6, 2022 Investor Day presentation.  *Id*.

67.     On June 1, 2022, Apollo requested a meeting with Arconic during the following week and proposed that the two companies enter into a confidentiality agreement.  *Id*.

68.     On June 9, 2022, Apollo and Irenic, during an in-person meeting with Defendants Myers and Asmussen, indicated that Apollo and Irenic planned to submit a revised proposal within the next two weeks.  *Id*.  Then, on June 23, 2022, Apollo informed Defendants that it would submit its next formal acquisition proposal on a different timeline because of the deteriorating macroeconomic environment.   As stated in the Proxy Statement, "[o]n June 23, 2022, a representative of Apollo contacted Mr. Henderson and noted that in light of deteriorating macroeconomic conditions, including a challenging financing market, Apollo and Irenic would not be submitting a proposal on the timeline that they had previously indicated."  *Id*.

69.     Between June 23, 2022 and November 28, 2022, Arconic, on the one hand, and Apollo and Irenic, on the other hand, continued to interact and hold discussions concerning a potential acquisition of Arconic through "occasional contacts" during this period.  *Id*. at 31.  Thus, Defendants were aware that Apollo and Irenic still intended to pursue their offer to acquire Arconic at a premium to the trading price of Arconic's common stock.

70.     In early November 2022, Jeffrey Stafeil ("Stafeil"), a member of Arconic's Board, disclosed to Arconic management and the other members of the Board that he had been appointed as the Chief Financial Officer of Tenneco Inc. ("Tenneco"), a company that was subject to a pending acquisition by Apollo, and that his appointment would be effective December 1, 2022, subject to the completion of Apollo's acquisition of Tenneco.  *Id*.  As a result, at the meetings of the Board that

followed, the Board regularly provided directors the opportunity to discuss Arconic's negotiations and interactions with Apollo without Mr. Stafeil present. *Id.* Arconic's decision in early November to wall Mr. Stafeil off from the Board's discussion of Arconic's negotiations and interactions with Apollo demonstrates that Arconic and the Individual Defendants knew that Apollo remained seriously interested in acquiring Arconic and would make another offer to do so at a premium to Arconic stock's market price.

71.    As alleged in detail in ¶¶33-46, Arconic repurchased its stock at artificially depressed market prices for a total of approximately $123 million in June, July, and August 2022 under the 2021 Program, and then created and announced the 2022 Program in November 2022, all without disclosing any information concerning: (a) Apollo's April 2022 Offer to acquire all of Arconic's outstanding stock at a significantly higher price range than the stock's market price during the period from June through November 2022; or (b) Apollo's and Irenic's continuing communications with Arconic during those months indicating their continuing intention to make an offer to acquire Arconic at a significant premium over the stock's market price.

**C.    Arconic Conceals Apollo's Continued Interest in Acquiring the Company and Its December 2022 Offer While Repurchasing Shares**

72.    By November 2022, Arconic and Apollo stepped up the pace of their negotiations concerning Apollo's offer to acquire Arconic.

73.    On November 28, 2022, Defendant Henderson met with Apollo, which informed him that it was "considering submitting a new proposal for an acquisition of Arconic at a meaningful premium to Arconic's stock price, which had decreased to $21.65 per share as of November 28, 2022." Proxy Statement at 31-32. Apollo told Henderson that the proposed acquisition of Arconic by Apollo "would produce an attractive, value-certain outcome for Arconic's shareholders and allow Arconic to operate in a new private governance model post-closing." *Id.* at 32.

74.    Arconic's Board, including Defendants Myers and Henderson, discussed Henderson's November 28, 2022 conversation with Apollo at a regularly scheduled Board meeting on December 2, 2022.  *Id*.

75.    On December 7, 2022, at a meeting with Defendants Myers and Asmussen, Apollo reiterated its interest in acquiring Arconic, and said that subject to internal approval, Apollo expected to submit an offer for Arconic the following week.  *Id*.

76.    On December 12, 2022, Apollo submitted a revised offer to purchase all of the Company's outstanding common stock for $30.00 in cash per share (the "December 2022 Offer"). *Id*.

77.    The December 2022 Offer referenced "a challenging macroeconomic environment." *Id*.

78.    The December 2022 Offer to acquire Arconic stock for $30 per share was at a significant premium (approximately 33%) to Arconic's common stock price, which closed on December 12, 2022, at $22.57 per share.  *Id*.  The December 2022 Offer was a higher premium than, and thus represented an increased bid over, the April 2022 Offer.

79.    The December 2022 Offer "requested a 30-day period to secure committed financing for the transaction" and indicated that Apollo "was prepared to use certain of [its affiliated investment funds'] financing sources to help secure the necessary debt funding to provide a fully committed binding transaction."  Moreover, the proposal reiterated Apollo's willingness to accept a "go-shop" period during which Arconic would be permitted to solicit competing bids for a limited period following the signing of the transaction, as well as a "relatively low" termination fee during that period, payable by Arconic if it terminated the Apollo transaction to accept a superior bid.

Apollo also requested a period of exclusive negotiations between Arconic and Apollo in order for Apollo to conduct satisfactory due diligence.  *Id.*

80.     On December 13, 2022, the Arconic Board, which included Defendants Myers and Henderson, held a special meeting to discuss Apollo's December 2022 Offer.  Members of Arconic's management, Goldman Sachs, and Wachtell participated in the meeting, as well as Evercore, which Arconic had retained as an additional financial advisor.  *Id.*

81.     At the December 13, 2022 Board meeting, the Board discussed Apollo's December 2022 Offer and compared it to Apollo's April 2022 Offer.  The Board directed Arconic's financial advisors Goldman Sachs and Evercore "to perform preliminary financial analyses" of the proposal and determined to meet again to consider the December 2022 Offer in light of those analyses.  *Id.*

82.     On December 21, 2022, the Arconic Board held another special meeting, in which members of Arconic's management, Wachtell, Goldman Sachs, and Evercore participated.  *Id.*  At this meeting, the Board "discussed unaudited prospective financial information for Arconic that Arconic management had presented to the Board of Directors in October 2022 as part of its annual review process."  The Board directed Arconic management to "refine management's view of Arconic's sustainable earnings power" and determined to meet again to continue to evaluate Apollo's December 2022 Offer.  Following the meeting, Defendants Myers and Asmussen informed Apollo that the Board would continue to consider the December 2022 Offer in January 2023.  *Id.* at 33.

83.     On January 19, 2023, the Arconic Board held a special meeting, in which members of Arconic's management, Wachtell, Goldman Sachs, and Evercore participated.  *Id.*

84.     At the January 19, 2023 Board meeting, the Board discussed three different prospective financial scenarios for Arconic for fiscal years 2023 through 2027, parties in addition to

Apollo that might potentially be interested in acquiring Arconic, and Goldman and Evercore's preliminary analyses of Apollo's December 2022 Offer. *Id*. at 33, 61. Following the discussion, the Board directed management to convey to Apollo that Apollo's December 2022 Offer was too low, but to give Apollo access to due diligence information and discussions with management "to allow Apollo to consider raising its bid and to provide additional assurance regarding the certainty of a potential transaction, in particular relating to transaction financing." Defendants Myers and Asmussen conveyed this message to Apollo later that day. *Id*. at 33.

85.     On January 26, 2023, Arconic entered into confidentiality agreements with Apollo and Irenic. *Id*.

86.     On January 29, 2023, Arconic provided Apollo, Irenic, and their respective representatives with access to an electronic data room containing due diligence information regarding Arconic, including financial projections. *Id*.

87.     On February 2, 2023, the Board held a regular meeting in which members of Arconic's management participated. *Id*.

88.     At the February 2, 2023 Board meeting, the Board discussed parties other than Apollo that might potentially be interested in and financially capable of acquiring Arconic, including both potential strategic bidders and other financial sponsors. Following this discussion, the Board directed Arconic's management to conduct a confidential outreach to three parties who, in the judgment of the Board and its advisors, would be most likely to be interested in, and financially capable of, consummating a potential acquisition of Arconic. *Id*.

89.     On February 9, 2023, Apollo and Irenic met with Arconic, Wachtell, Goldman Sachs, and Evercore for a due diligence session. *Id.*

90.    On February 10, 2023, Defendant Myers reached out to two strategic companies and a private equity firm ("Private Equity Firm A") to assess whether these parties would be interested in a possible transaction with Arconic, as instructed by the Board.  The two strategic companies indicated that they were not interested in a transaction at that time, but Private Equity Firm A indicated that it was interested and entered into a confidentiality agreement with Arconic on February 17, 2023.  On the same day, Arconic provided Private Equity Firm A with access to an electronic data room containing due diligence information.  *Id*. at 33-34.

91.    As alleged in detail in ¶¶47-55, Arconic repurchased approximately $47 million worth of its stock in November and December 2022 and January 2023 under the 2022 Program with no disclosure of any information concerning: (a) Apollo's offers to acquire Arconic's outstanding shares at materially higher prices than the prices at which Arconic repurchased shares; or (b) Apollo's communications to Arconic expressing Apollo's continuing interest in acquiring Arconic.

**D.    Arconic Continues to Conceal Apollo's Offer Until the End of the Class Period**

92.    On February 23, 2023, Defendants Myers and Henderson met with Apollo.  At that meeting, Apollo indicated that it planned to renew its offer to acquire Arconic for $30.00 per share within the next day.  Proxy Statement at 34.

93.    Later in the day on February 23, 2023, Apollo offered "to acquire Arconic in an all-cash transaction at a price of $30.00 per share" (the "February 2023 Offer").  *Id*.  The $30.00 per share offer was at a significant premium to the price of Arconic common stock, which closed on February 23, 2023 at $23.15 per share.  *Id*.  Based on its due diligence, Apollo stated that its February 2023 Offer "represented an increased offer to acquire Arconic as compared to the December 12 Apollo Proposal despite the same $30.00 per share price."  *Id.*

94.    The February 2023 Offer "included certain financing letters of support from J.P. Morgan Chase Bank, N.A. and Wells Fargo Bank, National Association confirming the availability of debt financing for the transaction, and reiterated that the Apollo Funds were prepared to use certain of the Apollo Funds' financing sources to help secure the necessary debt funding to provide a fully committed binding transaction." *Id.* The February 2023 Offer also stated that if Arconic provided "a reciprocal level of engagement," Apollo believed it could complete its due diligence and execute definitive transaction documents by March 27, 2023. *Id.*

95.    On February 28, 2023, during market hours at approximately 2:00 p.m. Eastern Standard Time, the *Wall Street Journal* reported that Apollo had submitted a bid to acquire Arconic and that Arconic's advisors had reached out to other potential acquirers:

**Apollo in Talks to Buy Aerospace-Parts Maker Arconic**

Private-equity firm Apollo Global Management Inc. is in talks to acquire aerospace-parts maker Arconic Corp., according to people familiar with the matter.

Apollo submitted a bid in February and has debt financing in place, the people said. Arconic's advisers at Goldman Sachs Group Inc. and Evercore Inc. have also reached out to other potential acquirers, the people said. . . .  Should there be a deal, it would be expected to carry a significant premium, the people said.

\*       \*       \*

The deal would come at a muted time for private-equity buyouts.  A tough financing market – coupled with a disconnect between buyers and sellers on price after equity values plummeted last year – has created roadblocks to deals.

Private-equity firms have turned more to private lenders, while some have opted to put more of their cash to work in new investments.  Apollo, which has a large credit arm, has the ability to be creative in the structuring of its deals.

96.    In response to this news, the price of Arconic common stock increased $4.68 per share, or 21.5%, from $21.76 per share immediately before the *Wall Street Journal* report to a closing price on February 28, 2023, of $26.44 per share.

- 24 -

97.    Later on February 28, 2023, Arconic's Board met with Arconic's management, Goldman Sachs, Evercore, and Wachtell to discuss Apollo's February 2023 Offer, an offer from Private Equity Firm A to acquire just part of Arconic, and preliminary financial analyses of both of these offers by Goldman Sachs and Evercore. After discussion, the Board directed management to ask Private Equity Firm A whether it would consider acquiring all of Arconic and determined to meet again to further discuss the proposals. Proxy Statement at 34-35.

98.    On March 2, 2023, two additional private equity firms ("Private Equity Firms B and C") contacted Arconic's financial advisors indicating interest in acquiring Arconic. *Id.* at 35.

99.    Also on March 2, 2023, Arconic's Board held a special meeting with management, Goldman Sachs, Evercore, and Wachtell and discussed the negotiations with Apollo and Private Equity Firm A and outreach from Private Equity Firms B and C. The Board then directed management to continue negotiations with Apollo and Private Equity Firm A and to enter into confidentiality agreements with other parties determined to have a bona fide interest in a transaction with Arconic. *Id.* at 35.

100.    During March 2023, Arconic and its advisors determined that Private Equity Firm C was not seriously interested in a transaction with Arconic, but Arconic entered into confidentiality agreements with Private Equity Firm B and another private equity firm ("Private Equity Firm D") to enable them to pursue a possible acquisition of Arconic. *Id.* at 35-36. Also during that month, Apollo and Irenic continued to meet with Arconic and its financial advisors to conduct due diligence, and Apollo's and Arconic's counsel negotiated merger documentation, but Private Equity Firms A and B stopped pursuing a transaction with Arconic. *Id.* at 36.

101.    On March 28, 2023, Private Equity Firm D told Arconic that it intended to offer to acquire Arconic at a possible valuation range of $30.00 to $33.50 per share. *Id.* at 37.

102.    On April 5, 2023, Private Equity Firm D offered to acquire all of Arconic's stock for cash at a price range of $30.00 to $33.00 per share.  *Id.*

103.    During April 2023, Apollo continued to conduct due diligence and negotiate deal terms and transaction documents with Arconic.  On April 11, 2023, Apollo offered $27.75 per share to acquire all of Arconic's stock, but after meeting and discussing this offer with Arconic's management and legal and financial advisors, the Board determined that this offer undervalued Arconic and instructed management to convey that information to Apollo.  *Id.* at 38.

104.    On April 19, 2023, Apollo offered $29.25 per share to acquire all of Arconic's stock. After meeting and discussing this offer with Arconic's management and legal and financial advisors on April 21, 2023, the Board instructed management to inform Apollo that Arconic would be willing to transact at a price of $33.00 per share.  *Id.* at 39.

105.    On April 26, 2023, Apollo made a "best and final offer" to acquire Arconic for $30.00 per share.  *Id*.  After meeting and discussing this offer with Arconic's management and legal and financial advisors on April 27, 2023, the Board instructed management to inform Apollo that Arconic would be willing to transact at a price of $31.00 per share.  *Id*. at 40.

106.    On May 1, 2023, Apollo reiterated that $30.00 per share was its final offer.  On May 2, 2023, after discussing this offer with Arconic's management and legal and financial advisors, the Board preliminarily decided to accept this offer.  The Board formally approved the offer at a meeting on the following day, on May 3, 2023.  *Id.* at 41.

107.    On May 4, 2023, during pre-market hours, Arconic issued a press release announcing that it had entered into an agreement to be acquired by Apollo in an all-cash transaction at $30.00 per share.  Thus, the last day of the Class Period is May 3, 2023.

108.    In response to this news, the price of Arconic common stock increased $6.38 per share, or 28.3%, from a closing price on May 3, 2023 of $22.55 per share to a closing price on May 4, 2023 of $28.93 per share.

109.    On June 16, 2023, Arconic published the Proxy Statement.

110.    On August 18, 2023, Apollo completed its acquisition of Arconic.

111.    Arconic's failure to disclose that an acquisition of Arconic at a significant premium to Arconic stock's market price had been proposed by a serious, financially capable bidder artificially deflated the price of Arconic common stock during the Class Period, and Arconic took advantage of those artificially lower prices by repurchasing shares.

112.    Arconic's actions constituted a device, scheme, or artifice to defraud, or operated as a deceit upon Lead Plaintiffs and the Class, in violation of Rule 10b-5.

## DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS

### A.    Defendants Violated Their Duty to Disclose Apollo's Offers or Abstain from Trading in Arconic Securities

113.    Beginning in June 2022, Defendants were aware of material nonpublic information concerning Apollo's ongoing acquisition interest in Arconic, and had a duty to disclose that information or abstain from trading in Arconic securities.  Defendants knew that Apollo had communicated all-cash proposals offering a significant premium over Arconic's trading price, backed by committed financing and a credible intention to complete the transaction.  The Board engaged in internal deliberations regarding these proposals, including obtaining financial advice from Goldman Sachs and Evercore, and concluded that Apollo's initial April 2022 Offer, even at a premium to market, undervalued the Company.  Yet while Defendants expressed that view internally and to Apollo and continued to engage with Apollo concerning a potential transaction, Arconic repurchased millions of shares at prices far below Apollo's offers, while concealing from investors

that a credible buyer was willing to pay a large premium over the market price for all outstanding Arconic stock.

114.    While repurchasing its own stock from June 2022 forward, Arconic was aware of material nonpublic information that a credible private-equity acquirer had initiated an acquisition process, was actively engaged in due diligence, and had increased its bid over time, and that Arconic's response had advanced through Board-level consideration. The undisclosed material facts included: (i) the offers by Apollo, one of the largest active investment managers in the country and one readily capable of financing an acquisition of Arconic, to acquire Arconic for significant premiums to its stock's market price; (ii) the Board's stated belief that Arconic stock was worth more than Apollo's offers and the Board's desire for a higher offer; (iii) ongoing communications among Apollo, Irenic, and the Board; (iv) Apollo's increasing bid price; and (v) the November 2022 recusal of Arconic Board member Jeffrey Stafeil from Apollo-related discussions after he informed Arconic that he had been appointed CFO of Tenneco, a company subject to a pending Apollo acquisition. After Stafeil informed Arconic of his pending affiliation with Apollo, the Board repeatedly met without Stafeil present to discuss negotiations with Apollo, further underscoring the seriousness and materiality of the ongoing acquisition-related communications between Arconic and Apollo.

115.    Without disclosing any of this material nonpublic information, Arconic repurchased approximately $170 million worth of its common stock in the open market between June 2022 and January 2023. These repurchases were executed at prices significantly below Apollo's offers and the ultimate deal price.

116.    Under Section 10(b) and Rule 10b-5, Arconic was required to abstain from trading in Arconic securities or to disclose the material information concerning Apollo's acquisition proposals.

But Arconic did not disclose this material nonpublic information and did not abstain from trading in its own securities while Defendants were aware of this material nonpublic information. Instead, Arconic repurchased millions of shares of its common stock during the Class Period, without disclosure, in violation of the federal securities laws.

### B. Defendants' Statements Concerning Stock Repurchases Under the 2021 and 2022 Programs Were Materially False and Misleading

117. Defendants also violated Section 10(b) and Rule 10b-5 by affirmatively disclosing selected information about Arconic's share repurchases and its approval of an additional share repurchase program without disclosing Apollo's offers or the fact that the repurchases occurred while Arconic was aware of material nonpublic information about those offers. At the outset of the Class Period, as Arconic began heavily repurchasing its shares, Defendants announced their plan for Arconic to repurchase over $120 million worth of stock by the end of 2022 (with the possibility for even more repurchases beyond that amount), and then continued to update investors about these buybacks throughout the Class Period, all with no disclosure concerning Apollo's offers to buy Arconic's outstanding shares at materially higher prices. Thus, Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

118. On June 6, 2022, Arconic hosted an in-person Investor Day at the NYSE. Defendant Asmussen stated at the Investor Day that:

> We're expected to complete our existing share repurchase program, and to date, we've purchased $177 million of our $300 million authorized program. . . . We have repurchased over 5 million shares or 5% of shares outstanding for $177 million from our $300 million authorization. We plan to execute the remaining $123 million of authorization before the end of this year[.]

*Id*. at 6-7.

119.    Defendant Asmussen also spoke about the Company's repurchases at the June 6, 2022 Investor Day: "We have repurchased over 5 million shares or 5% of shares outstanding for $177 million from our $300 million authorization.  We plan to execute the remaining $123 million of authorization before the end of this year." *Id.* at 7.

120.    Thus, just as Arconic began repurchasing large quantities of its shares in June 2022 while aware of material nonpublic information concerning Apollo's premium offer, Defendants also began specifically drawing the market's attention to those repurchases, making numerous affirmative misleading representations about the repurchases, and plans to conduct further repurchases, without disclosing Apollo's materially higher offer.  To tell investors that the Company was repurchasing over $120 million worth of shares at prevailing market prices without disclosing a credible proposal to acquire those shares at materially higher prices was materially misleading and unlawful.

121.    Analyst reports written after the Investor Day demonstrate that Defendants' statements about Arconic's share repurchases were material to investors.  On June 6, 2022, Deutsche Bank Research wrote: "Shareholder returns remains a key topic with preference in that order for (i) share buyback (~$130m remaining and expected by year-end), (ii) growth projects and a (iii) dividend once stable free cash flows will be established."

122.    Defendants also conspired to disseminate additional misleading information concerning Arconic's planned repurchases to the market by privately informing Deutsche Bank Research that the Company was considering an additional buyback program over and above the publicly announced $123 million in repurchases by year's end, without disclosing Apollo's material offer.  Thus, on June 16, 2022, Deutsche Bank Research published a report entitled "Post management meetings takeaways," discussing "meetings with the management team earlier this week" and disclosing that: "Shareholder returns will also include share buyback (with the optionality

for another program once the current $300m program is achieved, targeted by year-end). . . . The company is further looking for the next opportunities.  Management has a preference for share buyback over dividend . . . ."

123.    Thereafter, and throughout the rest of the Class Period, Defendants continued to mislead investors by providing numerous specific updates regarding Arconic's heavy volume of repurchases at prevailing market prices with no disclosure concerning Apollo's materially higher offer.

124.    The 2022 2Q 10-Q, filed with the SEC on August 2, 2022, stated that Arconic repurchased 1,324,027 shares of its common stock between June 1 and 30, 2022 for a total cost of approximately $37 million, and at an average price of $27.70 per share.  2022 2Q 10-Q at 43, 48. *See also* ¶¶33-38.

125.    Also on August 2, 2022, Arconic conducted a conference call with analysts and investors to discuss its financial results for the second quarter (the "Q2 2022 Conference Call"). During the Q2 2022 Conference Call, Defendant Asmussen stated in relevant part: "In the quarter, we repurchased approximately 1.3 million shares.  Since we announced this program in May of last year and through the end of the second quarter, we repurchased approximately 6.7 million shares or approximately 5% of our outstanding shares for $214 million against our $300 million program." Q2 2022 Conference Call at 4.

126.    Later on the Q2 2022 Conference Call, Defendant Myers also stated in relevant part: "Since we announced the [stock repurchase] program in May of last year through July 29, we have repurchased 8.7 million shares for approximately $269 million of the $300 million authorization. We expect to complete the program before year-end."  *Id*. at 5-6.  The dollar and share numbers

stated by Defendants Myers and Asmussen for the repurchases on the Q2 2022 Conference Call differed because Myers' numbers went through July, and Asmussen's only through June.

127.    Analysts considered information about the repurchases important to investors.  On August 3, 2022, Credit Suisse reported:  "Share repurchases continue at a high pace with ARNC buying back 1.3mm shares in 2Q-22 and another 2.0mm shares in July.  The total repurchases now stand at 8.7 mm shares for ~270mm against the $300mm authorization."  J.P. Morgan also reported the dollar and share volume of Arconic's repurchases during the second quarter of 2022.

128.    The 2022 3Q 10-Q, filed with the SEC on November 1, 2022, stated that Arconic repurchased 1,776,471 shares in July 2022 for an average price of $28.35 per share, and 1,257,192 shares in August 2022 at an average price of $28.56 per share, and that all repurchases during the quarter totaled approximately $86 million.  2022 3Q 10-Q at 19, 52.  *See also* ¶¶39-42.

129.    Also on November 1, 2022, Arconic conducted a conference call with analysts and investors to discuss its financial results for the third quarter (the "Q3 2022 Conference Call").  During the Q3 2022 Conference Call, Defendant Asmussen stated in relevant part: "In the quarter, we repurchased approximately 3 million shares and completed the initial $300 million authorization that we had announced in May of last year.  Since the inception of this program, we have reduced the number of shares outstanding by approximately 9%."  Q3 2022 Conference Call at 4.  Defendant Myers also stated during this call that "we completed the $300 million share repurchase authorization."  *Id.* at 2.

130.    On November 16, 2022, Arconic issued a press release announcing that the Board had approved the 2022 Program to repurchase up to $200 million worth of Arconic common stock.  The press release was attached as an exhibit to a Form 8-K that was signed by Defendant Asmussen and filed with the SEC that day.

131.    In the November 16, 2022 press release, Defendant Myers stated that:

We continue to view share repurchases as a high-return capital allocation opportunity for the Company and its shareholders.  Following the completion of our first $300 million repurchase authorization in the third quarter of 2022, this new program demonstrates our commitment to our long-term strategy and growth outlook.  We have confidence in our ability to fund both our organic growth capital investment plans and retire shares at opportunistic levels.

Thus, Defendants continued to mislead investors through affirmative disclosures concerning the Company's share repurchases – including describing them as a "high-return capital allocation opportunity" and "opportunistic" – without disclosing the whole truth regarding Apollo's offers to acquire those shares for materially higher prices.

132.    On February 21, 2023, Arconic held its Q4 2022 earnings conference call, during which Defendant Myers again discussed Arconic's share repurchases: "Additionally, we did not waver in our commitment to return capital to shareholders, as we completed our first share repurchase program and announced a second program of $200 million.  In total, we've bought back approximately 10% of our original shares outstanding."

133.    Once Defendants chose to speak on the subject of Arconic's repurchases, capital allocation, and share value, they were obligated to disclose the whole truth: that a credible bidder was offering to acquire all of the Company's stock for a significant premium to its market price, that the Board believed Apollo's offer undervalued the Company, that it was seeking a higher price, and that ongoing acquisition-related communications with Apollo restricted Arconic's ability to lawfully continue repurchases.  By omitting these facts, Defendants' statements in the Q1–Q4 earnings calls, Investor Day, press releases, SEC filings, and other investor communications set out above were materially false and misleading in violation of Section 10(b) and Rule 10b-5(b).

C.    **Defendants' Statements Concerning the 2021 and 2022 Programs'
Compliance with Rule 10b5-1 Were Materially False and Misleading**

134.    Defendants also violated Section 10(b) and Rule 10b-5 by affirmatively representing

that Arconic's stock repurchases were "intended to comply with Rule 10b5-1" when in fact the

repurchases violated this rule.

135.    The 2022 1Q 10-Q, filed with the SEC on May 4, 2022, stated the following

concerning the 2021 Program and Arconic's share repurchases under the 2021 Program:

> On May 4, 2021, Arconic announced that its Board of Directors approved a share
> repurchase program authorizing the Company to repurchase shares of its outstanding
> common stock up to an aggregate transactional value of $300 million over a two-year
> period expiring April 28, 2023.  Repurchases under the program may be made from
> time to time, as the Company deems appropriate, solely through open market
> repurchases effected through a broker dealer, based on a variety of factors such as
> price, capital position, liquidity, financial performance, alternative uses of capital,
> and overall market conditions. . . . The share repurchase program may be increased
> or otherwise modified, renewed, suspended or terminated by the Company at any
> time, without prior notice.  ***This program is intended to comply with Rule 10b5-
> 1*** . . . .

2022 2Q 10-Q at 41 (emphasis added).

136.    The statement quoted in ¶135 that Arconic's share repurchases were intended to

comply with Rule 10b5-1 remained current on the market as Arconic's most recent statement on this

subject until the filing of Arconic's next Form 10-Q in August 2022 and was continuously posted on

Arconic's website from the time it was first publicly issued in May 2022.  This statement became

actionable and materially false and misleading when Arconic repurchased stock in June 2022 and

subsequent months while aware of material nonpublic information concerning Apollo's April 2022

Offer and Apollo's continuing serious interest in acquiring Arconic for a premium over its stock's

market price.  At that time, Arconic and the Individual Defendants came under an obligation to

either disclose the material nonpublic information about the April 2022 Offer or abstain from trading

in Arconic stock, including by engaging in repurchases.  Accordingly, Defendants had an obligation

to update the statement quoted in ¶135, but they failed to do so and instead continued to repurchase Arconic stock in violation of Section 10(b), Rule 10b-5, and Rule 10b5-1.

137.    The 2022 2Q 10-Q, filed with the SEC on August 2, 2022, stated the following concerning the 2021 Program and Arconic's share repurchases under the 2021 Program:

> On May 4, 2021, Arconic announced that its Board of Directors approved a share repurchase program authorizing the Company to repurchase shares of its outstanding common stock up to an aggregate transactional value of $300 [million] over a two-year period expiring April 28, 2023.  Repurchases under the program may be made from time to time, as the Company deems appropriate, solely through open market repurchases effected through a broker dealer, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions . . . .  ***This program is intended to comply with Rule 10b5-1*** . . . .

2022 2Q 10-Q at 17, 48 (emphasis added).  Similarly, the 2022 3Q 10-Q, filed with the SEC on November 1, 2022, stated the following concerning the 2021 Program and Arconic's share repurchases under the 2021 Program:

> On May 4, 2021, Arconic announced that its Board of Directors approved a share repurchase program authorizing the Company to repurchase shares of its outstanding common stock up to an aggregate transactional value of $300 million over a two-year period expiring April 28, 2023.  Repurchases under the program were made from time to time, as the Company deemed appropriate, solely through open market repurchases effected through a broker dealer, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions.  ***This program was intended to comply with Rule 10b5-1*** . . . .

2022 3Q 10-Q at 52 (emphasis added); *see also id*. at 19.

138.    The 2022 10-K, filed with the SEC on February 21, 2023, stated the following concerning Arconic's share repurchases under the 2021 Program:

> On May 4, 2021, Arconic announced that its Board of Directors approved a share repurchase program authorizing the Company to repurchase shares of its outstanding common stock up to an aggregate transactional value of $300 [million] over a two-year period expiring April 28, 2023.  In 2022 and 2021, Arconic repurchased 4,863,672 and 4,912,505 shares, respectively, of the Company's common stock for $139 [million] and $161 [million], respectively, resulting in completion of the total authorization under this program in August 2022. . . . Repurchases under the program

were made from time to time, as the Company deemed appropriate, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions. ***This program was intended to comply with Rule 10b5-1*** . . . .

2022 10-K at 87 (emphasis added); *see also id.* at 42.

139.    The 2022 10-K also stated the following concerning Arconic's share repurchases

under the 2022 Program:

> On November 16, 2022, Arconic announced that its Board of Directors approved a share repurchase program authorizing the Company to repurchase up to $200 million of common stock for a two-year period expiring November 17, 2024. Repurchases under the program may be made from time to time, as the Company deems appropriate, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions. . . . The share repurchase program may be increased or otherwise modified, renewed, suspended or terminated by the Company at any time, without prior notice. . . . ***This program is intended to comply with Rule 10b5-1*** . . . .
>
> \*      \*      \*
>
> On November 16, 2022, Arconic announced that its Board of Directors approved a share repurchase program authorizing the Company to repurchase shares of its outstanding common stock up to an aggregate transactional value of $200 [million] over a two-year period expiring November 17, 2024. Repurchases under the program may be made from time to time, as the Company deems appropriate, solely through open market repurchases effected through a broker dealer, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions. . . . The share repurchase program may be increased or otherwise modified, renewed, suspended or terminated by the Company at any time, without prior notice. ***This program is intended to comply with Rule 10b5-1*** . . . . In 2022, Arconic repurchased 2,071,835 shares of the Company's common stock for $46 [million] under this program.

2022 10-K at 87 (emphasis added); *see also id*. at 35.

140.    Rule 10b5-1, entitled "Trading 'on the basis of' material nonpublic information in

insider trading cases," provides:

> (a) Manipulative or deceptive devices. The "manipulative or deceptive device[s] or contrivance[s]" prohibited by Section 10(b) of the Act (15 U.S.C. 78j) and §240.10b-5 (Rule 10b-5) thereunder include, among other things, the purchase or sale of a security of any issuer, on the basis of material nonpublic information about that security or issuer, in breach of a duty of trust or confidence that is owed directly,

indirectly, or derivatively, to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the material nonpublic information.

(b) Awareness of material nonpublic information.  Subject to the affirmative defenses in paragraph (c) of this section, a purchase or sale of a security of an issuer is on the basis of material nonpublic information for purposes of Section 10(b) and Rule 10b-5 if the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale.  The law of insider trading is otherwise defined by judicial opinions construing Rule 10b-5, and Rule 10b5-1 does not modify the scope of insider trading law in any other respect.

17 C.F.R. §240.10b5-1.

141.    The primary purpose of Rule 10b5-1, as embodied in Rule 10b5-1(a) and (b), is to prohibit trading while a person is "aware" of material nonpublic information, in breach of a duty of trust or confidence to the issuer or its shareholders.  This provision clarifies prior uncertainty in the case law about whether insider-trading liability requires some sort of "use" of the material nonpublic information beyond simply trading while "aware" of it and in breach of such a duty.  *See* Selective Disclosure and Insider Trading, Exchange Act Release No. 34-43154, 65 Fed. Reg. 51, (Aug. 24, 2000); Allan Horwich, "The Origin, Application, Validity, and Potential Misuse of Rule 10b5-1," 62 Bus. Law. 913, 914-15 (2007).  Thus, reasonable investors would understand Defendants' statement that Arconic's repurchases were intended to comply with Rule 10b5-1 to mean that Defendants were not aware of material nonpublic information while conducting the repurchases.

142.    From June 2022 onward, Arconic's leadership knew that Apollo, a credible private equity buyer with committed financing, was pursuing an acquisition of the Company.  Internally, the Board had already concluded that Apollo's April 2022 Offer, despite offering a premium to the prevailing market price for Arconic's common stock, undervalued Arconic, and sought to elicit a higher bid.  Among the undisclosed facts were: (i) the size and premium nature of Apollo's proposals; (ii) the Board's ongoing push for a higher offer; (iii) regular communications among Apollo, Irenic, and Board members; (iv) Apollo's successive bid increases; and (v) the November

- 37 -

2022 recusal of Director Jeffrey Stafeil from Apollo-related discussions after he told Arconic he had accepted the role of CFO at another company being acquired by Apollo. After Stafeil reported this to Arconic, the Board began holding Apollo-related discussions without him, underscoring the significance of Arconic's acquisition-related communications with Apollo.

143.    In multiple SEC filings during the Class Period, Arconic represented that its stock repurchase programs were "intended to comply with Rule 10b5-1." As detailed in ¶¶137-139, these assurances appeared in the Company's 2Q 2022 10-Q (filed August 2, 2022), 3Q 2022 10-Q (filed November 1, 2022), and 2022 10-K (filed February 21, 2023).

144.    In fact, Arconic's repurchases during the Class Period violated and did not comply with Rule 10b5-1.

145.    Rule 10b5-1(c) provides an affirmative defense to insider-trading liability for transactions made in accordance with a contract, instructions to a third party, or written plan. Among other things, Rule 10b5-1(c) requires that the contract, instructions, or written plan must be entered into before the person became aware of material nonpublic information, and it must not "permit the person to exercise any subsequent influence over how, when, or whether to effect purchases or sales." 17 C.F.R. §240.10b5-1(c). Although Arconic told investors, as quoted above, that its repurchases "were intended to comply with Rule 10b5-1," Arconic acknowledged that it retained discretion over the timing and amount of the transactions under its repurchase program. Defendants' discretionary control over the timing and amount of Arconic's repurchase transactions is demonstrated by their repeated statements in June 2022 that they intended to complete the Company's existing $300 million authorized repurchase program by the end of the year; by their telling Deutsche Bank in June 2022 that they had the "optionality for another program once the current $300m program is achieved"; by the fact that they completed the $300 million program four

months early and then implemented another program and promptly continued repurchasing stock; by Defendant Myers' statement in November 2022 that Arconic planned to "retire shares at opportunistic levels"; and by Arconic's repeated statement that repurchases would be "made from time to time, as the Company deems appropriate . . . based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions," as well as that "[t]he share repurchase program may be increased or otherwise modified, renewed, suspended or terminated by the Company at any time, without prior notice." Arconic did not state that it entered into a contract, instructions, or written plan that complied with Rule 10b5-1(c) and, on information and belief, it did not do so.

146.    Instead, Arconic executed discretionary open-market repurchases at the very time it was aware of material nonpublic information regarding Apollo's ongoing premium acquisition proposals, the Board's internal deliberations, the Board's conclusion that Apollo's initial April 2022 offer undervalued the Company, the Board's desire for a higher offer, and Apollo's subsequent increased offers. Thus, in violation of Rule 10b5-1, the repurchases were made "on the basis of material nonpublic information," because Arconic "was aware of the material nonpublic information when the person made the purchase[s]," 17 C.F.R. §10b5-1(b), and the repurchases therefore violated Section 10(b) and Rule 10b-5 because they were made "on the basis of material nonpublic information about [Arconic and its stock], in breach of a duty of trust or confidence that [was] owed . . . to . . . the shareholders of [Arconic] . . . ." 17 C.F.R. §10b5-1(a).

147.    By affirmatively stating in the 2Q 2022 10-Q, 3Q 2022 10-Q, and 2022 10-K that the repurchase programs were "intended to comply with Rule 10b5-1," Defendants created the false impression that the Company's trades were executed under the protections of this rule and were not made while Arconic was aware of material nonpublic information that Defendants had a duty to

disclose to Arconic's shareholders if it repurchased Arconic securities. Those statements were untrue when made because Arconic had engaged and was engaging in discretionary share repurchases "on the basis of material nonpublic information" in violation of Rule 10b5-1 in June 2022, July 2022, August 2022, November 2022, December 2022, and January 2023. Accordingly, repurchases during the Class Period under the 2021 Program and 2022 Program were not, and had not been, in compliance with Rule 10b5-1.

148.    Defendants Myers and Asmussen were senior executives and Defendants Myers and Henderson were directors of Arconic, and they were all aware of the material nonpublic information about Apollo's offers. Their knowledge is imputed to Arconic through their positions and through respondeat superior, and therefore Arconic was aware of the material nonpublic information. Because Arconic was aware of the material nonpublic information, the share repurchases were made on the basis of that material nonpublic information and were made in violation of Rule 10b5-1.

149.    Defendants' statements in ¶¶135 and 137-139 that the 2021 and 2022 Programs were "intended to comply with Rule 10b5-1" were untrue statements of material fact and omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made, in violation of Section 10(b) and Rule 10b-5, because Arconic had engaged and was engaging in share repurchases in violation of Rule 10b5-1.

### D.    Defendants' SOX Certifications Were Materially False and Misleading

150.    Defendants Myers and Asmussen signed SOX certifications, dated August 2, 2022, that were attached to the 2022 2Q 10-Q:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report . . .

151.    Defendants Myers and Asmussen signed SOX certifications, dated November 1, 2022, that were attached to the 2022 3Q 10-Q and contained identical statements to the statements alleged in ¶150.

152.    Defendants Myers and Asmussen signed SOX certifications, dated February 21, 2023, that were attached to the 2022 10-K and contained identical statements to the statements alleged in ¶150.

153.    Defendants Myers', Asmussen's, and Arconic's statements quoted in ¶¶150-152 were untrue statements of a material fact and omitted material facts necessary to make the statements, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) and Rule 10b-5(b), because, as alleged in this Complaint, at the time the statements were made, the documents the certifications were attached to contained false and misleading statements concerning the repurchases and made no disclosure regarding Apollo's acquisition proposals, the Board's internally expressed view that Apollo's offer undervalued Arconic, the Company's ongoing communications with Apollo seeking a higher offer, or the fact that Arconic was conducting discretionary stock repurchases at prices far below Apollo's offers while Defendants were aware of that material nonpublic information.

## DEFENDANTS ACTED WITH SCIENTER

154.    Arconic and the Individual Defendants acted with scienter because the Defendants had actual knowledge of the material undisclosed facts concerning Apollo's credible offer to acquire Arconic shares at materially higher prices that rendered their public statements materially false and misleading.

155.    Defendants were aware of the details and timing of Apollo's offers.  Apollo communicated its offers to the highest executive level of Arconic – sending its offer letters directly to Defendants Myers, Asmussen, and Henderson – and its offers were discussed at multiple Board

meetings, which were chaired by Henderson and attended by Myers and Asmussen, and in which the Company's senior management and legal and financial advisors participated.

156.    Defendants were aware of Arconic's repurchases of millions of shares of its own stock.  Among other things, Defendants disclosed these repurchases in the 2022 2Q 10-Q, 2022 3Q 10-Q, 2022 10-K, and 2023 1Q 10-Q, filed in August 2022, November 2022, February 2023, and May 2023, respectively.  Defendants Myers and Asmussen signed these filings and certified their completeness and accuracy.  Moreover, Arconic's disclosures about the repurchases stated that they were made "from time to time, as the Company deem[ed] appropriate, . . . based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions."  Defendant Myers (the CEO) spoke about the repurchases at Arconic's Investor Day, on analyst calls, and in a press release (¶¶118, 131-132), and Defendant Asmussen (the CFO) spoke about the repurchases on an analyst call (¶119).

157.    Defendants were aware of the market price of Arconic's stock and were therefore aware that Apollo's offers were at prices materially above the market price, as well as that Arconic's repurchases were at prices materially below Apollo's offers.

158.    The magnitude and pace of Arconic's stock repurchases during the Class Period also support a strong inference of scienter.  Arconic repurchased approximately $123 million worth of stock during the first three months of the Class Period from June 2022 through August 2022, or $41 million per month, more than twice the prior $16 million monthly rate of share repurchases from May 2021 through March 2022.  In terms of numbers of shares, Arconic repurchased more shares in each of June 2022 and July 2022 than it had repurchased in the previous month with the highest number of repurchased shares (August 2021).  The accelerated June-August 2022 repurchases exhausted Arconic's then-authorized $300 million repurchase program in August 2022, just two

months after Defendants repeatedly told investors in June that they expected to complete the $300 million program "before the end of the year" – *i.e.*, the program was completed four months early. Moreover, Defendants told Deutsche Bank in June 2022 that they had "optionality" to launch another repurchase program upon completion of the $300 million program, as they indeed did in November 2022.  Thus, the repurchases represented a deliberate part of Defendants' scheme to defraud investors that was launched in June after Defendants received Apollo's initial offers.

159.    In early November 2022, while Defendants were continuing to engage with Apollo about its offer, the Arconic Board decided to wall director Jeffrey Stafeil off from any Board discussion of the offer as soon as he notified Arconic that he had accepted an offer to become CFO of a company, Tenneco, that was in the process of being acquired by Apollo.  Proxy Statement at 31. Thus, Defendants were aware that Apollo's offer to acquire Arconic remained live, such that Stafeil's acceptance of a position at a company Apollo was about to acquire represented a conflict of interest.

160.    To continue Arconic's stock repurchases as part of the fraudulent scheme launched in June 2022, Defendants created a second share repurchase program in November 2022, while Defendants were continuing to engage with Apollo concerning a potential transaction and shortly before Apollo made its December 2022 Offer.  Defendants proceeded to carry out millions of dollars' worth of repurchases under the 2022 Program, even after Apollo formally told them on November 28, 2022 that Apollo would pursue its proposal to acquire Arconic at a meaningful premium to Arconic's stock price, and after Defendants received Apollo's December 2022 Offer for $30 per share on December 12, 2022.  Arconic repurchased more shares in December 2022 than it did in any other month under either the 2021 Program or the 2022 Program.

161.    In addition to Defendants' actual awareness of the undisclosed material facts, the inference of scienter is enhanced further by the financial motive Defendants had for Arconic to repurchase millions of its shares at prices artificially deflated by Defendants' failure to disclose Apollo's offer to acquire those shares at materially higher prices.  Further, by repurchasing shares without disclosing Apollo's offer, Defendants propped up their negotiating position in responding to acquisition offers by Apollo and by the other bidders who would emerge – either when Defendants solicited other bidders in accordance with their fiduciary duty to Arconic's shareholders to seek the best acquisition price, or when Apollo's offer became publicly known and unsolicited bidders would emerge.  This strategy would have failed if Defendants had disclosed Apollo's offer before conducting the repurchases, because the stock price would have increased and Defendants would have been unable to buy stock "opportunistically" on the cheap, as they said they intended to do.  Thus, Apollo's offer and Defendants' awareness that the Company was presented with a material acquisition proposal gave Defendants an additional motive to repurchase stock without disclosing the offer.

## LOSS CAUSATION AND ECONOMIC LOSS

162.    During the Class Period, as detailed in this Complaint, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the prices of Arconic common stock and operated as a fraud or deceit on sellers of Arconic common stock.  As detailed above, when material undisclosed information emerged and the truth was revealed concerning, *inter alia*, Apollo's offers, Arconic's response to those offers, and Arconic's repurchases while it was aware of material nonpublic information concerning those offers, the price of Arconic common stock increased as the prior artificial depression or deflation was removed.  The increase in the price of Arconic common stock was the direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the share price increase negates

- 44 -

any inference that the losses suffered by Lead Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and other Class members was a direct result of Defendants' fraudulent scheme to artificially depress or deflate the prices of Arconic common stock and to maintain the stock at artificially depressed or deflated levels, and the subsequent significant increase in the price of Arconic common stock when Defendants' prior misrepresentations, omissions, and other fraudulent conduct were revealed.

163.    At all relevant times, Defendants' omissions or materially false and misleading statements alleged in this Complaint directly or proximately caused the damages suffered by Lead Plaintiffs and other Class members. Those omissions and statements were materially false and misleading through their failure to disclose a true and accurate picture of the material facts concerning the market for Arconic's shares, including Apollo's premium offers and Arconic's repurchases while Defendants were aware of material nonpublic information, as alleged in this Complaint. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, and otherwise failed to disclose information they had a duty to disclose, causing the price of Arconic's common stock to be artificially depressed or deflated. Lead Plaintiffs and other Class members sold shares of Arconic common stock at those artificially low prices, causing them to suffer damages as alleged in this Complaint.

## PRESUMPTION OF RELIANCE

164.    Lead Plaintiffs and the Class are entitled to a presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for

Arconic's common stock was efficient at all relevant times by virtue of the following factors, among others:

(a)     Arconic's common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient market;

(b)     Arconic regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)     Arconic was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and customers of their respective brokerage firms.   These reports were publicly available and entered the public marketplace.

165.    As a result of the foregoing, the market for Arconic's common stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the Company's stock.  Under these circumstances, all sellers of Arconic's common stock during the Class Period suffered similar injury through their sales of Arconic's common stock at artificially depressed or deflated prices, and a presumption of reliance applies.

166.    Lead Plaintiffs and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted in this Complaint against Defendants are predicated upon omissions of material fact that Defendants had a duty to disclose.

167.    Without knowledge of the misrepresented or omitted material facts, Lead Plaintiffs and other Class members sold shares of Arconic common stock between the time Defendants omitted, misrepresented, and failed to disclose material facts and the time the true facts were disclosed.  Accordingly, Lead Plaintiffs and other Class members are entitled to a presumption of reliance upon the integrity of the market.

## NO SAFE HARBOR

168.    The statutory safe harbor provided for forward-looking statements does not apply to the allegedly false statements and omissions pled in this Complaint.  The statements alleged to be false and misleading in this Complaint all relate to then-existing facts and circumstances.  To the extent any of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pled in this Complaint, the Company and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, or the forward-looking statement was authorized and approved by an executive officer of the Company who knew that the statement was false and misleading when made.

## CLASS ACTION ALLEGATIONS

169.    Lead Plaintiffs bring this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all sellers of Arconic's common stock during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are Defendants; Apollo; Irenic; the officers

and directors of the Company, Apollo, and Irenic ("Other Excluded Persons"); the Defendants' and the Other Excluded Persons' immediate families, legal representatives, heirs, successors, or assigns; and any entity in which any of the foregoing have or had a controlling interest.

170.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Arconic's common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members of the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Arconic or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.  As of February 17, 2023, there were approximately 99.4 million shares of Arconic common stock issued and outstanding.  Shares of Arconic common stock were held by hundreds or thousands of investors located geographically throughout the country.  Joinder would be highly impracticable.

171.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sold shares of Arconic common stock during the Class Period and sustained damages from Defendants' wrongful conduct in violation of the federal securities laws alleged in this Complaint.

172.    Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel who are competent and experienced in securities class action litigation.  Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

173.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether Defendants violated the 1934 Act as alleged in this Complaint;

(b)      whether Defendants omitted or misrepresented material facts;

(c)      whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(d)      whether the prices of Arconic's common stock during the Class Period were artificially depressed or deflated because of Defendants' conduct alleged in this Complaint; and

(e)      whether the members of the Class have sustained damages and, if so, the proper measure of damages.

174.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Treatment as a class will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

175.    Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

176.    No difficulties are likely to be encountered in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against Defendants Arconic, Myers, and Asmussen

177.    Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth in this Count.

178.    Section 10(b) of the 1934 Act prohibits securities fraud:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

179.    SEC Rule 10b-5 defines securities fraud more specifically:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

180.    During the Class Period, Defendants Arconic, Myers, and Asmussen engaged in a scheme, practice, and course of business that was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and the Class, as alleged in this Complaint; and (ii) cause Lead Plaintiffs and the Class to sell Company common stock at artificially depressed or deflated prices.  In furtherance of this unlawful scheme, practice, and course of business, these Defendants, and each of them, took the actions alleged in this Complaint.

181.    Defendants Arconic, Myers, and Asmussen violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and omitted material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Lead Plaintiffs and others similarly situated in connection with their sale of the Company's common stock.

182.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective sales of the Company's common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against Defendants Myers, Asmussen, and Henderson

183.    Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth in this Count.

184.    During the Class Period, the Individual Defendants acted as controlling persons of Arconic within the meaning of Section 20(a) of the 1934 Act.  By virtue of their positions with the Company, the Individual Defendants had the power and ability to control the actions of Arconic and its employees.  These Defendants each participated in and are culpable for and by virtue of the acts alleged in this Complaint.  By reason of this conduct, these Defendants are liable pursuant to Section 20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs respectfully demand relief as follows:

A.    Declaring this action to be a class action properly maintained under Rule 23 of the Federal Rules of Civil Procedure;

B.      Declaring that Defendants are liable under the 1934 Act;

C.      Awarding damages in favor of Lead Plaintiffs and other members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest on that amount;

D.      Awarding Lead Plaintiffs and members of the Class their costs of suit, including reasonable attorneys' fees and expenses and expert fees; and

E.      Directing such further relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury.

DATED:  August 25, 2025              ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                     CHAD JOHNSON
                                     NOAM MANDEL
                                     DESIREE CUMMINGS
                                     JONATHAN ZWEIG
                                     JAI CHANDRASEKHAR
                                     CHRISTOPHER GILROY
                                     CRISTELLE RABBAN
                                     ALYSSA PLASCOFF


                                          */s/ Noam Mandel*
                                       NOAM MANDEL

                                     420 Lexington Avenue, Suite 1832
                                     New York, NY  10170
                                     Telephone:  (212) 432-5100
                                     chadj@rgrdlaw.com
                                     noam@rgrdlaw.com
                                     dcummings@rgrdlaw.com
                                     jzweig@rgrdlaw.com
                                     jaic@rgrdlaw.com
                                     cgilroy@rgrdlaw.com
                                     crabban@rgrdlaw.com
                                     aplascoff@rgrdlaw.com

                                     *Lead Counsel for Lead Plaintiffs*

ASHERKELLY
CYNTHIA J. BILLINGS-DUNN
25800 Northwestern Highway, Suite 1100
Southfield, MI  48075
Telephone:  248/746-2710
cbdunn@asherkellylaw.com

*Additional Counsel*