**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE ARCONIC CORPORATION SECURITIES LITIGATION | Case No.: 1:25-cv-00863-AKH<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**<u>MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.      PLAINTIFFS' MISSTATEMENT THEORY FAILS ............................................... 3

        A.      The Opposition Confirms There Are No False Or Misleading Statements ............ 3

                1.      The Statements About Stock Repurchases Were True And Not
                        Rendered Misleading By Omission .................................................. 4

                2.      Statements About Arconic's Intention To Comply With Rule
                        10b5-1 Are True, Not Misleading, And Not Actionable ........................... 6

                        a.      The "Intent to Comply" Statement Is Protected By The
                                Safe Harbor—A Point Plaintiffs Do Not Dispute ........................... 6

                        b.      Plaintiffs' Allegation That Arconic Had No 10b5-1 Plan
                                Should Not Be Credited ................................................................. 7

                        c.      There Was No Interest From The Apollo Funds Requiring
                                Disclosure When The "Intent to Comply" Statements Were
                                Made ......................................................................................... 9

                3.      The Sarbanes-Oxley Certifications Cannot Support A Fraud Claim ........ 11

        B.      The Opposition Confirms There Is No Scienter .................................................. 11

                1.      No Particularized Facts Overcome The Innocent Inference .................... 12

                2.      Plaintiffs' Theory Defies Economic Sense, Reinforcing The
                        Innocent Inference ......................................................................... 13

                3.      Plaintiffs Do Not Plead That Any Defendant Had "Actual
                        Knowledge" That Any Public Statement Was False .............................. 14

II.     PLAINTIFFS' SCHEME THEORY FAILS .......................................................... 18

        A.      The Contemporaneous Trader Rule Bars Plaintiffs' Scheme Claim .................... 18

        B.      Defendants Did Not Trade On The Basis Of Material Non-Public
                Information ...................................................................................................... 20

                1.      Arconic Had No Duty To Abstain When It Repurchased Shares
                        Between June 2022 And August 2022 ................................................. 21

                2.      Arconic Had No Duty To Abstain When It Repurchased Shares
                        Between November 2022 And January 2023 ......................................... 22

        C.      Plaintiffs Fail To Allege A Strong Inference Of Scienter For Their Scheme
                Claim ............................................................................................................... 25

        D.      Plaintiffs Cannot Premise Their Scheme Claim On Alleged Statements To
                Deutsche Bank Analysts .................................................................................... 28

III.    THE COMPLAINT DOES NOT PLEAD CONTROL PERSON LIABILITY ............ 28

CONCLUSION .................................................................................................................. 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aegean Marine Petrol. Network, Inc. Sec. Litig.*,
  529 F. Supp. 3d 111 (S.D.N.Y. 2021)......................................................................................16

*In re Archegos 20A Litig.*,
  156 F.4th 108 (2d Cir. 2025) ...............................................................................................28

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)..............................................................................................11, 22, 23

*Berkowitz v. Conrail, Inc.*,
  1997 WL 611606 (E.D. Pa. Sept. 25, 1997) .........................................................................25

*In re Block, Inc. Sec. Litig.*,
  2025 WL 2607890 (S.D.N.Y. Sept. 8, 2025).........................................................................5

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ........................................................................................4, 5, 6

*Brodzinsky v. FrontPoint Partner LLC*,
  2012 WL 1468507 (D. Conn. Apr. 26, 2012).......................................................................19

*Buhrke Fam. Revocable Tr. v. U.S. Bancorp.*,
  726 F. Supp. 3d 315 (S.D.N.Y. 2024)..................................................................................19

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)...............................................................................................10

*Castellano v. Young & Rubicam, Inc.*
  257 F.3d 171 (2d Cir. 2001)..................................................................................................24

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)..................................................................................................14

*Emps.' Ret. Sys. of R.I. v. Williams Cos.*,
  889 F.3d 1153 (10th Cir. 2018) .................................................................................. *passim*

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd sub nom*, *Kapitalforeningen
  Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019) ................................17

*In re Gen. Motors Class E Stock Buyout Sec. Litig.*,
  694 F. Supp. 1119 (D. Del. 1988)........................................................................................24

*Gruber v. Gilbertson*,
  2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) ........................................................................20

*Hartford Fire Ins. Co. v. Federated Dep't Stores*,
  723 F. Supp. 976 (S.D.N.Y. 1989) .........................................................................................23

*Honig v. Hansen*,
  2021 WL 4651475 (S.D.N.Y. Oct. 6, 2021) ...........................................................................15

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020) .....................................................................................................17

*Jackvony v. RIHT Fin. Corp.*,
  873 F.2d 411 (1st Cir. 1989) ........................................................................................... *passim*

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ...................................................................................................14

*Kalnit v. Eichler*,
  99 F. Supp. 2d 327 (S.D.N.Y. 2000) ......................................................................................14

*Kao v. British Airways, PLC*,
  2018 WL 501609 (S.D.N.Y. Jan. 19, 2018) .......................................................................6, 18

*LL Cap. Partners, LP v. Rockefeller Ctr. Props., Inc.*,
  921 F. Supp. 1174 (S.D.N.Y. 1996) .......................................................................................23

*In re Lottery.com, Inc. Sec. Litig.*,
  765 F. Supp. 3d 303 (S.D.N.Y. 2025) ....................................................................................17

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024) ......................................................................................................... *passim*

*In re Nat'l Instruments Corp. Sec. Litig.*,
  2024 WL 4108011 (S.D.N.Y. Sept. 6, 2024) .................................................................. *passim*

*In re Nat'l Instruments Sec. Litig.*,
  2025 WL 2682172 (S.D.N.Y. Sept. 19, 2025) ........................................................................21

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................................................20

*Panfil v. ACC Corp.*,
  768 F. Supp. 54 (W.D.N.Y. 1991), *aff'd*, 952 F.2d 394 (2d Cir. 1991) ...........................23, 25

*In re Peabody Energy Corp. Sec. Litig.*,
  2022 WL 671222 (S.D.N.Y. Mar. 7, 2022) ..............................................................................6

*In re Perrigo PLC Co. Sec. Litig.*,
  435 F. Supp. 3d 571 (S.D.N.Y. 2020)...................................................................27

*Ramzan v. GDS Holdings Ltd.*,
  2020 WL 1689772 (S.D.N.Y. Apr. 7, 2020)..........................................................17

*Reiss v. Pan Am. World Airways, Inc.*,
  711 F.2d 11 (2d Cir. 1983)............................................................................... *passim*

*Rosi v. Aclaris Therapeutics, Inc.*,
  2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) ........................................................11

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom.*, *Tongue v. Sanofi*, 816
  F.3d 199 (2d Cir. 2016)......................................................................................15

*SEC v. Aly*,
  2018 WL 1581986 (S.D.N.Y. Mar. 27, 2018) ........................................................24

*SEC v. Rio Tinto plc*,
  41 F.4th 47 (2d Cir. 2022) ...................................................................................20

*SEC v. Shapiro*,
  494 F.2d 1301 (2d Cir. 1974)...............................................................................24

*SEC v. SolarWinds Corp.*,
  741 F. Supp. 3d 37 (S.D.N.Y. 2024).....................................................................10

*SEC v. Wyly*,
  788 F. Supp. 2d 92 (S.D.N.Y. 2011).....................................................................24

*Singh v. Cigna*,
  918 F.3d 57 (2d Cir. 2019)....................................................................................25

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010)....................................................................................6

*In re Smith Barney Transfer Agent Litig.*,
  884 F. Supp. 2d 152 (S.D.N.Y. 2012)...................................................................29

*In re SunEdison, Inc. Sec. Litig.*,
  300 F. Supp. 3d 444 (S.D.N.Y. 2018)...................................................................26

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)...................................................................18

*Taylor v. First Union Corp. of S.C.*,
  857 F.2d 240 (4th Cir. 1988) ..........................................................................11, 25

iv

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008)........................................................................................17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..............................................................................................12, 14

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ............................................................................................10

*Traverso v. Eller Media Co.*,
    2002 WL 467717 (N.D. Cal. Mar. 25, 2002)..............................................................23

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    625 F. Supp. 3d 164 (S.D.N.Y. 2022).........................................................................28

*United States v. O'Hagan*,
    521 U.S. 642 (1997).....................................................................................................20

*Wilkov v. Ameriprise Fin. Servs., Inc.*,
    753 F. App'x 44 (2d Cir. 2018) ...................................................................................19

*Willard v. UP Fintech Holding Ltd.*,
    527 F. Supp. 3d 609 (S.D.N.Y. 2021).........................................................................25

*Wilson v. Comtech Telecomms. Corp.*,
    648 F.2d 88 (2d Cir. 1981)...........................................................................................20

*In re WorldCom, Inc. Sec. Litig.*,
    352 F. Supp. 2d 472 (S.D.N.Y. 2005).........................................................................17

**INTRODUCTION**

Arconic, an aluminum manufacturer, enacted Board-approved stock repurchase programs in May 2021 and again in November 2022. It accurately disclosed details of those programs to investors, including the amounts of shares repurchased. It also accurately informed investors that the Company "intended" that its repurchase programs "comply with Rule 10b5-1"—a statement reflecting the fact that Rule 10b5-1 plans were in place to govern non-discretionary trading and to help ensure that stock repurchases were made without material non-public information. Pursuant to those programs, Arconic bought stock in June, July, and August 2022, and again in November and December 2022 and January 2023, returning hundreds of millions of dollars to shareholders.

Plaintiffs nevertheless claim they were misled because the repurchases occurred without disclosure of outreach from the Apollo Funds—a suitor with a history of disappointing Arconic. In their opening Motion, Defendants identified two fundamental flaws in the Complaint: first, Plaintiffs improperly treat rejected and preliminary outreach as information requiring disclosure, even though disclosure would have actually misled the market about the likelihood of a transaction; and second, Plaintiffs ignore that once any discussions proceeded beyond a preliminary level, Arconic had already stopped repurchasing stock. Dkt. 36 (the "Motion" or "MTD"). Tellingly, Plaintiffs' opposition addresses neither point. Dkt. 39 (the "Opposition" or "Opp.").

Instead, Plaintiffs double down on the Complaint's exaggerations. They twist accurate disclosures about "occasional contacts" between Arconic and the Apollo Funds to claim that a potential transaction was "ongoing" throughout the entire period of stock repurchases. That assertion is entirely unsubstantiated. Plaintiffs assume—without any factual support—that the "occasional contacts" Arconic disclosed involved "discuss[ion of] Apollo's potential acquisition."

1

Opp. at 5. No well-pleaded fact supports that inference. Once this central pleading defect is recognized, the entire case falls away.

Plaintiffs' attempts to salvage their misstatement claims are easily disposed of. The statements about stock repurchases were undisputedly true, and settled authority from the Supreme Court and this District forecloses Plaintiffs' attempt to recharacterize them as misleading half-truths. Plaintiffs speculate about the absence of a 10b5-1 plan based on "information and belief" that is only a misreading of the Company's disclosures. The Company did have 10b5-1 plans,[1] and Plaintiffs' wishful thinking to the contrary cannot support their theory that Defendants lacked an intent to comply with Rule 10b5-1. Nor can Plaintiffs rely on Sarbanes-Oxley certifications, which are not independently actionable without an underlying false statement—a point Plaintiffs do not dispute.

The same deficiencies infect Plaintiffs' scienter allegations. Defendants' Motion explained that Plaintiffs' motive theory is not merely unsupported, it defies economic reason. Plaintiffs allege no benefit to any Individual Defendant or to the Company. Instead, they contend that the repurchases artificially depressed Arconic's stock price in order to improve its negotiating position—without explaining how lowering the stock price could plausibly confer any negotiating advantage. Plaintiffs also assert that the Individual Defendants had "access to facts" about the repurchase program and the Apollo Funds' communications, but access alone is legally irrelevant absent allegations of knowledge that any statement was misleading. The latter is absent from the Complaint. Now, Plaintiffs add the conclusory assertion that the repurchase program was perpetuated "in order to continue" some "fraudulent scheme" to conceal acquisition interest, yet they never explain how the program could have concealed anything, let alone furthered a fraud.

---

[1] At the time period relevant to the Complaint, the SEC did not require companies to disclose Rule 10b5-1 plans, and the plans themselves are not publicly available.

What remains is an extraordinarily powerful innocent inference: Defendants believed their statements about repurchases were accurate (because they were) and had no reason to believe they also needed to disclose the Apollo Funds' rejected proposals or tentative outreach, which had nothing to do with the challenged statements.

Plaintiffs recognize that their insider-trading based scheme liability claim cannot survive the contemporaneous trading rule. They therefore attempt to repackage it as a hybrid trading-and-misstatement scheme, and claim that the contemporaneous trading rule does not apply. But Plaintiffs are wrong on the law; contemporaneous trading is still required. And even apart from that defect, the scheme claim fails because there were no actionable misstatements.

Plaintiffs are also wrong about materiality. The fact that a would-be acquirer may have financing does not mean its proposal represents adequate value or is likely to be accepted—something Arconic's repeated rejection of the Apollo Funds' overtures makes clear.

The securities laws do not require a company to halt a stock repurchase program in response to unsolicited, uncertain third-party outreach. Nor do they require premature disclosure of such uncertain contacts. The Complaint should be dismissed with prejudice.

## ARGUMENT

## I.    PLAINTIFFS' MISSTATEMENT THEORY FAILS

### A.    The Opposition Confirms There Are No False Or Misleading Statements

Plaintiffs' Opposition does not overcome the Complaint's threshold flaw: that it fails to plead an actionable misstatement or omission. To the contrary, their Opposition makes clear that none of the categories of challenged statements—about stock repurchases, Arconic's intent to comply with Rule 10b5-1, and the SOX certifications—states a claim. All fail for multiple, independent reasons.

### 1. The Statements About Stock Repurchases Were True And Not Rendered Misleading By Omission

Plaintiffs do not dispute that Arconic truthfully and accurately reported the amounts and timing of its stock repurchases. Instead, they attempt to recharacterize those factual disclosures as statements about "the subject of the prices at which Arconic repurchased its shares," and on that basis argue that the disclosures were misleading for failure to include "any information concerning Apollo's premium offer or the Arconic Board's determination that Apollo's offer undervalued the shares." Opp. at 15, 23.

Putting aside for now the status of the Apollo Funds' "offer"—which had been turned down months before the class period begins—Judge Cote flatly rejected this same theory in *In re National Instruments Corp. Securities Litigation*, 2024 WL 4108011 (S.D.N.Y. Sept. 6, 2024). There, the court held that accurate statements reporting share repurchases are not rendered misleading for failure to disclose an offer to acquire the company. *Id.* at *5. As Judge Cote explained, statements about stock repurchases "d[o] not imply, for instance, that the[] repurchases occurred at the highest possible price offered by any market participant," and therefore are "true and … not rendered misleading by the failure to disclose offers that [the company] had received from [a would-be acquirer]." *Id.*

The Ninth Circuit reached the same conclusion in *Brody v. Transitional Hospitals Corp.*, holding that a press release announcing a stock repurchase program—which allegedly omitted information about a "possible takeover"—"neither stated nor implied anything regarding a merger." 280 F.3d 997, 1006 (9th Cir. 2002).

4

Plaintiffs make no effort to distinguish *National Instruments*, nor do they meaningfully contend with *Brody*.[2] Instead, in a cursory footnote, they ask this Court to disregard Judge Cote's reasoning altogether. Opp. at 23 n.6. They cite no authority suggesting that accurate statements about the quantity, timing, or price of stock repurchases become misleading merely because they do not also discuss a potential transaction.

Plaintiffs' theory is also irreconcilable with the Supreme Court's decision in *Macquarie*, which distinguished inactionable "pure omissions" from actionable "half-truths." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263-64 (2024). To plead a half-truth, an omission must be sufficiently connected to the topic of the statements such that "the omission renders affirmative statements misleading." *Id.* at 265. As courts in this District have explained, the duty of completeness "extends only to representations that are *germane* to that particular topic." *In re Block, Inc. Sec. Litig.*, 2025 WL 2607890, at *12 (S.D.N.Y. Sept. 8, 2025) (emphasis added). That germaneness requirement is essential; without it, the distinction drawn in *Macquarie* would collapse, and any nondisclosure could be recast as a half-truth through a tenuous association with an affirmative statement on a different topic.

That is precisely what Plaintiffs attempt here. They take true statements of historical fact about stock repurchases—including the disclosure of average repurchase price—and ascribe to them an unreasonable implied meaning: that by mentioning price, Defendants were implicitly representing that there were no outstanding or previously rejected offers to purchase shares at a

---

[2] Plaintiffs contend that *Brody* is inapposite because the plaintiffs there "did not allege that defendants failed to disclose that the board had determined that the stock's value was higher than an undisclosed offer." Opp. at 23 n.6. That is beside the point. As Judge Cote explained in *National Instruments*, "simply summariz[ing] transactions that had already occurred" does "not imply, for instance, that these repurchases occurred at the highest possible price offered by any market participant." 2024 WL 4108011, at *5. Recasting the alleged omission as an undisclosed board determination rather than an undisclosed offer does not transform an accurate report of historical repurchases into a misleading statement.

higher price. *National Instruments* and *Brody* foreclose that interpretation. Plaintiffs thus seek to impose liability for information Defendants neither said nor implied. That is the hallmark of a pure omission, which Plaintiffs concede is not actionable under *Macquarie*.

### 2. Statements About Arconic's Intention To Comply With Rule 10b5-1 Are True, Not Misleading, And Not Actionable

#### a. The "Intent to Comply" Statement Is Protected By The Safe Harbor—A Point Plaintiffs Do Not Dispute

Plaintiffs' claims based on Arconic's statements that its share repurchase program "is intended to comply with Rule 10b5-1" also fail. Plaintiffs do not dispute that the challenged statement is forward-looking and falls within the PSLRA's safe harbor. That concession alone is enough to dismiss. *See In re Peabody Energy Corp. Sec. Litig.*, 2022 WL 671222, at *17 (S.D.N.Y. Mar. 7, 2022) (a defendant's "stated intent … is a forward-looking statement"); *Kao v. British Airways, PLC*, 2018 WL 501609, at *5 (S.D.N.Y. Jan. 19, 2018) (failure to oppose a "specific argument in a motion to dismiss" constitutes waiver).

Had Plaintiffs addressed the merits of the safe harbor, they would fare no better. To avoid the safe harbor, Plaintiffs must plead facts showing the statement "was made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010). The Complaint is devoid of any allegation that Defendants did not believe the repurchase program complied with Rule 10b5-1. Indeed, Plaintiffs do not allege that anyone—whether in Legal, Treasury, a member of the Disclosure Committee, an officer, a member of the Board of Directors, outside counsel, a broker, or any other advisor—ever believed that the Company's disclosed intention that its repurchase program would comply with Rule 10b5-1 was false. To the contrary, Arconic consistently disclosed in its SEC filings that the program was intended to comply with Rule 10b5-1. The most natural reading of those disclosures is that Arconic had adopted, or intended to adopt, a trading plan under Rule 10b5-1(c) (which, in fact, it did, *see infra* at 8-9).

6

Because Plaintiffs do not allege a basis for finding that Defendants had actual knowledge that their statements were false, the claim is protected by the safe harbor and should be dismissed.

          b.        <u>Plaintiffs' Allegation That Arconic Had No 10b5-1 Plan Should Not Be Credited</u>

Plaintiffs double down on their allegation—on "information and belief"—that "Arconic had no such preestablished plan under Rule 10b5-1(c)." Opp. at 9-10; *see also* AC ¶ 145. That conclusory allegation is unsupported and rests on a flawed inference. Plaintiffs' Opposition makes clear that the main basis for this claim is language in the same SEC filings stating that repurchases would be "made from time to time, as the Company deems appropriate," based on factors such as price, liquidity, capital position, and market conditions. Opp. at 9-10; *see also* AC ¶¶ 135, 137-39.[3] Plaintiffs contend that this program-level flexibility demonstrates that the Company retained "complete discretion," and therefore that no Rule 10b5-1 plan could have existed.

That inference does not hold. A company may retain discretion whether to establish a repurchase program while delegating the timing, pricing, and execution of any actual trades to a pre-established Rule 10b5-1 plan. Likewise, a company has discretion to set trading parameters (*e.g.*, price ceilings and floors) that will be executed via a Rule 10b5-1 plan. And it has discretion to cancel a program if it no longer deems it an appropriate use of capital. That is what Arconic's disclosure said. And that is consistent with establishing a Rule 10b5-1 plan that helps ensure that

---

[3] For example, the disclosure from the second quarter 2022 Form 10-Q, filed with the SEC on May 4, 2022, is quoted in Paragraph 135 of the AC (all alterations in the AC): "On May 4, 2021, Arconic announced that its Board of Directors approved a share repurchase program authorizing the Company to repurchase shares of its outstanding common stock up to an aggregate transactional value of $300 million over a two-year period expiring April 28, 2023. Repurchases under the program may be made from time to time, as the Company deems appropriate, solely through open market repurchases effected through a broker dealer, based on a variety of factors such as price, capital position, liquidity, financial performance, alternative uses of capital, and overall market conditions. … The share repurchase program may be increased or otherwise modified, renewed, suspended, or terminated by the Company at any time, without prior notice. ***This program is intended to comply with Rule 10b5-1***."

decisions are made only when the company does not have material non-public information. Stated differently, the language on which Plaintiffs' hinge their "information and belief" does not address trading mechanics; it addresses the authorization and parameters of the repurchase program.

Plaintiffs' theory thus rests on a circular conflation of these distinct concepts. They infer the nonexistence of a Rule 10b5-1 plan from disclosures that are fully consistent with such a plan and say nothing about trade execution. Program-level discretion does not contradict—much less render false—the Company's statements that its repurchase program was intended to comply with Rule 10b5-1. Those disclosures were presented together in the same SEC filings, reflecting their evident compatibility rather than inconsistency. *See, e.g.*, AC ¶ 135.

Plaintiffs' remaining arguments for why the Court should infer there was no plan fare no better. The statement that Arconic planned to "retire shares at opportunistic levels" (Opp. at 9) does not imply solely ad hoc or discretionary trading; it reflects that repurchases would occur only if market conditions met specified criteria. That is fully consistent with a Rule 10b5-1 plan that employs pre-established price and volume thresholds. And Plaintiffs' contention that the statement of intent was false because it did not expressly disclose the existence of a Rule 10b5-1(c) plan fails as well. At the relevant time, the SEC did not require issuers to publicly disclose trading plans, and silence on that subject cannot be transformed into proof that the Company's disclosed intent was untrue.

Finally, Plaintiffs make much of the fact that "Defendants' motion never actually states that Arconic had a 10b5-1(c) plan," and even suggest that Defendants "would surely have submitted the supposedly 'implied,' 'inferred' 10b5-1(c) plan if any such plan actually existed." Opp. at 10. But Plaintiffs cannot invert Rule 12 by alleging—on "information and belief" and without supporting facts—that no Rule 10b5-1 plan existed, and then faulting Defendants for

8

declining to introduce evidence outside the pleadings to rebut that speculation. Had Defendants attached the plans, Plaintiffs surely would have cried foul and moved to strike or attempted to convert the Motion to one for summary judgment. Defendants are willing to share the plans at the Court's request in connection with deciding this Motion. But Plaintiffs' invitation to draw a negative inference from Defendants' adherence to settled pleading rules is unfounded, and it cannot substitute for factual allegations showing that the Company's statements of intent to comply with Rule 10b5-1 were false or misleading.

   c.  There Was No Interest From The Apollo Funds Requiring Disclosure When The "Intent to Comply" Statements Were Made

Plaintiffs also fail to grapple with a critical timing mismatch in their theory of the case. Defendants' Motion explained that statements about "intention to comply" with Rule 10b-5 were made when there was no live inquiry from the Apollo Funds. MTD at 16-18.

The May 2022 statement occurred before the putative class period, which Plaintiffs do not dispute. Instead, they assert that Defendants had a duty to update. Opp. at 11.[4] This makes no sense. Arconic's "intent to comply" with Rule 10b5-1 had not changed; this is not a statement that is susceptible to being "updated." Nor do Plaintiffs allege that Arconic learned new information after May 2022 that would give rise to a duty to update. MTD at 17.[5] Moreover, "[e]xcept for specific periodic reporting requirements," such as quarterly and annual reports, there is "no general

---

[4] Plaintiffs do not allege that Defendants had a duty to update any other statement regarding Arconic's stated intention to comply with Rule 10b5-1.

[5] Imagine the disclosure regime if Plaintiffs were correct. Under Plaintiffs' view, Arconic would have been required in June 2022 to "update" its May statement that its repurchase program was intended to comply with Rule 10b5-1 to disclose that it had rejected unsolicited outreach from the Apollo Funds months earlier—and that the possibility of future outreach might remain. Setting aside that those facts have no logical connection to one another (which is precisely why Plaintiffs' theory is non-actionable under *Macquarie*), such a disclosure would confuse rather than inform investors, and impose obligations the securities laws do not require. *Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 415 (1st Cir. 1989); *accord Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1169 (10th Cir. 2018).

duty on the part of a company to provide the public with all material information." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997); *see also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact"). Plaintiffs' citation to *SEC v. SolarWinds Corp.*, 741 F. Supp. 3d 37, 78-79 (S.D.N.Y. 2024), is inapposite. There, the court said nothing about any duty to update. *See id.* Instead, it held that "sustained public misrepresentations" and "flat falsehoods" on the company's *website* were actionable during the relevant period. *Id.* at 81-82. Here, by contrast, Defendants' statements—in its quarterly SEC filings about share repurchases—were true at all times and peripheral to the Company's operations.

As to the August and November 2022 statements, Plaintiffs assert—without factual support—that "Apollo's proposed acquisition of Arconic remained a material, ongoing potential transaction," claiming that "Apollo told Arconic it would submit its proposal on a different timeline" and that the parties "continued to interact and discuss" a possible acquisition. Opp. at 5. These assertions are contradicted by the Proxy, which explains that after June 23, 2022, there were only "occasional contacts" that "did not result in the submission of any new proposals for an acquisition of Arconic." MTD Ex. A. at 31. Plaintiffs allege no facts concerning the substance of these contacts—such as who participated, what was discussed, or whether they related to any transaction at all—much less facts showing that statements of intent to comply with Rule 10b5-1 were false. Nor do they explain why these occasional contacts were anything other than ordinary, run-of-the-mill contacts between executives. *See Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 415 (1st Cir. 1989) (Breyer, J.) (requiring large corporations to disclose "tentative feelers" from other companies would "more likely confuse, than inform, the marketplace"); *see also Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1169 (10th Cir. 2018) (same); *Reiss v. Pan Am. World*

10

*Airways, Inc.*, 711 F.2d 11, 14 (2d Cir. 1983) (merger negotiations are "inherently fluid" and "uncertain[]," so disclosure may be "more misleading than secrecy").[6]

Finally, Plaintiffs do not address the February 2023 statement at all, let alone explain how it could be false when the Company had ceased engaging in any stock repurchases by that time. Their silence confirms the absence of any plausible falsity as to that statement.

### 3.    The Sarbanes-Oxley Certifications Cannot Support A Fraud Claim

Plaintiffs concede that statements certifying compliance with SOX do not provide a standalone basis for liability and, instead, are actionable only if there are "underlying false statements." Opp. at 23 n.8. Because Plaintiffs do not plead an actionable false or misleading statement, the SOX certifications cannot support a claim. *See Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *21 (S.D.N.Y. Mar. 29, 2021).[7]

### B.    The Opposition Confirms There Is No Scienter

Plaintiffs' misstatement claim also fails because their allegations do not give rise to a plausible inference of scienter—much less one that can overcome the exceptionally strong innocent inference that Defendants believed their statements were accurate (which they were) and had no reason to believe they were required to disclose the Apollo Funds' rejected offers and

---

[6] Plaintiffs contend that *Reiss* "was overruled by" *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Opp. at 20 n.5. Not so. The *Basic* Court merely rejected the brightline rule that merger discussions never need to be disclosed. *Basic*, 485 U.S. at 236. Since *Basic*, however, courts have reaffirmed the principles underlying *Reiss*—i.e., that merger negotiations are inherently fluid and, thus, premature disclosure of them can more likely mislead than inform the market. *See, e.g., Emps.' Ret. Sys. of R.I.*, 889 F.3d at 1168-69 (describing "the very perils that the limit on disclosure imposed by the materiality requirement serves to avoid," including uncertainty for companies and the risk of "bury[ing] the shareholders in an avalanche of trivial information" (citation omitted)); *Jackvony*, 873 F.2d at 415 (similar); *Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 244-45 (4th Cir. 1988) (similar).

[7] Plaintiffs do not explain how the statements about intended compliance with Rule 10b5-1 and SOX certifications are half-truths under *Macquarie*, instead pressing an affirmative misstatement theory. Opp. at 21-22.

tentative outreach or abstain from trading. That independently defeats Plaintiffs' 10(b) claim. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007).

### 1.    No Particularized Facts Overcome The Innocent Inference

The most compelling inference from Plaintiffs' allegations is that Defendants reasonably believed the Apollo Funds' outreach did not warrant disclosure when they made the challenged statements. Between June and early December 2022, there was no outstanding offer and only "occasional contacts" on unspecified topics between Arconic, the Apollo Funds, and Irenic. After the Apollo Funds submitted a preliminary proposal in mid-December 2022, there still were no confidentiality agreements, no due diligence, no negotiations, and no board resolutions until late January 2023—after repurchases had ended. *See* AC ¶¶ 85-107; *see also* MTD at 27-28 n.8. At the time of each challenged statement, Arconic had ample reason to conclude that the Apollo Funds' tentative outreach did not require disclosure, and that its trading activity did not trigger any disclosure obligation.

It is also far more plausible that Defendants never conceived that Arconic's accurate reporting of its share repurchases, or its statement that the programs were intended to comply with Rule 10b5-1, could be misleading for failure to disclose the Apollo Funds' tentative outreach. As explained above, those statements had nothing to do with the Apollo Funds and were not rendered misleading by the omission of that information.

Critically, the Opposition does not identify a single allegation specific to Myers's or Asmussen's state of mind—let alone allegations sufficient to support a "strong inference" that any Defendant acted with intent to defraud.[8] Plaintiffs point to no particularized facts that outweigh the benign inference here, such as a confidential witness alleging that negotiations were more

---

[8] The third Individual Defendant, Henderson, is not named in Count I, which alleges primary liability, but only Count II, the control person claim.

advanced than disclosed in the Proxy, or facts suggesting that the "occasional contacts" involved substantive merger discussions. Nor do Plaintiffs allege that anyone—such as Arconic's Chief Legal Officer—ever concluded that the SEC filings required additional disclosure, much less communicated such a view to Defendants. To the contrary, Arconic repeatedly disclosed that the share repurchase programs were "intended to comply with Rule 10b5-1," which strongly supports the inference that Arconic entered into Rule 10b5-1 plans without material non-public information. AC ¶¶ 135, 137-39. Plaintiffs' contrary allegation that no such plans existed rests on speculation.

### 2. Plaintiffs' Theory Defies Economic Sense, Reinforcing The Innocent Inference

Plaintiffs' theory also fails because it makes no economic sense. They do not explain how Defendants derived any concrete benefit from the alleged misstatements or the purported scheme. As Defendants explained in the Motion, stock repurchases do not benefit companies at the expense of shareholders; they benefit shareholders by reducing dilution and, all else equal, increasing the stock price. *See* MTD at 22 n.6. Plaintiffs do not respond to that point.

Instead, Plaintiffs merely repeat their conclusory allegation that *Arconic*—and not any Individual Defendant—had a "clear motive" to repurchase shares without disclosing the Apollo Funds' outreach because doing so allegedly allowed the Company to buy shares at lower prices and thereby "strengthen[] its negotiating position" with the Apollo Funds or other bidders. Opp. at 26. That contention defies common sense. Plaintiffs' theory assumes that Defendants intentionally depressed Arconic's stock price in order to purchase shares "on the cheap" and thereby "prop[] up" their negotiating leverage with potential acquirers. AC ¶ 161. But as the Second Circuit has explained, "[a]chieving a superior agreement with [an acquirer] does not demonstrate defendants' intent to benefit themselves at the expense of the shareholders because

13

the shareholders themselves would benefit from a superior transaction." *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001).

More broadly, where a plaintiff's theory "defies economic reason, it does not yield a reasonable inference of fraudulent intent." *Id.* at 140-41 (cleaned up).[9] And under settled Second Circuit law, allegations of motive are insufficient absent facts showing that Defendants received a "concrete and personal" benefit from the alleged fraud. *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)). Plaintiffs allege no such benefit here.

Plaintiffs largely ignore these principles. And while motive is only one component of the scienter analysis, the economic irrationality of Plaintiffs' theory significantly strengthens the competing—and far more plausible—inference that Defendants believed their statements were accurate (because they were) and had no reason to believe they were required to disclose the Apollo Funds' rejected proposals or tentative outreach, which had no connection to the challenged statements. *Tellabs*, 551 U.S. at 323 (scienter inquiry is "inherently comparative").

### 3. Plaintiffs Do Not Plead That Any Defendant Had "Actual Knowledge" That Any Public Statement Was False

Against the backdrop of their nonsensical motive theory, Plaintiffs' showing of "strong circumstantial evidence" of conscious misbehavior or recklessness must be "correspondingly greater." *ECA, Local 134*, 553 F.3d at 199 (citation omitted). Far from meeting that exacting

---

[9] Plaintiffs attempt to sidestep *Kalnit* by pointing to purported factual differences, asserting that the plaintiff there illogically alleged a scheme that would have resulted in a lower acquisition price. Opp. at 26 n.10 (citing *Kalnit v. Eichler*, 99 F. Supp. 2d 327, 342-43 (S.D.N.Y. 2000)). That misses the point. The Second Circuit affirmed dismissal not because of any peculiar feature of the alleged scheme, but because the plaintiff failed to allege "any specific benefit that would inure to the defendants that would not be either generalized to all corporate directors or beneficial to all shareholders." *Kalnit*, 264 F.3d at 142. Plaintiffs' allegations suffer from the same defect here: the Complaint identifies no concrete benefit enjoyed by Defendants at the expense of shareholders.

standard, Plaintiffs grasp at straws. Their Opposition focuses on two unremarkable facts: (1) the decision to recuse Jeffrey Stafeil from discussions concerning the Apollo Funds' outreach, and (2) the purported "magnitude and pace" of Arconic's repurchases. Opp. at 24-25. Neither allegation—standing alone or together—supports a strong inference that Defendants knew "their public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) (citation omitted), *aff'd sub nom.*, *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

The recusal of Stafeil from future discussions does not establish scienter. As an initial matter, Plaintiffs' assertion that the recusal occurred in November is unsupported by the Proxy.[10] Regardless, the decision to wall off a Board member from further discussions does not suggest that Arconic believed an offer from the Apollo Funds was imminent at the time of the November statements, or any earlier point. Nor do Plaintiffs explain how such a precautionary governance measure bears on Defendants' scienter with respect to accurate statements about (a) stock repurchases, (b) Arconic's intention to comply with Rule 10b5-1, or (c) SOX certifications. Taking steps to avoid bias in Board discussions says nothing about the materiality of tentative outreach or about Defendants' knowledge of falsity. The far more compelling inference is that the Board exercised caution while reasonably concluding that the preliminary discussions did not warrant disclosure—particularly in the M&A context, where premature "[d]isclosure may in fact be more

---

[10] Plaintiffs' account of the decision to recuse Stafeil from discussions concerning the Apollo Funds misrepresents the timeline. Plaintiffs assert that this occurred in *November* 2022. Opp. at 25. But Plaintiffs made that up. Their only source regarding Stafeil is the Proxy, *see* AC ¶ 159, and the Proxy makes clear that Stafeil was not screened from any Board discussions until *December* 2022—after the new share repurchase program had already been adopted, *see* MTD Ex. A, Proxy at 31. Where, as here, the documents on which Plaintiffs rely directly contradict their allegations, the documents control, and the Court should disregard Plaintiffs' contrary assertion. *See Honig v. Hansen*, 2021 WL 4651475, at *6 (S.D.N.Y. Oct. 6, 2021).

15

misleading than secrecy." *Reiss*, 711 F.2d at 14; *see also Emps.' Ret. Sys. of R.I.*, 889 F.3d at 1169 (similar); *Jackvony*, 873 F.2d at 415 (similar).

Plaintiffs' reliance on the volume and timing of stock repurchases fares no better.[11] Plaintiffs argue that scienter may be inferred from the "magnitude and pace" of repurchases, which they claim "accelerated dramatically" in June–August 2022 and again in December 2022. Opp. at 25. But Plaintiffs offer no explanation for why the Apollo Funds' outreach would have caused Defendants to accelerate the repurchases. Further, during the June-August period, there was nothing material to disclose and no misleading information to correct. Any repurchases during that time therefore say nothing about Defendants' awareness of falsity, intent to evade Rule 10b5-1, or the accuracy of SOX certifications.

Nor does the adoption of a new repurchase program in November 2022 and subsequent repurchases in December 2022 and January 2023 support an inference of scienter. Arconic disclosed the sale of its Russian operations for cash proceeds of $230 million in November 2022, and disclosed the new repurchase program the following day. MTD Ex. C (Nov. 16, 2022 8-K); MTD Ex. D (Nov. 15, 2022 8-K). The most plausible inference from that timing—and the repurchases that followed pursuant to a Rule 10b5-1(c) plan—is that Defendants believed share repurchases represented an attractive capital allocation opportunity for the Company and its shareholders. Given that any effort to depress the stock price by withholding information would

---

[11] Plaintiffs cite only one case—*In re Aegean Marine Petrol. Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111 (S.D.N.Y. 2021)—for the proposition that insider trading can indicate bad faith and scienter. That case bears no resemblance to this one. There, the court held that "[u]nusual insider sales" by an individual defendant could "permit an inference of bad faith and scienter." *Id.* at 173 (citation omitted). The allegations involved suspicious personal stock sales totaling approximately $1 million of stock by an individual defendant, coinciding with the sale of "over 20% of [the company's] stock" by another insider. *Id.* at 173-74. Here, by contrast, Plaintiffs do not allege—nor could they allege—that any Individual Defendant sold stock during the class period. And far from being "unusual," Arconic's stock repurchases were fully and accurately disclosed and consistent with the stated goal of returning capital to shareholders. *Aegean* therefore provides no support for Plaintiffs' scienter theory.

16

defy economic logic, the volume of repurchases cannot support a strong inference of an intent to mislead.

At bottom, Plaintiffs' scienter allegations amount to nothing more than the Individual Defendants' mere access to information and "the fact of the buyback itself." *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018), *aff'd sub nom*, *Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019). That is insufficient as a matter of law. *See id.*; *see also Ramzan v. GDS Holdings Ltd.*, 2020 WL 1689772, at *4 (S.D.N.Y. Apr. 7, 2020) ("*[S]cienter* cannot be inferred solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information." (citation omitted)).

Plaintiffs finally gesture toward "collective" corporate scienter. Opp. at 26. The Court should swiftly reject Plaintiffs' clear throwaway argument, and take this argument for what it is: Plaintiffs' recognition that they have not pleaded scienter, particularly for the Individual Defendants. "[C]ollective" corporate scienter is available only in "exceedingly rare instances" typically involving statements so "'dramatic' that collective corporate scienter may be inferred" even absent individual scienter. *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (citation omitted).[12] Examples include something "akin to General Motors hypothetically announcing that it had sold one million SUVs in 2006, when the actual number was zero." *In re Lottery.com, Inc. Sec. Litig.*, 765 F. Supp. 3d 303, 359 (S.D.N.Y. 2025). This case—concerning accurate disclosures about repurchases, nondisclosure of tentative and rejected outreach, and trading conducted pursuant to a Rule 10b5-1(c) plan—comes nowhere close.

---

[12] Plaintiffs' only support for their "collective" scienter theory is *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472 (S.D.N.Y. 2005), which was decided before the Second Circuit clarified that "collective" scienter is a narrow exception, not the rule, *see Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.,* 531 F.3d 190, 195-97 (2d Cir. 2008); *Jackson*, 960 F.3d at 98-99.

\*     \*     \*

In sum, Plaintiffs' scienter argument rests on an economically irrational motive and tenuous circumstantial allegations. That showing is no match for the exceptionally strong innocent inference here: that Defendants believed their statements were accurate and had no reason to believe they were required to disclose the Apollo Funds' rejected proposals and tentative outreach, which had no connection to the challenged statements. Plaintiffs' misstatement claim should be dismissed.

## II.    PLAINTIFFS' SCHEME THEORY FAILS

Plaintiffs' scheme claim fails for three independent reasons: it is barred by the contemporaneous trader rule, it lacks any supporting allegations of trading on material non-public information, and it fails to plead a strong inference of scienter.[13] Before reaching those determinations, however, the Court should dismiss the scheme claims against Defendants Myers and Asmussen. As explained in Defendants' Motion, the Complaint contains no allegations supporting primary liability for insider trading against either individual. MTD at 28. Plaintiffs do not respond, presumably because they had no response. *See Kao*, 2018 WL 501609, at \*5 (finding waiver where "party fail[ed] to oppose specific arguments").

### A.    The Contemporaneous Trader Rule Bars Plaintiffs' Scheme Claim

Plaintiffs do not even attempt to argue that they traded contemporaneously. *See* Opp. at 8-13. Nor could they: their trades occurred at least *weeks* after company repurchases, far from the "reasonable period of time, usually limited to a few days," required to establish contemporaneity. *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 311 n.51

---

[13] Plaintiffs accuse Defendants of "attempt[ing] to mischaracterize … *Macquarie*" by purportedly extending its ruling to claims brought under Rules 10b-5(a) and (c). Opp. at 13-14. But Defendants made no such argument. *See* MTD at 12-13.

(S.D.N.Y. 2008); *see also Brodzinsky v. FrontPoint Partner LLC*, 2012 WL 1468507, at *4-5 (D. Conn. Apr. 26, 2012) (rejecting a claim where trades were two weeks apart).

Unable to satisfy this threshold requirement, Plaintiffs attempt to evade it by cobbling together an amorphous scheme supposedly based on *both* insider trading *and* misstatements or omissions. Opp. at 13. Plaintiffs assert—incorrectly—that the contemporaneous trader rule does not apply to this repackaged theory. That argument fails for several reasons.

*First*, Plaintiffs do not plead any actionable misstatement or half-truth. *See supra* § I. To the extent Plaintiffs' scheme theory depends on alleged misstatements or omissions, it therefore fails outright. Any remaining scheme claim rests on insider trading alone—but Plaintiffs expressly disclaim reliance on "mere insider trading alone." *See* Opp. at 12-13 (arguing Defendants' cases are "inapposite" because they "concern[] freestanding insider-trading claims").[14] Once Plaintiffs' misstatement theory is dismissed, their scheme theory collapses as well. *See Wilkov v. Ameriprise Fin. Servs., Inc.*, 753 F. App'x 44, 46 n.1 (2d Cir. 2018) (affirming dismissal of claims "on the ground that they were 'abandoned' … when [plaintiff] failed to oppose" arguments made in a motion to dismiss).

*Second*, even as repackaged, Plaintiffs' scheme claim is nothing more than a classic insider-trading claim to which the contemporaneous trader rule squarely applies.[15] The Complaint and Opposition make clear that Plaintiffs seek to impose liability for allegedly breaching a duty to disclose or abstain from trading. *See, e.g.*, Opp. at 11 ("Defendants engaged in other deceptive

---

[14] Plaintiffs concede that the contemporaneous trader rule applies to such "freestanding insider-trading claims," Opp. at 8, 12, and make no attempt to establish that they satisfy it.

[15] Tellingly, Plaintiffs do not cite a single case to lay out the elements of their undefined scheme claim. Opp. at 13; *cf. Buhrke Fam. Revocable Tr. v. U.S. Bancorp.*, 726 F. Supp. 3d 315, 363 (S.D.N.Y. 2024) (dismissing undefined scheme claim that "rel[ied] on a small number of scattered cursory references in the Amended Complaint to a fraudulent scheme, none of which detail any scheme separate and apart from their core misstatements theory").

conduct that supports scheme liability, including *Arconic's repurchase of its own stock while aware of MNPI about Apollo's premium offer*." (emphasis added)); *see also, e.g.*, AC ¶¶ 4, 113, 116, 136, 147, 163. The Second Circuit has been unequivocal: those duties are "owed *only to those investors trading contemporaneously with the insider*." *Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 94 (2d Cir. 1981) (emphasis added). Plaintiffs do not cite any cases that support abandoning the contemporaneous trader rule simply because a statement is part of the alleged scheme.

The cases Plaintiffs do cite—*In re Oxford Health Plans, Inc.*, 187 F.R.D. 133 (S.D.N.Y. 1999), and *Gruber v. Gilbertson*, 2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018)—do not alter this result. Neither addressed whether the contemporaneous trader rule applies to scheme claims grounded in insider trading. *Oxford Health* involved separate misstatement and insider-trading claims, not a scheme claim under Rules 10b-5(a) and (c). 187 F.R.D. at 138-39, 143. And *Gruber* involved alleged market manipulation—not a disclose-or-abstain theory. 2018 WL 1418188, at *7-11, *14. By contrast, Plaintiffs here premise their scheme claim on the very duties underlying the "'classical theory' of insider trading." *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997).

Finally, once the insider-trading component is dismissed, any remaining scheme claim based solely on misstatements and omissions must also be dismissed. Misstatements and omissions alone "cannot form the 'sole basis' for liability under the scheme subsections." *SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022) (citation omitted).

**B.    Defendants Did Not Trade On The Basis Of Material Non-Public Information**

Independent of the defects discussed above, Plaintiffs' scheme claim also fails because Defendants did not trade on the basis of material non-public information during the relevant repurchase periods—June to August 2022 and November 2022 to January 2023.

20

### 1.    Arconic Had No Duty To Abstain When It Repurchased Shares Between June 2022 And August 2022

Plaintiffs nowhere explain how the stock repurchases made between June and August 2022 could have been executed on the basis of material non-public information. During that period, there were no outstanding offers, no ongoing negotiations, and no reasons to believe the Apollo Funds would imminently submit a successful proposal. MTD at 30. To the contrary, Arconic had already declined the Apollo Funds' April 2022 proposal, and by June 2022 the Apollo Funds' interest in submitting a revised offer had cooled.

Plaintiffs' vague allegations of "occasional contacts" do not support any inference—let alone a plausible inference—that the Apollo Funds intended to submit a revised offer. Those allegations lack specificity and describe precisely the type of tentative, routine interactions between executives that courts have long held to be immaterial. *Emps.' Ret. Sys. of R.I.*, 889 F.3d at 1169; *Jackvony*, 873 F.2d at 415; *Reiss*, 711 F.2d at 14.

Plaintiffs attempt to analogize this case to *National Instruments*. *See* Opp. at 18. That analogy fails. Plaintiffs quote the court's observation that "[t]here was a meaningful possibility that [the offeror] would continue its efforts to acquire [the target] after it indicated serious interest in doing so." *Id.* (quoting *In re Nat'l Instruments Sec. Litig.*, 2025 WL 2682172, at *4). But Plaintiffs ignore the critical factual distinctions Defendants identified in their Motion. *See* MTD at 32-33.

In *National Instruments*, the plaintiffs alleged that the would-be acquirer (1) expressly stated its intent "to move quickly," (2) threatened to take its bid directly to shareholders, and (3) stated that acquiring the target company was its "highest strategic priority"—while the target company took affirmative "steps 'to encourage an improved bid.'" *See id.* (quoting *In re Nat'l Instruments Corp. Sec. Litig.*, 2024 WL 4108011, at *2, *6). In other words, the acquirer actively

and aggressively pursued the transaction, and the target company engaged in conduct designed to advance it. During the June–August 2022 period, there was no active pursuit, no negotiations, and no conduct by Arconic suggesting that a transaction was likely to occur.

### 2. Arconic Had No Duty To Abstain When It Repurchased Shares Between November 2022 And January 2023

The allegations concerning the second repurchase period—November 2022 through early January 2023—are likewise insufficient. The Apollo Funds submitted a revised, nonbinding proposal on December 12, 2022. But that proposal was based solely on public information, involved no due diligence, lacked committed financing, and was rejected on January 19, 2023, without intervening negotiations. Those facts do not amount to material non-public information during the relevant repurchase period.

As Plaintiffs acknowledge, the governing standard for assessing the materiality of speculative events such as preliminary merger discussions is set forth in *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). *Basic* instructs courts to assess materiality using a two-part "probability/magnitude" framework, focusing on objective "indicia of interest" in consummating a transaction—such as "board resolutions, instructions to investment bankers, and actual negotiations." *Id.* at 239. None of those indicia was present here during the relevant time period.

In an effort to satisfy *Basic*'s probability requirement, Plaintiffs blur the timeline. They point to allegations that purportedly show "negotiations between principals." Opp. at 18. But the only allegations of actual negotiations occurred after Arconic had already ceased share repurchases. *See* AC ¶¶ 89, 92, 100, 103-06. Likewise, Arconic allegedly retained investment bankers to facilitate a merger only *after* share repurchases ended, and any board resolutions

22

post-dated the repurchase period as well. *See* AC ¶¶ 89, 97, 99.[16] The Court must assess the probability of a transaction "in light of the facts *as they then existed*, not with the hindsight knowledge that the transaction was or was not completed." *Panfil v. ACC Corp.*, 768 F. Supp. 54, 58-59 (W.D.N.Y. 1991) (emphasis added; citation omitted), *aff'd*, 952 F.2d 394 (2d Cir. 1991); *see also Hartford Fire Ins. Co. v. Federated Dep't Stores*, 723 F. Supp. 976, 985, 987 (S.D.N.Y. 1989) (similar). Viewed through that lens, none of *Basic*'s "indicia of interest" existed during the relevant time period.

*Basic* and the timeline against them, Plaintiffs invent a new standard—what they call a "'value-certain' transactional certainty" test—based almost entirely on the Apollo Funds' asserted ability to finance an acquisition.[17] Opp. at 16. But a would-be acquirer's financial capacity is irrelevant absent allegations of the parties' "serious commitment to consummate the transaction." *Emps.' Ret. Sys. of R.I.*, 889 F.3d at 1168. Courts routinely hold that one-sided or "unrequited" expressions of interest do not constitute material information. *See LL Cap. Partners, LP v. Rockefeller Ctr. Props., Inc.*, 921 F. Supp. 1174, 1180 (S.D.N.Y. 1996); *Traverso v. Eller Media Co.*, 2002 WL 467717, at *7 (N.D. Cal. Mar. 25, 2002).

Plaintiffs' December 2022 and early January 2023 allegations do not show that Arconic had any serious commitment to pursue a transaction. Nor can Plaintiffs manufacture materiality from two undeveloped facts: occasional contacts with the Apollo Funds and the decision to recuse

---

[16] To be sure, the Amended Complaint alleges that Arconic corresponded with financial advisors in 2022. AC ¶¶ 81-82. But it did so for internal deliberations—not, as courts require, "*to facilitate a merger*." *Emps.' Ret. Sys. of R.I.*, 889 F.3d at 1169 (emphasis added) (quoting *Taylor*, 857 F.2d at 244-45).

[17] The consequences of accepting Plaintiffs' "transactional certainty" theory would be staggering. Under Plaintiffs' view, any unilateral—even rejected—expression of interest by a well-capitalized potential acquirer would automatically become material, obligating target companies either to make repetitive disclosures or to halt otherwise lawful trading. That is not—and cannot be—the law, particularly where, as here, the target company has a years-long history of receiving "tentative feelers" from the same would-be acquirer. *Jackvony*, 873 F.2d at 415; *Emps.' Ret. Sys. of R.I.*, 889 F.3d at 1169.

Stafeil from certain Board discussions. As explained above, the undefined "occasional contacts" are insufficient to support any non-speculative inference. And Stafeil's recusal reflects prudent governance rather than increasing transaction probability and cannot—standing alone—support an inference that Defendants traded on the basis of material non-public information.

None of the cases Plaintiffs cite suggests otherwise. Most involve circumstances where the target company affirmatively pursued a transaction or took concrete steps toward consummation—facts wholly absent here.[18] Plaintiffs' reliance on *SEC v. Aly*, 2018 WL 1581986, at *20 (S.D.N.Y. Mar. 27, 2018), is also misplaced. *Aly* involved a fraudulent public disclosure of a fictitious high-premium offer, which caused an immediate stock-price spike and yielded substantial profits for the defendant within minutes. *Id.* at *5-6. The court held that the misstatement was material precisely because it should never have been disclosed. *Id.* at *21. *Aly* thus underscores the danger of premature—or false—merger disclosures and supports, rather than undermines, Defendants' position. *See Jackvony*, 873 F.2d at 415 (premature disclosure "would more likely confuse, than inform, the marketplace"); *Emps.' Ret. Sys. of R.I.*, 889 F.3d at 1169 (similar); *Reiss*, 711 F.2d at 14 (similar).

For their parting shot, Plaintiffs retreat behind the procedural posture of this Motion, arguing that materiality is too fact-intensive to be resolved at the pleading stage. Opp. at 20.

---

[18] *See In re Nat'l Instruments Corp. Sec. Litig.*, 2024 WL 4108011, at *2, 6 (would-be acquirer "was prepared to move quickly," threatened to go directly to target's shareholders, and expressed that an acquisition was its "highest strategic priority"; meanwhile, target company took affirmative steps "to encourage an improved bid"); *SEC v. Wyly*, 788 F. Supp. 2d 92, 122-23 (S.D.N.Y. 2011) (defendants who comprised two-thirds of company's executive committee and half of its Board of Directors "could be confident that they could effectuate any planned sale"); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 181-82 (2d Cir. 2001) (failed "extensive" negotiations were not immaterial as a matter of law, because after the negotiations fell apart, the target company "actively considered its strategic alternatives" and "initiated conversations with a leveraged buy-out firm"); *In re Gen. Motors Class E Stock Buyout Sec. Litig.*, 694 F. Supp. 1119, 1128 (D. Del. 1988) (defendant proactively attempted to sell to purchaser, and both parties engaged in talks before they collapsed); *SEC v. Shapiro*, 494 F.2d 1301, 1306-07 (2d Cir. 1974) ("negotiations between [the companies] recommenced" and a director of the target's board "reacted favorably to the merger and promised to propose the merger to [target company's] board").

Plaintiffs are wrong. "[T]he materiality hurdle remains a meaningful pleading obstacle." *Willard*

*v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 618 (S.D.N.Y. 2021) (quoting *In re ProShares*

*Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013)). And courts regularly dismiss claims at the

pleading stage where plaintiffs fail to allege facts showing materiality. MTD at 29 (citing cases);[19]

*see generally Singh v. Cigna*, 918 F.3d 57 (2d Cir. 2019) (affirming dismissal on materiality

grounds).

### C.   Plaintiffs Fail To Allege A Strong Inference Of Scienter For Their Scheme Claim

Plaintiffs' scheme claim independently fails because the Complaint does not allege facts

giving rise to a strong inference of scienter. As explained above, Plaintiffs do not allege any

rational economic motive for Defendants to have engaged in the purported scheme. The far more

compelling—and indeed the only plausible—inference here is the innocent one: Defendants

believed their statements were accurate, had no reason to believe they were required to disclose

---

[19] Plaintiffs attempt to distinguish Defendants' materiality cases in a cursory footnote. *See* Opp. at 20 n.5. That effort is unpersuasive. Plaintiffs first contend that *Taylor v. First Union Corp. of South Carolina* held merger discussions were immaterial because the proposed merger would have been illegal. Opp. at 20 n.5. That is an impermissibly narrow reading of *Taylor*. The Fourth Circuit based its decision on the "preliminary, contingent, and speculative" nature of the merger discussions—stemming from the absence of both "factual" and "legal predicates" for a transaction. 857 F.2d at 244. Indeed, relying heavily on *Taylor*, the Tenth Circuit in *Employees' Retirement System of Rhode Island* affirmed dismissal where the defendants failed to disclose repeated overtures from a potential acquirer—even though there were no legal barriers to consummating the merger. 889 F.3d at 1169-70. Plaintiffs attempt to distinguish *Employees' Retirement System of Rhode Island*, asserting that there were no "concrete offers, specific discussions, or anything more than vague expressions of interest." Opp. at 20 n.5. But Plaintiffs here allege nothing more than occasional contacts and rejected, preliminary proposals lacking due diligence or committed financing. Plaintiffs' effort to distinguish *Berkowitz v. Conrail, Inc.*, 1997 WL 611606 (E.D. Pa. Sept. 25, 1997), fares even worse. There, the court held immaterial an alternative acquirer's repeated outreach—on "at least eight occasions"—including a concrete offer and expressions of "strong interest in a business combination." *Id.* at *9. Contrary to Plaintiffs' suggestion, the allegations stated that in the days preceding the merger announcement, the alternative acquirer twice expressed a desire to "present a concrete proposal" to the board, *id.* at *3. Finally, Plaintiffs point to *Panfil v. ACC Corp.*, 768 F. Supp. at 59, on the ground that there were no discussions or contacts with any suitor in that case, Opp. at 20 n.5. But discussions and contacts were present in all of the other cases Defendants cite—and in any event, *Panfil* expressly reiterates the controlling principle that "tentative" negotiations are immaterial. *See id.* at 58 (citing *Taylor*, 857 F.2d at 244-45, and *Jackvony*, 873 F.2d at 413-14).

the Apollo Funds' rejected proposals or tentative outreach, and did not believe they were engaging in an insider-trading based scheme to defraud investors. *See supra* § I.B.

Plaintiffs attempt to establish scienter for the scheme claim by asserting that Defendants recklessly breached a "known or obvious" duty to disclose or abstain. Opp. at 25-26. But, for the reasons explained throughout this brief, Defendants had no such duty. *See supra* § II.A-B. In any event, the Complaint does not allege facts showing that any such duty would have been "known or obvious" to Defendants. *See In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 494-95 (S.D.N.Y. 2018).

From June through August 2022, there were no live offers and no negotiations between Arconic and the Apollo Funds. Defendants therefore cannot be said to have acted recklessly by failing to recognize a duty to disclose or abstain based solely on a previously rejected proposal and unspecified "occasional contacts." That conclusion is reinforced by well-settled authority cautioning against premature disclosure of tentative merger discussions, which "would more likely confuse, than inform, the marketplace." *Jackvony*, 873 F.2d at 415; *see also Emps.' Ret. Sys. of R.I.*, 889 F.3d at 1169 (similar); *Reiss*, 711 F.2d at 14 (similar).

Nor does the Apollo Funds' revised, nonbinding proposal in mid-December 2022 support an inference of recklessness. That proposal—rejected in January 2023—contained a significantly lower price and a less definitive financing commitment than the April 2022 proposal. AC ¶¶ 58-59, 78-79. In other words, the December 2022 proposal did not meaningfully change the disclosure landscape. Absent hindsight, Plaintiffs identify no reason why Defendants would have been reckless in failing to believe that this otherwise unremarkable overture triggered a duty to disclose

26

or abstain.[20] The absence of recklessness is even clearer once Plaintiffs' unfounded allegations about the absence of a Rule 10b5-1 plan are set aside.

The sole case Plaintiffs cite for the proposition that recklessness may be inferred—*In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571 (S.D.N.Y. 2020)—only underscores the deficiency of their allegations. *Perrigo* reiterates that recklessness requires "conduct that [wa]s highly unreasonable, representing an extreme departure from the standards of ordinary care." *Id.* at 581. There, the plaintiffs alleged that Perrigo violated GAAP, failed to disclose its potential tax liability, and later received a detailed letter from the Irish tax authority setting forth audit findings, the authority's legal position, and the precise calculation of liability. *Id.* at 576-79. Even then, the court held that the plaintiffs alleged recklessness only after the defendants received formal notice—because only at that point would it have been "reckless not to recognize the obligation to disclose." *Id.* at 588.

There is no comparable circumstance here. As discussed above, Defendants had no obligation to abstain from trading or disclose the Apollo Funds' outreach. Nor were Defendants ever notified—by a regulator or otherwise—that continuing repurchases would violate any disclosure duty. Plaintiffs also do not allege that any Defendant believed that Arconic should not continue repurchases. Once again, this becomes even clearer when Plaintiffs' misplaced allegations about the absence of a Rule 10b5-1 plan are rejected. *See supra* § I.A.2.b.

---

[20] Besides being factually inaccurate, Plaintiffs' suggestion that Arconic's decision to wall off a potentially conflicted Board member does not alter this calculus. MTD at 19. That Arconic took reasonable steps to ensure Board deliberations were free from biases says nothing about whether Arconic demonstrated "a serious commitment to consummate [a] transaction" with the Apollo Funds. *Emps.' Ret. Sys. of R.I.*, 889 F.3d at 1168.

### D.   Plaintiffs Cannot Premise Their Scheme Claim On Alleged Statements To Deutsche Bank Analysts

Plaintiffs make a last-ditch effort to salvage their scheme claim by asserting that Defendants engaged in "deceptive conduct" by allegedly telling Deutsche Bank analysts, in June 2022, that Arconic was considering entering into an additional repurchase program after completing its existing program without disclosing the Apollo Funds' offer. Opp. at 13. That theory fails for multiple independent reasons. First, the alleged statement was true and not misleading, and therefore did not constitute an actionable half-truth requiring further disclosure. *See supra* § I.A.1. Second, Defendants had no duty in June 2022 to disclose the Apollo Funds' offer, which had been rejected months earlier. *See supra* § II.B.2. Third, Plaintiffs' theory does not allege the type of deceptive conduct necessary to support scheme liability.

As courts in this District have made clear, "the creation of a false statement that is then disseminated by another who is the 'maker' is not sufficient to create scheme liability." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 248-49 (S.D.N.Y. 2022) (discussing *Lorenzo* and *Rio Tinto*). Put differently, "[w]here the only fraudulent conduct that is alleged is the making of a false statement to the investing public, a defendant in a private civil action is either liable as a maker under Rule 10b-5(b) or is not liable to investors at all." *Id.* at 248-49. Plaintiffs allege no deceptive conduct beyond the purported communication itself, which forecloses scheme liability as a matter of law.

For each of those reasons, Plaintiffs' dissemination-based scheme claim fails.

## III.   THE COMPLAINT DOES NOT PLEAD CONTROL PERSON LIABILITY

Plaintiffs do not dispute that their control person claim rises and falls with their primary Section 10(b) claim. Opp. at 27. Because the primary claim fails, the control person claim necessarily fails as well. *See In re Archegos 20A Litig.*, 156 F.4th 108, 121 (2d Cir. 2025).

28

Independently, Plaintiffs do not meaningfully respond to Defendants' arguments that the Complaint fails to plead "control" as required under Section 20(a). *See* MTD at 36. Plaintiffs assert—in conclusory fashion—that control is "readily satisfied by the Complaint's allegations … with respect to scienter." Opp. at 27. But scienter allegations do not substitute for control allegations, and Plaintiffs do not explain what actions or decisions Defendants allegedly controlled. MTD at 36; *see also In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 166 (S.D.N.Y. 2012) (plaintiffs must allege more than the defendant's "control person *status*; instead, [they] must assert that [the defendant] exercised *actual* control over the matters at issue" (citation omitted)).

Nor, to the extent Plaintiffs' Section 20(a) claim is premised on insider-trading allegations, do Plaintiffs plead facts showing that any Individual Defendant "controlled" the repurchases at issue. *See* MTD at 36 (citing *Tan v. Goldman Sachs Grp.*, 2023 WL 2753238, at *10 (S.D.N.Y. Mar. 31, 2023)). Plaintiffs' failure to allege actual control provides an independent basis for dismissal of the control person claim.

## CONCLUSION

The Court should dismiss the Amended Complaint with prejudice.

Dated: January 23, 2026                Respectfully submitted,
New York, New York

By: */s/ Francesca E. Brody*
Francesca E. Brody
Norman M. Hobbie Jr.
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
fbrody@sidley.com
nhobbie@sidley.com

Hille R. Sheppard (admitted *pro hac vice*)

Claire G. Lee (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
hsheppard@sidley.com
claire.lee@sidley.com

*Attorneys for Defendants*

30